**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
**UNITED STATES OF AMERICA,**                    :
                                                 :
   - v. -                          :          **Indictment No. 10 CR 433 (SLT)**
                                                 :
**JONATHAN BRAUN,**                              :
                                                 :
       **Defendant.**          :
--------------------------------------------------------------X


## MEMORANDUM IN SUPPORT OF DEFENDANT JONATHAN BRAUN'S MOTION FOR BAIL PENDING TRIAL


### INTRODUCTION

Jonathan Braun is presently being held without bail, charged with one count of Conspiring to Import Marijuana, one count of Conspiring to Distribute Marijuana, one count of Possession of Marijuana with Intent to Distribute, and one count of a Conspiring to Launder Money. Mr. Braun is 27 years old and has no prior felonies. Because his pretrial detention by the Government is clearly violative of his rights under the Bail Reform Act of 1984, 18 USC 3142, et seq (hereinafter the "Act"), and its controlling case law, he petitions the Court herein to compel the Government to prove in an adversarial proceeding, that his continuing incarceration is authorized and warranted by the stringent criteria of the Act, as more fully set forth below, or otherwise order his release on his personal recognizance or on terms and conditions satisfactory to the Court to assure his attendance at trial. Pretrial Services has already recommended Mr. Braun be released on bond. In pertinent part the Pretrial Report states:

> **Pretrial Services respectfully recommends that the defendant be released on a secured bond co-signed by sureties. In addition, the following conditions should be imposed.:**
> **1) travel restricted to New York City**
> **2) surrender all travel documents and do not apply for a new passport**

1

**3) random home and employment visits**
**4) report to Pretrial Services as directed**
**5) home incarceration with location monitoring except with leave permission for court appearances, attorney visits, and medical appointments**
**6) subject to an initial drug test and, if positive, subject to random drug testing and treatment**
**7) the defendant is not to be released until the confession of judgment is satisfied and location monitoring equipment is in place.** (Emphasis Supplied).

On June 3, 2010 Magistrate Viktor V. Pohorelsky denied Mr. Braun bail, however Judge Pohorelsky also found that Mr. Braun was not a danger to the community.

For the reasons discussed below, including an analysis of the governing statutory and legal authority, the Government cannot meet its formidable burden of proof. As will be demonstrated to the Court's satisfaction, Mr. Braun's personal circumstances, together with his familial and community ties firmly, establish that he is neither a danger to the community nor is he a risk of flight. Alternatively assuming *arguendo* that he is, there are conditions that could reasonably assure Mr. Braun's continuing attendance and participation in the ongoing proceedings, and adherence to bail conditions.

On May 27, 2010, an Indictment was issued in the Eastern District of New York against Mr. Braun. The underlying Indictment counts, as referenced above, allege Mr. Braun conspired to import and distribute marijuana, possessed marijuana with intent to distribute, and conspired to launder money.

As detailed infra, many defendants with more egregious circumstances have been granted bail in the Eastern and Southern Districts of New York. Moreover, even defendants in a case with alleged connections to Mr. Braun's case have received bail. All three of the defendants in a marijuana case in May 2009 in which the Government alleges has ties to Mr. Braun have received bail in the Eastern District of New York. Government Motion for Detention, p. 9; *United States v. Guariglia, et. al.*, 09 MJ 00477 (JMA). Defendant Brian Guariglia was released

2

on a $200,000 bail with three sworn sureties. **Exhibit A**. Odede Kariti bail was set at $300,000 with one sworn surety and two additional sureties. **Exhibit B**. Yotvat Kariti was released on bail with a $150,000 bond with one sworn surety and two additional sureties. **Exhibit C**. While the allegations in the Indictment against Mr. Braun, if proven, are clearly unlawful and provide for a presumption that "no condition or combination of conditions will reasonably assure the safety of any other person and the community" 18 U.S.C. §3142(e), none of the charges in the Indictment are for murder, murder conspiracy, extortion, gun possession, forced labor, or for harboring illegal aliens.

## ARGUMENT

## MR. BRAUN IS ENTITLED TO BAIL PENDING TRIAL

### I.     THE APPLICABLE LAW

Mr. Braun poses neither a danger to the community nor a risk of flight and the Court should, therefore, release him on bail so that he can participate actively in his defense. The Bail Reform Act, 18 U.S.C. § 3141, et seq, lists four factors that a court must consider to determine whether the release of a defendant would present an unreasonable danger to the community or an unacceptable risk of flight: (a) the nature and circumstances of the offense charged, (b) the weight of the evidence against the defendant, (c) the history and characteristics of the defendant, and (d) the nature and seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g).

In addition, the charges the Government has brought against Mr. Braun carry a rebuttable presumption that he poses a danger to the community. 18 U.S.C. §3141 (e). To rebut this presumption, however, Mr. Braun need only produce some evidence to the contrary while the government retains the burden to demonstrate by clear and convincing evidence that Mr. Braun

poses a danger to the community and by a preponderance of the evidence that he is a risk of flight:

> In a presumption case such as this, **a defendant bears a limited burden of production—not a burden of persuasion**—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight. Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.

> **Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence** that the defendant presents a danger to the community. The government retains the ultimate burden of persuasion by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.

*United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (internal citations omitted) (Emphasis Supplied).

As demonstrated below, there is ample evidence to rebut the presumption that Mr. Braun presents a danger to the community or a risk of flight. Thus, because the evidence as it pertains to each of the above-listed factors (taking into account the weight the Court deems appropriate for the rebutted presumption) overwhelmingly supports the conclusion that Mr. Braun is entitled to be released on bail, we respectfully request that the Court revoke the order of detention and discharge Mr. Braun.

## II.     MR. BRAUN POSES NO RISK OF FLIGHT

Mr. Braun poses no risk of flight, and accordingly the Government cannot establish by a preponderance of evidence the operative facts necessary to meet the statutory threshold for conditional bail. As evidenced by the letters of support annexed to this Pleading and excerpted *infra*, Mr. Braun has substantial, if not overwhelming, family and community ties. *See* 18 U.S.C. 3142(g)(3)(A). Mr. Braun was born, raised, and currently lives in the United States. He is a devoted and active member of his religious community. In addition, both his parents and siblings

all live in the United States. It warrants noting that as interpreted by the Second Circuit in *United States v. Friedman, supra* at 50, the mere fact that he is charged with a crime which may have a potential sentence of incarceration attached to it does not constitute a presumption of a risk of flight for the purposes of the Act. Likewise, the presumed destination of such flight would be Israel; however Israel has amended its internal statutes to allow extradition to the United States. *United States v. Samet,* 2001 U.S. App. Lexis 21468 (2d Cir. 2001).

Under Israel's "Law of Return" any Jew and members of his family who have expressed their desire to settle in Israel will be granted citizenship. The State of Israel was founded in 1948. Israel's Law of Return, enacted just two years later in 1950, affirmed the already well-established right of any Jew to become an *oleh*, or immigrant, and to secure a visa, citizenship, and to settle in Israel. *See* The Law of Return 5710 (1950), http://www.knesset.gov.il/laws/special/eng/return.htm). Because of the long history of persecution of Jews throughout the world, the Law of Return was drafted to apply to all Jews. In the words of the Law of Return, "*[e]very Jew* has the right to come to this country as an oleh." *Id*. at Section 1 (Emphasis Supplied). If this means that anyone subject to the Law of Return is an increased flight risk then "every Jew" would have to be viewed for bail purposes as a greater risk of flight than any non-Jew. That means that 5,300,000 Americans would be viewed as heightened bail risks simply because they are Jewish.[1] This logic would extend, for example, even to a Jew whose family lived in this country since the first Jews arrived on the shores of New Amsterdam in 1654.[2] It is ironic that a law designed to provide refuge to persecuted Jews has now become the basis for

---

[1] *See Haaretz.com, 12/09/07 at* http://www.haaretz.com/hasen/spages/903585.html (Israeli newspaper reporting on information collected by the Jewish Agency on the Jewish population of various countries). This is a conservative figure, because it includes only those who consider themselves Jews. Many individuals who do not consider themselves Jews would be so considered by the Law of Return. *Id.*

[2] *See, e.g.,* Arthur Hertzberg, The Jews in America at 19 (1989).

detaining a Jew who might otherwise have been released pending trial. The extradition treaty effectively nullifies any argument the Government may make with respect to the Law of Return.

An extradition treaty between the United States and Israel has been in force since December 5, 1963. It was recently amended and improved in a number of significant ways in a protocol signed on July 6, 2005, and effective January 1, 2007. *Convention on Extradition Between the Government of the United States of America and the Government of the State of Israel*, U.S.–Isr., Dec. 10, 1962, 14 U.S. T. 1707, corr. version in 18 U.S. T. 382 (effective Dec. 6, 1963) (**Exhibit D**). Both the original treaty and the current amended version provide that each country must extradite its own nationals. Article IV of the original treaty provided that "[a] requested Party shall not decline to extradite a person sought because such person is a national of the requested Party." That means, of course, that Israel has undertaken to extradite its own nationals to the United States. Pursuant to the original treaty, there were numerous extraditions by Israel to the United States. Indeed, in 2005, the Justice Department advised the Senate that from 1999 to 2005, "the United States has extradited a total of 20 fugitives from Israel, of *whom 15 were Israeli nationals (including dual United States-Israeli nationals)*" (Emphasis Supplied). Statement of Mary Ellen Marlow, Director, Office of Int'l Affairs, Criminal Div., Dept. of Justice, Senate Committee on Foreign Relations, Nov. 15, 2005, at 7 (**Exhibit E**). For example, in 2002, Michael Akva, an Israeli citizen, was extradited by Israel to the United States on securities fraud and insider trading charges.[3] In 2000, Sharon Haroush, an Israeli citizen, was extradited by Israel to the United States on fraud and theft charges.[4] Another notable case, Chaim Berger, an American citizen from New York, was indicted in 1977 in the Southern District of

---

[3] *See U.S. Sec. and Exchange Comm'n, SEC Obtains Default Judgments Ordering Two Defendants to Pay $7.6 Million For Insider Trading*, http://www.sec.gov/litigation/litreleases/lr18193.htm.
[4] *See Israel to Extradite Citizen to U.S., United Press Int'l Network*, March 30, 2000.

New York for defrauding the government of many millions of dollars.[5] He fled to Israel where he had never lived previously, and claimed citizenship under the Law of Return. He was extradited back to the United States, pled guilty and was sentenced to six years imprisonment.[6] All of these extraditions took place under the pre-amendment treaty. In its 2005 statement to the Senate, the Justice Department reviewed the state of extraditions from Israel to the United States, and found the pre-amendment approach "to be workable." **Exhibit E**, Marlow Statement at 7.[7] Indeed, in 2006, the Attorney General of the United States publicly praised Israel for its pre-amendment extradition to the United States of an Israeli who was a suspected mob boss on drug charges.[8] Nonetheless, despite the history of successful extraditions, the Administration sought and obtained Senate ratification for a protocol amending the treaty in a way that would "significantly streamline[] the process of requesting extradition." *Id*. at 6. For example, the amended treaty now

- allows the use of hearsay, *Id*.;[9]

- "streamline[s] the procedures for 'provisional arrest,'" *Id*. at 7; see Article XI;

- expands the list of extraditable offenses, providing that any crime that constitutes an offense in both countries and is punishable by imprisonment of one year or more is extraditable. Article II.

- requires that only one offense need be extraditable; as long as there is one extraditable

---

[5] *See Randal Archibald, Israeli Court Allows Return of Man Indicted in Fraud*, N.Y. Times, Aug. 7, 2001, available at http://query.nytimes.com/gst/fullpage.html?res= 9C02E1DA1E3CF934A3575BC0A9679C8B63.

[6] *See United States v. Berger*, No. 97-Cr-00410-BSJ (S.D.N.Y. May 23, 2002) (Docket 167, Filed Judgment as to Defendant Chaim Berger).

[7] At one time there had been a problem because, despite the extradition treaty, Israel enacted a 1978 law that conflicted with the treaty when it came to Israeli nationals. Id. at 6. That domestic Israeli law has, however, since been amended to yield the "workable" framework. Id. at 6-7.

[8] *See U.S. Attorney General praises Israel for fight against terror, international crime*, Associated Press, June 27, 2006, 6/27/06 APALERTCRIM 15:54:33.

[9] *See* Article X bis, section 2 (providing that the information in the extradition request "shall be admissible as evidence in extradition proceedings even though they would be considered hearsay or otherwise would not conform to evidentiary rules applicable at trial").

offense in the U.S.'s request, Israel can extradite on non-extraditable offenses as well. Article II, section 4.

Most importantly, the amended version of the treaty reiterates the principle that nationality is no defense to extradition. Article IV, section one, of the amended treaty provides: "the requested Party shall not refuse extradition solely on the basis of nationality."[10] Protocol between the Government of the State of Israel and the Government of the United States Amending the Convention on Extradition Signed at Washington, D.C., on Dec. 10, 1962, U.S.-Isr., July 6, 2005, available at http://purl.access.gpo.gov/GPO/LPS65673 (**Exhibit F**). Thus, Mr. Braun's citizenship and nationality would be no bar to extradition, even were he to become an Israeli citizen under the Law of Return.[11] Any American, whether Jewish or not, would be extraditable in the same way from Israel.

Not surprisingly, after the new protocol, extraditions from Israel have increased. For example, this past September, the United States Attorney's Office, Southern District of New York announced that Israel arrested nine Israelis in a lottery telemarketing fraud scheme. According to the government's press release, "[t]his case involves the largest number of Israeli citizens ever to be provisionally arrested by Israel in anticipation of extradition."[12] Finally, extradition defendants—if they jumped bail to travel to Israel—are typically detained by the Israelis pending extradition. For example, Michael Akva, an Israeli citizen extradited in 2002 for

---

[10] That clause is introduced with the phrase, "except as provided in the Article . . . ." But none of the exceptions apply to Mr. Braun.
[11] A limited exception applies to persons who were Israelis at the time of the offense. Such persons are still to be extradited from Israel to the United States, but only on the condition that they be returned to Israel to serve their sentences. *See* Marlow Statement at 6 -7; *see also* Israel's Extradition Law, 5714-1954, as amended, at section 1A. But that was part of the pre-existing procedure that the Justice Department found to be workable. Id. at 7. In any event, Mr. Braun, is not and has never been an Israeli citizen, and certainly was not an Israeli citizen at the time of the alleged offenses, and is thus subject to all the extradition provisions of the treaty, and if extradited to the United States, would serve his sentence here.
[12] *See* Israel-Based Defendants Indicted and Arrested in Loterry Telemarketing Fraud Targeting U.S. Citizens, http://www.usdoj.gov/usao/nys/pressreleases/September08/mayoetalarrestindictmentpr.pdf

securities fraud and insider trading, *see supra* at 14, who had jumped bail in the United States, was detained by the Israelis until extradited to the United States. [13]

In sum, there exists an extradition treaty that has always been "workable." After the recent amendments it is now better than "workable"; it is an up-to-date, streamlined treaty, regularly invoked for all serious criminal matters, including drug cases. It applies to everyone, Jews and non- Jews. It even applies to Israeli nationals. This treaty will insure that Mr. Braun— even if he were to become a citizen of Israel under the Law of Return—will be returned to the United States, tried in the United States, and if convicted, that he will serve any sentence in the United States. Were he to flee to Israel, he would be detained pending extradition. Any American, whether Jewish or non-Jewish, would be treated the same way if he or she were to flee to Israel.

Because of this effective treaty, the Law of Return does not create the opportunity for successful flight and it therefore dissipates any motive to flee. Finally, to accelerate the extradition procedure, some courts have required as a condition of bail that defendants with strong ties to Israel (including citizenship) execute irrevocable waivers of extradition. *See United States v. Simon*, 2006 U.S. Dist. LEXIS 52979 (D. Nev. July 27, 2006) (Israeli citizen released upon condition of executing extradition waiver); *United States v. Karni*, 298 F. Supp. 2d 129, 133 (D.D.C. 2004) (same); *United States v. Cohen*, No. 00-CR-00100 (S.D. Fla. May 5, 2000); *United States v. Cohen*, No. 02-MJ-02592 (S.D. Fla. May 3, 2002); *United States v. Freund*, No. 99-CR-00561 (S.D.N.Y. May 10, 1999). Mr. Braun would execute such a waiver in this case.

Mr. Braun's enduring and strong connection to the community indicate that there is no reason to believe that he will not appear before this Court when required. Under the Act, absence

---

[13] *See SEC Obtains Default Judgments Ordering Two Defendants to Pay $7.6 Million for Insider Trading, supra*, n.12 (noting that Akva received "credit for time that he served while in custody in Israel awaiting extradition").

of any genuine issue of flight risk mandates that he be released on his personal recognizance pending trial.

The Government's explanations for their categorization of Mr. Braun as a risk of flight are full of mistakes, misinterpretations, and mischaracterizations. The Government asserts that Mr. Braun has "considerable funds" based upon his choice in attorneys and his refusal to discuss his finances with Pretrial Services. Detention Letter, p. 9. Mr. Braun's choice of attorney should have no effect on the determination for bail nor provide any insight into his economic situation. Furthermore, Mr. Braun refused to discuss his financial position with Pretrial Services upon the advice of counsel.  Bail Hearing Transcript, June 3, 2010, p. 22, lines 10-16 (**Exhibit G**).

In May 2009, the DEA raided a stash house in Staten Island and recovered 600 lbs. of marijuana and $500,000.[14] The Government alleges that Mr. Braun controlled the stash house and after the raid fled to Israel then to Canada to avoid arrest. Detention Letter, p. 9. Contrary to the Government's contention that Mr. Braun "immediately" left, Detention Letter, p. 3, to Israel, Mr. Braun did not travel until July 24th as documented by his passport, hardly "shortly after." *Id.* at 9. Further, it is worth noting that Mr. Braun returned to the United States on his own; he was not extradited. If he really desired to flee any potential charges or escape current charges his best opportunity existed when he was legally in Israel and yet he voluntarily chose to return to the United States. Throughout his time away from the country, in both Israel and Canada, Mr. Braun always used his own legally issued passport and traveled under his own name. In January of this year, he also traveled to the Bahamas, again, under his own name and passport. There is no evidence that he ever traveled under any name or documentation but his own.

---

[14] As previously stated in the introduction section of this memorandum, all three defendants in this case have been released on bail.

The Government has claimed that Mr. Braun expressed to a cooperating witness his intent to flee if he was released on bail, his ability to obtain fraudulent documents, and his access to large sums of overseas money. *Id*. at 10. Mr. Braun both categorically denies making these statements and their accuracy. In response, the defense requests an opportunity to question the cooperating witness or the debriefing agent under oath to get to the truth of the alleged statements.

Moreover, the Government states that five driver's licenses were found during a search of Mr. Braun's residence and wrongfully assumed that because the DEA agents had retrieved Mr. Braun's license from his person that the others were "obviously fraudulent". *Id*. at 10-11. In addition, the Government then surmises that since Mr. Braun can obtain such "obviously fraudulent" licenses he can also obtain fake passports and other fake documents. Yet, each license was legally issued by the New York State Department of Motor Vehicles with Mr. Braun's real and accurate information, as the Government stated each was "identical" to the others. *Id*. They were all obtained after the previous one had been lost.[15] Therefore, the Government's connection between Mr. Braun's driver's licenses and his ability to obtain fraudulent documents is without merit. Mr. Braun's governmental issued licenses are irrelevant to the Government's claim that he is a risk of flight.

Assuming, *arguendo*, Mr. Braun does indeed pose a flight risk, the law, in spite of this supposition, will unfalteringly favor bail release. *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). As set forth above, even if the Government establishes, by a preponderance of the evidence, that the defendant presents a flight risk, the Government must also demonstrate, by a

---

[15] In spring of 2010, Mr. Braun was arrested on a reckless driving charge in Staten Island. He appeared in court under his own name, never a fraudulent name.

preponderance of the evidence, that no conditions could be imposed on the defendant that would reasonably assure his attendance in court. *Id*. The operative standard is "reasonable assurances" not conditions that guarantee attendance. *United States v. Tomero*, 169 F.3rd 639 (2d Cir. 2006).

Multiple defendants in the Eastern and Southern Districts of New York facing drugs charges or with extensive connections to foreign countries have received bail and found to not be a risk of flight. Many of them had ties to Israel and had traveled there on previous occasions.

In *United States v. Joseph Shereshevsky*, 08 CR 01092, on September 4, 2008, bail was granted by District Court Judge Lynch to a convicted felon charged in an alleged $250 million securities fraud action where the defendant had substantial international ties and business operations in Israel and Africa. Some of the countries in Africa had no extradition treaties with the United States. Mr. Shereshevsky's bail was a ten million dollar personal recognizance bond cosigned by ten financially responsible people, at least five of which were not related to him through blood or marriage, one million dollars in property not owned by Mr. Shereshevsky, secured by $5,000 cash from each cosigner, and home confinement with electronic monitoring.

In *United States v. Ezagui*, M-08-530 in August of 2008, Magistrate Judge Guo of the Eastern District of New York granted Mr. Ezagui bail. Even though Mr. Ezagui had been arrested at Kennedy Airport with a one-way ticket to South America, Mr. Ezagui, a citizen of Israel where his wife and children reside, was also granted bail. His bail consisted of a three million dollar bond cosigned by his brother and one additionally financially responsible surety, secured by three properties owned by his brother and his brother's shares in a corporation, and home detention with electronic monitoring. While on bail, Mr. Ezagui's son was injured during service with the Israeli army, and the Court granted him permission to visit his son in Israel. Mr.

Ezagui stayed in Israel for two weeks and returned without incident, adhering to the Court's restrictions.

In *United States v. Dina Wein Reis*, 08 MJ 02362, the defendant was charged with one count of conspiracy to commit wire fraud and six counts of wire fraud. She was granted bail by Judge Shira Scheindlin of the Southern District of New York with a ten million dollar bond secured by approximately 2.5 million dollars in property. Ms. Reis had a home in Israel, conducted business there, and visited frequently.

In *United States v. Batista*, 163 F.Supp. 2d 222 (S.D.N.Y. 2001) bail was granted to a defendant with a criminal history and family situated in Puerto Rico. Likewise, in *United States v. Perananda*, 2001 U.S. Dist. Lexis 1320 (S.D.N.Y. 2001) bail was granted to a defendant who was an avowed drug addict with family ties outside the court's jurisdiction.

In *United States v. Larry Hough*, 09 CR 1136 (WHP), Mr. Hough was charged with conspiracy to distribute and possess with intent to distribute MDMA (Ecstasy) in the Southern District of New York. The Government alleged Mr. Hough possessed 150,000 ecstasy pills. Mr. Hough was released on bail on December 2, 2009 with a $250,000 personal recognizance bond co-signed by three financially responsible people, and home detention with electronic monitoring.

In *United States v. Stephanie Shephard*, 10 MAG 1121, the defendant is charged with one count of conspiring to possess with intent to distribute 1,000 kilograms of marijuana in the Southern District of New York. On May 26, 2010, she was released upon signing a bond for $100,000, $1,000 in cash, and was provided one week to allow three financially responsible people to cosign the bond.

13

Based on the standard listed above, and the underlying policy of the Act, the Government cannot meet its burden of proof of establishing by a preponderance of the evidence that there exists no conditions or combination of conditions which will ameliorate the risk of flight, and provide the reasonable assurances of Mr. Braun's participation in these proceedings. Clearly, conditions of a personal bond, home detention with electronic monitoring and GPS, supervised travel for religious and medical purposes, pledged property, and the personal guarantees of co-sureties with moral suasion over him can provide ample assurances of Mr. Braun's appearance at trail. Please see below.

## III.    MR. BRAUN IS NOT A DANGER TO THE COMMUNITY

One of the most convincing pieces of evidence that Mr. Braun is not a danger to the community or any particular individual is the finding of Magistrate Viktor V. Pohorelsky: "I'm not convinced that there is clear and convincing evidence that he would be a danger because he would harm somebody physically. I don't buy that part of the government's argument..." Bail Hearing Transcript, p. 25, lines 12-15 (**Exhibit G**). Judge Pohorelsky's statement demonstrates that he believed that Mr. Braun had successfully rebutted the presumption and the Government had failed to meet its burden. Additionally, as mentioned previously, Pretrial Services recommended bail.

The Government, in an attempt to present evidence that Mr. Braun is a violent threat to the community, cited a story produced by an unknown cooperating witness. According to "CW1" Mr. Braun assaulted and threatened a "worker" in California after finding out that a stash house the worker was in charge of was robbed of $100,000. Detention Letter, p. 6. Thus far, the Government has not furnished any information with respect to the reliability of the witness or his/her account of this alleged incident. It is not known how CW1 came across such information

14

and there appears to be no corroboration of this story. Even the Government's own language indicates a lack of credibility of the details of this account, "...in sum and substance..." *Id.*

The Government also cites intercepted text messages between Mr. Braun and an alleged criminal associate as evidence that Mr. Braun is a danger to the community. As explained before Magistrate Pohorelsky, the text messages are actually between Mr. Braun and his ex-girlfriend. The texts are excerpts taken out of context during a lover's quarrel. The Government attempts to insert their own words and interpretations into the quoted texts and therefore alters the real meanings to suit their contentions. For example, the Government provides the following message from the ex-girlfriend: "you deserve to be locked in a cage [prison] like the animal you are," but does not explain any reason why "cage" should be interpreted to mean prison. *Id.* Their use of desired explanations in place of actual content becomes more apparent when comparing the intended meanings behind the messages. For instance, his ex-girlfriend stated, "If I lose my job because of this – you will regret it and that is a promise." The Government portrayed this threat as a reference to her threatening to go to the police, and not a threat of unlawful actions. *Id.* But in explanation of Mr. Braun's alleged statement "[I]f you interfere with my life and make me uncomfortable you will leave me no choice but to do the same back to you in a much worse way," the Government concluded that he was making an illegal threat to prevent her from cooperating, not a threat to take legal actions as was their analysis of the ex-girlfriend's threat. *Id.* at 6-7. It is illogical to conclude that these two messages should be read differently, especially when considering the Government's labeling the ex-girlfriend as a criminal associate.

Scores of defendants with far more egregious and violent charges against them such as murder, attempted murder, murder conspiracy, gun possession, extortion, kidnapping, and other

violent crimes, to name a few, have regularly received bail in the Eastern and Southern Districts of New York. In comparison, Mr. Braun's alleged Indictment is for a non-violent crime.

Despite the violent nature of the forced labor and harboring illegal aliens charges against the defendants in *Sabhnani*, the Second Circuit Court vacated the district court's order of pretrial detention and the case was remanded to permit the parties to provide assurances and finalize bail release orders to be executed by the district court. *United States v. Sabhnani*, 493 F.3d 63, 79 (2d Cir. 2007). The principles extended in *Sabhnani* by the Second Circuit are applicable here and we contend that an order setting conditions of release, including, but not necessarily limited to, a personal recognizance bond, home detention, electronic monitoring of Mr. Braun's communications, and monitored travel for religious services and/or medical appointments would significantly mitigate flight risk. The Government has not explored these constraints and therefore has not demonstrated by a preponderance of the evidence that no conditions could be imposed that would sufficiently ensure Mr. Braun's attendance at trial. Thus, the Government has failed to provide support for denying Mr. Braun's bail.

In *United States v. Onofrio Modica*, et. al., 09 Cr. 1243 (LAK), Mr. Modica, an alleged soldier in the Gambino Crime Family, is charged with, *inter alia*, racketeering conspiracy, racketeering, illegal gambling, extortion, and assault in the aid of racketeering. Mr. Modica is alleged to have committed five of the eighteen racketeering acts including murder, jury tampering, and obstruction of justice. Under indictment in this case, Mr. Modica is currently released on bail. Michael Scotto, one of Mr. Modica's co-defendants, was granted bail with a three million dollar bond. Mr. Scotto is charged with, *inter alia*, racketeering conspiracy, racketeering, extortion conspiracy, and sex trafficking of a minor.

Further examples include: *United States v. Gigante*, 85 F.3d at 84 (alleged "boss" of "Genovese organized crime family"); *United States v. Spero*, 99 Cr. 520 (E.D.N.Y.) (Korman, J.) (alleged Consigliere of Bonanno Crime Family, charged with murder and other violence); *United States v. Bellomo*, 96 Cr. 430 (S.D.N.Y.) (Kaplan, J.) (alleged Genovese Acting Underboss Mickey Generoso, charged with murder conspiracy); *United States v. Fama*, 95 Cr. 840 (S.D.N.Y.) (Owen, J.) (reputed soldier charged with heroin distribution, kidnaping and murder); *United States v. Gregory Scarpa, Jr.*, 94 Cr. 1119 (E.D.N.Y.) (Raggi, J.) (accused participant in bloody Colombo Family war); *United States v. Orena*, 93 Cr. 1366 (E.D.N.Y.) (Korman, J.) (reputed soldier and boss' son, charged with murder conspiracy and weapons possession); *United States v. Failla*, 93 Cr. 294  (E.D.N.Y.) (Sifton, J.) (multiple high-ranking members of Gambino Family accused, among other charges, of killing a government witness); *United States v. Conti*, 93 Cr. 053 (E.D.N.Y.) (Glasser, J.) (organized crime defendant charged with murder and murder conspiracy); *United States v. Russo*, 92 Cr. 529 (S.D.N.Y.) (Cedarbaum, J.) (alleged mafia captain charged with murder and other violent crimes); *United States v. Persico*, 92 Cr. 351 (E.D.N.Y.) (Sifton, J.) (alleged mafia captain charged with murder conspiracy in connection with internal Colombo war); *United States v. Rosenfeld*, 90 Cr. 755 (S.D.N.Y.) (Sweet, J.) (defendant released on bail despite charges of threatening one cooperator with a gun and killing another); cf., e.g., *United States v. Fiumara*, 02 Cr. 317 (D.N.J. 2002) (reputed head of Genovese Family's New Jersey faction, whose parole was revoked for four alleged murders).

In consideration of the aforementioned defendants' obtainment of bail, while charged with crimes ranging from murder, murder conspiracy, killing Government witnesses, narcotics distribution, to kidnapping, there rests no principled basis for withholding bail from Mr. Braun. The factors explained above and the bail package presented in Section IV sufficiently rebut the

presumption and therefore the Government has not met its burden to demonstrate Mr. Braun's dangerousness by clear and convincing evidence. The Government claims that the presumption is not a "bursting bubble" and should still be considered even after it has been rebutted. *Id.* at 4. As stated at the bail hearing, the Government fails to cite any Second Circuit authority for this proposal, and the cases cited from other circuits are approximately twenty years old.

## IV.   MR. BRAUN'S PROPOSED BAIL PACKAGE

To ensure compliance with his release conditions, including his appearance in this Court, as required, Mr. Braun proposes to post a $5,000,000 bond, secured by at least $1,000,000 in property, to be monitored electronically with GPS, and to turn over his passport and other travel documents. **Mr. Braun is now offering an additional $4,000,000 in bond, for a total of five times more than he had during his previous bail hearing and $2,000,000 more than the Government is seeking in the Indictment.**

Also, on behalf of Mr. Braun, there are 12 economically qualified individuals amongst his family and friends willing to sign a $5 million surety bond as a testament to their belief that he is not a danger to the community or a risk of flight.

In addition, Mr. Braun consents to home confinement with electronic monitoring, with permission to leave for religious observation and events, medical visits, and counsel visits. The willingness of his family, to risk the loss of their properties and life savings should Mr. Braun violate his bail conditions, cannot be deemed insignificant, and holds a high degree of moral suasion; *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991) (we see no reason why an agreement to forfeit bail should not be valid, it adds considerably to the incentive value of the forfeiture condition).

## V. ADDITIONAL CONSIDERATIONS STATUTORY, EQUITABLE AND PRACTICAL ARGUE STRONGLY FOR MR. BRAUN'S RELEASE

### A. Prolonged Pretrial Detention will Compromise Mr. Braun's Ability to Defend Himself

Bail is further imperative in that it permits Mr. Braun to adequately assist counsel in preparing his defense. We remark that the Government allegedly has a vast amount of information from intercepted communications and cooperating witnesses and in these circumstances, Mr. Braun's presence is essential in assisting counsel to decipher and accurately explain such information, if they do in fact exist. Indeed, without his aid, the ability to present an effective defense, or even make competent suppression motions, will be seriously impaired.

Moreover, since Mr. Braun has been indicted in the Eastern District of New York, and it is unlikely that his case will be tried any earlier than next year, he consequently faces an exceedingly protracted pretrial detention. These factors, proper considerations in considering the extension of bail, are squarely in favor of release. *See, e.g., Orena*, 986 F.2d at 630-31 (collecting cases); *United States v. Frisone*, 795 F.2d 1 (2d Cir. 1986); *United States v. Gallo*, 653 F.Supp. 320, 336-39 (E.D.N.Y. 1986); *Scarpa*, 815 F.Supp. at 91.

### B. Letters of Support Attest to Mr. Braun's Good Character and Strong Family and Community Ties

The Court will hear from Mr. Braun's family, friends, and community; the people who *truly* know his character and propensities. Accompanying this submission are letters of support that vividly illustrate his upstanding moral character and solid family [and] strong community ties. 18 U.S.C. 3142 (g)(3)(A). These letters depict a loving and devoted nephew and grandson, as well as, a generous, charitable neighbor and community member. The assistance, friendship, and guidance that Mr. Braun has given his family and community over the years is now

19

reciprocated by the vast array of people proffering properties and letters of support with this application.

As the letters verify, Mr. Braun, among other admirable qualities, is a loving grandson, nephew, and friend. As the following excerpts reveal, the letters accompanying this application underscore the love and respect shared between Mr. Braun and the members of his community. In sum, after years of intimate acquaintance with Mr. Braun, the community has shown their universal trust in him. More specifically:

1) Marlene Miska, a long-time friend of the Braun family, writes:

"Living in the community with Jonathan Braun for many years, I have always found him to be a very courteous and personable young man.  He and his family are always willing and available to help out for various causes and projects in our neighborhood."

2) Dina Klein, cousin of Jonathan, explains:

"I suffered many loses in my life from a brother to my grandparents and a separation from my husband the father of my three children and the love of my life for 14 years. Jonathan Braun my cousin to whom I refer to as my brother, my family has always been there for me, and my children. Jonathans love for family and his support durring my triumphing times, is just a small part of who he is. His respect and admiration for his mother and grandmother is one of the most beautiful things, one can observe. Jonathan is the brother of two sisters to whom he watched over always and cared for with the concern as though he was their parent."

3) Ben Welwart, uncle of Jonathan Braun, affirms:

"The Braun Family are pillars of the community and the thought of flight risk are just not there. The mother has been a NYC School teacher for many years and the Father a salesman at the same job for over 30 years. He is also a 30 year member of the largest volunteer ambulance group and a NY State EMT.

The entire extended Braun family stand ready to insure financially and to support any other bail conditions set by the Judge with regards to being a flight risk.

I have known Jonathan all his life and this is not the loving, caring, and considerate young man depicted in the indictment. He deserves every ounce of compassion and all rights afforded him under the law."

4) Sophie Welwart, 90 year old grandmother of Jonathan Braun, asserts:

"When my husband passed away it was a difficult time for the family Jonathan stepped up and was here for me always. He would come home spend time with me that I should not be lonely for my husband. He is kind, sincere, cheerful, loving, and one of the best young men I know. It would be catastrophic for a young man like Jonathan to be punished for things that are only hearsay. Give him back to society where he can continue to be a good citizen. I want that the remaining years god will give me that I can enjoy and love and care for my grandson."

5) Sion and Miriam Vaanunu, family friends to the Braun's for over 30 years, maintain:

"We have known the Braun family for almost 30 thirty years. Our children grew up together and went to the same schools… The family is well known in the community for charitable acts and personally has helped us through many hard times... Their children, Michelle, Jonathan and Shana, and both their entire families play a very active role in our lives and within the Jewish community."

6) Abraham & Leah Felsenburg, uncle and aunt of Jonathan Braun, offer:

"…found him to be extremely helpful and concerned about our well being. He offered to pick us up at the airport, and help us with many other errands. His kindness showed through at all times."

7) Yossi and Gitty Ziskind, cousins to Jonathan Braun, explain:

"His love and devotion for his extended family are most admirable.  He has a very warm and generous personality which naturally draws us closer to him.

Every year our entire family gets together for a holiday party.  In recent years, Jonathan began bringing along a friend who had no place to be.  He embraced him as family and we, in turn, all learned from his example and made him feel welcome as well."

8) Yehuda and Chany Gobioff, uncle and aunt to Jonathan Braun, write:

"The respect he shows his parents and grandparents are most commendable.  His sisters and brothers in law are beneficiaries of his giving and generosity and his love for them."

9) Estee Weisz, uncle of Jonathan Braun, on behalf of Mr. Braun:

"…Are they speaking of the same sweet boy I know and love Yonatan (Jonathan) is a genuinely nice kind and warm young man. He was always there for everyone. I knew I could count on him…He enjoyed being with his family and we enjoyed being with him and he would never miss an occasion. He participated in every birthday party, or a graduation, or a religious holiday meal. He especially loved his grandmother and would walk through fire to accommodate her every wish."

10) Rivkie Herskowitz, aunt to Jonathan Braun, contends:

"He lived at home with his parents and elderly grandmother at a time when most young people would prefer to fly the coop and leave behind any familial responsibilities. He joins his Dad (my brother, Yankie) weekly at Rabbi Yaakov Yagen's Torah classes at the Sephardic Center in Brooklyn. We see Jonathan often, when he joins the family in many happy occasions, weddings, (most recently my son's wedding in March), bar mitzvahs and the annual family Chanukah party. He gets along wonderfully well with his many cousins, though they are quiet a colorful group stemming from various Orthodox Jewish sects – some Hasidic, some modern orthodox, some professional, some businessmen, some Talmudic students, some blue collar workers. Our family is very close-knit (Jonathan's father is one of eight siblings) and Jonathan has always been one of the boys."

11) David and Esther Berman, cousins to Jonathan Braun, write:

"We have known Jonathan since he was born…Jonathan is an integral part of the family, always there to help [his] parents, sisters and anyone in need."

12) Debbie Perl, friend of the Braun family, explains:

"As a friend of the Braun family, I feel I must try to convey a bit about Jonathan's good nature and character. There's nothing he wouldn't do for his family or for anyone in need. Both parents are hard working people, ad Jonathan could always be counted upon to help out around the house…He is and always has been a rock that his parents can depend on when the occasion arises. He has always been steadfast when it came to helping a neighbor or coming to the aid of a family member when they needed him."

13) Esther Brezel, aunt to Jonathan Braun, affirms:

"Both his father Yankie, a volunteer EMT and his mother Amy, a first grade public school teacher are true role models that Jonathan and his two sisters emulate. It is not too often that one can observe such a respectful relationship between children, parents and grandparents."

14) Joseph and Rochel Schwartz, uncle and aunt to Jonathan Braun, assert:

"As an aunt and uncle of Jonathan Braun we would like to share with you a glimpse of his exemplary character. Jonathan has always been family oriented. He always attends family gatherings and showed love and concern to all. He has always shown his utmost respect to his parents and elderly grandparents and is always available to help them when needed."

15) Benjy Miller, brother-in-law to Jonathan Braun, writes:

"...Jon accepted me with warm and open arms into his close-knit family, making easy a transition that may otherwise have been awkward and uncomfortable...The birth of my son was even more revealing of Jon's good nature. He offered to help whenever we needed, something we took advantage of at every opportunity. He was particularly instrumental in allowing my wife to finish the hours for her masters degree in special

education, as he would watch our son, Mickey...My son's face would light up every time his uncle walked in the room, and Jon was able to sooth him no matter how upset he might be."

16) Shannon Braun, sister of Jonathan Braun, states:

"I cannot think of anyone I would trust more then him with my son...Just about a month ago I had a huge scare. I had been hospitalized due to a stroke. I am just twenty-five years old and this is very rare for someone my age. My brother got to the hospital before I even got there. There was no way he was not going to be by my side every step of the way. My brother would do anything for me, as well as any one of his friends and family. During my stay in the hospital he was either by my side or home at my parents house caring my baby who is now eleven months old so that the other members of my family could come and visit me."

17) Carrie Weiss, neighbor of Jonathan Braun for 25 years, offers:

"The words 'Dangerous' and 'Violent' (as I have read in the newspapers), are probably the last words I used to describe Jonathan Braun. He is one of the sweetest guys I know! Anyone who really knows him will tell you the same. He comes from one of the most giving families, who would do anything for anyone, and I have personally witnessed that first hand...Please don't hold him for being a violent man, because that could not be further from the truth. I do not believe that our community would fear him to come home."

18) Ari Schiffer, first cousin to Jonathan Braun, defends:

"Within a matter of years, all the children of Sophie and Mickey were nestled within walking distance from one another and walk we did. Each Sabbath afternoon was spent together. Each Sunday was spent at another event or party that would bring this family closer and closer. Regardless of the veracity of the current accusations or the insulting sensationalism of the press, one thing is certain…Jonathan has a home waiting for him, with a loving immediate and extended family that will welcome him, care for him, protect him from the awful words being spoken of him and to allow a proper legal proceeding to take its course, justly and honestly. This is a family of honesty and integrity that would never accept anything less than that. You can be certain that that same family wants only to see through this to the end with what we know will be a positive outcome."

19) Heidi Schwartz, friend to the Braun family, writes:

"Jonathan and my son have been classmates and friends since they were born and we have shared all of the normal and wonderful aspects of raising children with my friends. Jonathan has been raised with great love and support from his family and entire community of people, to encourage his growth. What I can truly say of Jonathan is his absolute capacity to use his potential to do great things. He has promise and capabilities that we can all see in him and know that are true, to do the greater good. Jonathan has so much potential, so much heartfelt, sincere goodness. I've seen his beautiful soul. We ask

23

with mercy from you and mercy from the court, to see and know the potential in Jonathan."

20) Jacob and Esther Felsenburg, cousins to Jonathan Braun, explain:

"Knowing Jonathan since his birth, definitely warrants my sorrowful plea to be heard by your honor at this so very critical time. Jonathan has always been a cousin we can depend on for a warm smile, compassionate support at times of sorrow and a truly loving and helping hand in times of need. Jonathan's respect for the elderly and needy is legendary. He was always a shining example of a true good-hearted individual just trying to make sure everyone is happy and taken care of in every way possible. I plead with your honor to please take into consideration all the benefits we enjoyed and cherished while spending time with Jonathan in the past and we so much look forward to in the future.  A bright energetic man with so much love to give should most definitely be granted leniency at this time."

21)  Gobioff, cousin to Jonathan Braun, describes:

"Jonathan…has been an integral part of our extended family for as long as I can remember. Jonathan has never shown any aggression or unfriendly behavior to any relative whether they were young or old. He has always been a welcomed participant to any family function and we hope that this will be able to continue."

22) Shirley Crespi, friend to the Braun family, defends:

"I will never forget Jonathan sitting with my sons when their grandfather passed away. His presence was compassionate as well as loving. As a parent I recognize that being together in the care of your family will help in the healing process as well as the rehabilitation of his wrong doings."

23) Deirdre Mirmelli, friend to Jonathan Braun, writes:

"My son moved to New York to attend Columbia University, and a short time later, my husband passed away, suddenly and unexpectedly, Jonathan and his family treated him as one of their own, and gave him the family life and support, that was lacking. His family is loving and kind and one of his sisters is expecting her first child. They are all devastated. I hope your honor that you are able to see Jonathan as the decent human being that he is, and find it in your heart to show some compassion to this young man."

24) Yitzy and Rifki Braun, uncle and aunt to Jonathan Braun, explain:

"Jonathan always impressed us as one who cares for others and one who is amongst the first to lend a hand in helping out with whatever situation may arise. His style of helping was without fanfare and never looking to be recognized for his good deed.  We are very fond of him & are very much looking forward to have the opportunity to be able to once again spend such family time with him soon."

25) Mr. & Mrs. Akiva Braun write on Jonathan Braun's behalf:

"The Braun family is one of the most well liked families both in Staten Island and our community. The closeness he, his siblings, and his parents share is most admirable. Jonathan is one of the finest, most caring, well mannered individuals we know. The Braun maternal grandparents have always lived with and been an integral part of both their home and their lives. Mrs. Braun's mother continues to reside with Jonathan and his family until this very day and is treated royally. Jonathan has always been available to help her, whether on errands or to doctors. Jonathan considers to help his grandmother considering it an honor and never a burden. Many a lost should, wounded heart, or a friend in distress or during difficult times were aided by Amy's homemade suppers and delicious baked goods aside from Jonathan's continuous encouragement and friendship. Many of Jonathan's friends today are happily married and settled with families of their own thanks to Jonathan's care and support during their hard times. Today we stand behind Jonathan during his trying times and appeal to you on his behalf."

26) Ari Schwartz, related by marriage to Jonathan Braun, describes:

"He has become close to my family and me and I have realized over time that he is a kind person with a genuine heart. He's part of a family with sincere and honest role models. His home is full of good influences, which will help him grow in a positive direction."

27) Chavie Herz, friend to Jonathan Braun, writes:

"I always knew that if I ever needed anything, he would be the first person I can rely on. He has been there for me during hard times and always put a smile on my face when it was much needed. Jon is a good boy with a gentle soul. He is well meaning, giving, caring and extremely compassionate."

28) Rifka Herz, friend to Jonathan Braun, writes:

"I have known John to be a sensitive, caring, family-oriented, loyal and loving young man. He has always been there to help me in my time of need and was always the first to offer me (and others, even strangers) a helping hand, no matter what the circumstance or occasion."

29) Shani Schwartz, father in law to the sister of Jonathan Braun, asserts:

"…due to the fact that Brauns are very close knit family, I have had the pleasure of spending time with Jonathan at many family functions. The respect and love that he shows for his parents and grandparents is wonderful to see, and he exhibits these feelings often and very openly. I have known Jonathan's parents for many years and am very proud to be able to say that we are now all part of a warm and very closely associated family."

30) Eli and Aidi Brezel, first cousins to Jonathan Braun, write:

"Jon was always ready to do anything for anyone, even at his own convenience. His parents, Amy and Yanky, are beloved members of our community, as a first-grade public

25

school teacher and a family show store salesman and volunteer EMT, respectively. In an extended family as close as ours, we have many opportunities to spend time with our relatives, and to observe the wonderful and loving relationship that Jonathan has with his parents, grandparents, and sisters, as well as the rest of us."

31) David Steltzer, childhood friend of Jonathan Braun, asserts:

"I am writing to you on behalf of my friend Yonaton Braun. He was my closest friend during my childhood and teenage years and we remain close and in touch today. I know he shares close relationships with all of the members of his family and with his new nephew. Yonaton's family relies on him regularly as has my own over the years – he always selflessly helped us when we were in need. We know his heart is always in the right place and we fully empathize with the pain of the family."

32) Yossi and Malky Taub, cousins to Jonathan Braun, write:

"Our cousin Jonathan Braun is an upstanding member of our large family. We are always happy to meet him attending family functions and celebrations. His gentle demeanor and respect for his elderly grandparents are a tribute to his good manners and fine upbringing."

33) Isaac and Sarah Felsenburg, cousins to Jonathan Braun, explain:

"We are deeply troubled upon hearing of the sad situation of our dear cousin Jonathan Braun. He would always go the extra mile to help others in need."

34) Aliza Widroff, Jonathan Braun's thirteen year old cousin, states:

"He's been there for me whenever I needed him. He's a really nice person and I don't think he is the type of person who would purposely hurt anyone. Please take this into consideration. I don't want to wait to see my cousin. He's like a big brother to me. I want him in my life."

35) Aviva Weisz, cousin to Jonathan Braun, says:

"Growing up I was very sick. I am a chronic asthmatic and spent my fair share of time in hospital beds due to a collapsed lung. When I was home and resting, Jonathan was always the first to be there, to keep me company and play...He was always around to cheer me up, always had the right thing to say...Jonathan always put others before him, was always the first to volunteer to help out, eager to do the right thing."

36) Nicole Arianne Mirmelli, close friend to Jonathan Braun, relates:

"Jon is a kind soul and always takes that extra step to making his friends and family feel wonderful...Jonathan took time out of every day for the first few months that my brother was there [Columbia University] to make sure that he understood the trains and subway systems. Jon personally called my brother everyday to check in on him and make sure that he was ok and didn't need anything...Jonathan didn't have to go all the way to the city from Long Island to help my brother, his roommate or fraternity brothers could have

helped him but, Jonathan wanted to. That's just simply the type of person he is. Aside from taking care of my brother through his years in NY, Jonathan's family also 'adopted' him, and opened their home to him and invited him over for Friday night dinner and all of the high holidays. That meant the world to my mother and grandmother, for they were both worried that he wouldn't have a place to go."

37) Cliff and Anna Gutmajer, friends of Jonathan Braun's family for 28 years, write:

"Jonathan, Michal and Shana have always been very respectful and have grown into responsible, family oriented adults following in the footsteps of their parents, Amy and Yankie Braun."

38) Jacob and Helene Braun, Jonathan Braun's parents, state:

"Our son Jonathan is a respectful caring individual who always puts his family first. If you would ever see my son with his elderly grandparents both on the maternal and paternal sides you would see a young man with the utmost respect and care. His grandmother would never carry a heavy bag if she calls he jumps. His maternal grandparents have lived in the same house downstairs since he was born. They nurtured him and took care of him when his parents worked. Jonathan was always a sweet boy and has grown into a sweet loving man. Seeing him with our grandson is a sight gentle, loving, and caring... Nothing is ever too much for this young man. His community his family his friends his Rabbis see him as a supportive individual.

Our son needs a chance to prove to everyone his innocence it would be most favorable to do so in his own home where we can all help him overcome his challenges. Please give us the chance to show you how wonderful our son really is. He is bright and good and if you can find it in your heart to help us through these trying days we would be humbly grateful to any kindness you may show this family."

39) Jeremy Welwart, cousin to Jonathan Braun, explains:

"Jonathan was there for me at many important mile stones in my life and was able to be called upon when his help was needed as an honest and faithful friend."

40) David and Sheryl Jacobwitz, family friends of Jonathan Braun, write:

"Jonathan grew up to be an extremely respectful, very generous, sensitive and giving young man. Like his father Jacob 'he would give you the shirt off his back when in need'"

41) Grace and Eli Rindsberg, uncle and aunt of Jonathan Braun, say:

"We have known him all of his life and have only witnessed him to be a very kind and sweet young man. He is very family oriented. He is a good son and a good grandson. He was raised by his parents and his grandparents who are fine upstanding citizens and community members. We only see his proper respect to his maternal grandmother and paternal grandparents, elderly people who cherish him."

42) Ester B. Friedman, family friend of Jonathan Braun, asserts:

"I have known Jonathan (Yonatan) for many years peripherally but came to know him and his family very well in the past few years when I became friends with his older sister, Michelle (Michal). However a friendship with one Braun is actually a friendship with the entire family. The Brauns are solid, loving and open hearted people who have instilled in all their children, specifically Jonathan, the idea of what true friendship really means. I know that I am among many friends of the family who feel this way about them."

43) Debra Steltzer, a friend of Jonathan Braun, relates:

"Although we are not related, Yonatan has always been a big brother to me. For all those years that I spent in his house he was always there for me. He loved and cared for me just as my own brother. I always felt protected around him because I knew he would always be there to help me with whatever I needed."

44) Jeffrey Steltzer, a family friend of Jonathan Braun, conveys:

"He was part of our community little league for many years of which I was in charge. He was always helpful to me in preparing equipment for the game. He was always willing to help out with anything that needed to be done. I felt fortunate that my son had a friend like Jonathan."

45) Nadine Teitelbaum, cousin to Jonathan Braun, writes:

"He is a sweet guy with a good heart who would lay down his life for the people he loves. Yonatan…is the product of a good home, with parents and siblings who love him and care a great deal about him. Jonathan deserves the compassion of the court, to be released on bail to his family, who can guarantee his well being and ease of peace of mind so that he can defend himself when the time comes. Jonathan and his family can be trusted to uphold the conditions set forth by the court should they chose to grant bail."

46) Daniel Rindsberg, first cousin to Jonathan Braun, declares:

"Please allow Jonathan to go home to his family. Jonathan is an integral part of our wonderful and caring extended family. For the past many years Jonathan and I would sit next to one another in synagogue on the High Holidays. As the services tend to take almost forever, it's always good having Jonathan as company. He's a kind, caring and gentle soul…Jonathan grew up in the same house and Grandma Sophie and Grampa – an only son, in between two sisters. Jonathan could almost be my brother. My little brother. I always wanted to be a big brother. Jonathan deserves to be at home with his parents and Grandma."

47) Todd Miller, the father of Jonathan's brother-in-law, explains:

"I know his family on a first hand basis and know how caring his parents the Braun's are. Mrs. Amy Braun cares for her 11-month old grandson (and daughter who just suffered a brain aneurism last month). Mr. Yankie Braun has been volunteering for the Jewish ambulance/rescue squad (Haltzala) for most of his adult life."

48) Michael Natenzon, friend to Jonathan Braun, writes:

"He is an individual of great character, and is very loyal to his family and friends. He is being unfairly depicted in the media by people who are all too willing to pass judgment without knowing him as a person. All I am asking is that you do not let your judgment be clouded by these stories. Jonathan is a person of great character. At 27, his whole life is still ahead of him."

49) Dr. Michelle Braun-Schwartz, sister to Jonathan Braun, defends:

"Jonathan is someone I always looked up to and he exemplifies the key elements that are needed to make someone a good and honest person. To this day he still takes excellent care of my 90 year old grandma, whether she needs a ride to the doctor, grocery, or just to hear a funny story he is there. …and now we are expecting a baby. I see how my brother is with my nephew and I want my baby to have the opportunity when it comes in September to be with his or her uncle. All I ask is this letter grant him a chance to come home to a house filled with love and strength to support him while he faces these challenges."

50) Michelle Goldzal, friend to the Braun family, describes:

"It is strong, supporting, loving, and giving families such as the Brauns that makes the community what it is today. I truly believe he would benefit greatly by being sent home to his supporting and loving family to guide and help him through it all."

51) Paul Lebowitz, friend to the Braun family for over 20 years, explains:

"Over the years Yonaton assisted in a volunteer organization that I currently direct which collects and delivers foods for the poor Jewish people in Brooklyn for the Passover holiday. He helped organize this effort among his friends and with the amount of volunteers he brought in, the delivery went by quickly and efficiently."

52) Rebecca Steltzer, friend to the Braun family for over 20 years, writes:

"In many ways John has been like a member of my family and I've always found him to be a great guy with many positive qualities. John has been involved and active in our community, and above all he has been very dedicated to his family. This situation breaks my heart, and I am sure that I join many others in hoping for some compassion for Johnathan, as well as the friends and family that love and miss him. Please let him come home to us."

53) Shaindy Silber, friend to the Braun family, writes:

"I am very close with the Braun family, I spent a lot of time in their house. Jonathan was always very sweet and friendly towards me."

54) Robin Widroff, relative to Jonathan Braun, asserts:

"John is a very warm person and family means everything to him. Over the years John has always made sure he was there for his family even to the extent he remained living at home with his parents, sisters and grandparents… John has always been there for me, whether it was keeping me company, giving me advice or just having a bad day John was the one I would call to make me feel better."

55) Shmuel and Shirley Rosenberg, friends to the Braun family, on Jonathan's behalf:

"The parents, grandparents and extended family are respected members of the Willowbrook community. We both taught him in elementary school and remember Jonathan as a well adjusted child with many friends."

56) Yosef Schwartz, brother to Jonathan Braun's brother-in-law, explains:

"I've seen how he welcomed my brother into the family as if her were one of their own. He also acted kindly toward me and made me feel comfortable and welcome."

57) Toby Steltzer, friend to the Braun family for over 27 years, declares:

"I have seen him grow up for 27 years and I can say with true knowledge and certainty that he is a very fine person who possesses good character traits. He has spent countless hours in my home over the years so I have had the chance to know the real Yonatan. His love and devotion to his family is something that one rarely sees in a person his age. During his school years he was frequently involved in many charitable activities that benefitted the community and needy people. In the past year I have witnessed Yonatan being a wonderful uncle to his new nephew Mickey. He shows the same love and caring when taking care of the baby that he has always shown throughout his life. When I needed someone to care for my younger daughter when I returned to school, Yonatan was always someone I could trust to help me out and care for her responsibly. He has so many people who love him, not just his family, but friends like me. We ask that you send him back to his family and to those of us who love him so much. It shows what a good person he is that he can inspire so much love from so many people. He has so much good to offer this world, please give him the chance to do so."

(Letter 1-57, *See* **Exhibit H**).

The Court should be aware that the above letters from Mr. Braun's family and friends reflect only part of the actual letters submitted on his behalf.

## **<u>CONCLUSION</u>**

Mr. Braun urges this Court to determine that he is not a risk of flight nor a danger to the community and Order a personal recognizance bond or grant bail to him on the conditions we propose, or any others it deems reasonable.

Dated: June 16, 2010
      Brooklyn, New York

                     Respectfully submitted,

                     By:  <u>/s/ John C. Meringolo</u>
                     **JOHN C. MERINGOLO, ESQ.** (JM3487)
                     Meringolo & Associates, P.C.
                     11 Evans Street
                     Brooklyn, New York 11201
                     Direct No. (347) 599-0992
                     *Attorneys for Defendant Jonathan Braun*