

# Department of Justice

STATEMENT

OF

MARY ELLEN WARLOW
DIRECTOR
OFFICE OF INTERNATIONAL AFFAIRS
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BEFORE THE

COMMITTEE ON FOREIGN RELATIONS
UNITED STATES SENATE

CONCERNING

LAW ENFORCEMENT TREATIES

PRESENTED ON

NOVEMBER 15, 2005

Statement of
Mary Ellen Warlow
Director
Office of International Affairs
Criminal Division
Department of Justice

Before the
Committee on Foreign Relations
United States Senate

Concerning
Law Enforcement Treaties

November 15, 2005

Mr. Chairman and members of the Committee, I am pleased to appear before you today to present the views of the Department of Justice on four law enforcement treaties, including one protocol, that have been referred to the Committee. Each of these instruments will advance the law enforcement interests of the United States. They are of particular importance as we face an increasing need for cooperation and assistance from the international community in the investigation of crimes relating to terrorism and other serious violent activity, trafficking in persons and drugs, and large-scale financial offenses.

The updated extradition treaty between the United States and the United Kingdom of Great Britain and Northern Ireland modernizes and streamlines the 1972 treaty and the 1985 supplementary treaty. The protocol to the extradition treaty between the United States and Israel amends the terms of the existing treaty. The bilateral mutual legal assistance treaties ("MLATs") with Germany and Japan are the first of their kind to be negotiated between the United States and the treaty partner.

The decision to proceed with the negotiation of law enforcement treaties such as these is made by the Departments of State and Justice, and reflects our international law enforcement priorities. The Department of Justice participated in the negotiation of these extradition and mutual legal assistance treaties, and we join the Department of State today in urging the Committee to report favorably to the Senate and recommend its advice and consent to ratification of each of the treaties. In my testimony today, I will concentrate on why these treaties are important for United States law enforcement agencies engaged in investigating and prosecuting serious offenses.

### The Extradition Treaty and Protocol

Modernizing our extradition treaties and, where appropriate, establishing new extradition relationships, remain among the top priorities of the Justice Department's international law enforcement efforts.

The extradition treaty and protocol being considered by the Committee replace and update, respectively, the existing treaties that govern our extradition relations with two of our most important law enforcement partners, the United Kingdom and Israel. Both of the new instruments contain features we regularly seek in order to establish or augment a modern, effective extradition relationship.

### The United States-United Kingdom Extradition Treaty

The new extradition treaty with the United Kingdom of Great Britain and Northern Ireland, which will replace the outdated 1972 treaty and the supplementary treaty of 1985, was signed on March 31, 2003, and is an integral part of the coordinated bilateral commitment to enhancing and modernizing the U.S.-U.K. law enforcement relationship. It includes a number of improvements to the existing instruments. For instance, it is a "dual criminality" treaty,

2

expanding the scope of extraditable offenses well beyond those specifically recognized in the existing treaty's list or in domestic U.K. extradition law and allowing the automatic extension of the proposed treaty's provisions to new forms of criminality that are made punishable as felonies in both countries in the future. It will allow requests for provisional arrest, which are used in urgent circumstances to prevent the flight of serious felons or protect society from dangerous and violent suspects, to be made directly between the Department of Justice and an authority to be designated by the United Kingdom, thus obviating the need to go through formal diplomatic channels in order to secure emergency assistance. Further, it gives clear guidance to the courts on actions not to be considered as "political offenses" for which extradition is barred and redirects decisions on "political motivation" to the Executive branch, a placement of responsibility that is consistent with all our other modern extradition treaties and longstanding United States caselaw.

Another provision in the new treaty of particular significance is that authorizing "temporary surrender." Under the current treaty, the extradition of an individual who is being prosecuted or serving a sentence in one country must be deferred until the completion of the trial and any sentence imposed. Such a deferral can have disastrous consequences for a later prosecution due to lapse of time, the absence or death of witnesses, and the failure of memory. The new provision will allow the individual being tried or punished in one country to be sent temporarily to the other for purposes of prosecution there and then returned to the first country for resumption of the original trial or sentence. The availability of "temporary surrender" has become more and more significant in recent years as international criminals, including terrorists, transgress the laws of a number of nations to plan and carry out their illegal activities. This particular provision has a very real and practical impact on our ability to successfully prosecute

3

defendants who have violated the laws of both nations. We wish to inform the Committee that our government has requested the extradition of a defendant who has been indicted in a major terrorism case here in the United States. However, that defendant currently stands charged with criminal violations in the United Kingdom as well. In this scenario, the establishment of a temporary surrender mechanism through approval of this new treaty is considered vital to ensuring that this defendant – and others similarly situated – ultimately faces trial and is brought to justice in the United States.

All of these provisions of the new treaty will clearly be of benefit to both the United States and the United Kingdom and will serve to enhance our efforts to bring fugitives to justice. One of the primary United States objectives in negotiating the new treaty was to remove the "prima facie" evidence requirement imposed by the United Kingdom in extradition cases and replace it with a less stringent standard being made available under new U.K. domestic extradition laws. As events transpired, the government of the United Kingdom undertook to designate the United States for favored treatment under the new legislation and the lower standard of proof as of January 2004, even though the United States ratification process was not yet complete. This designation has made the preparation of extradition requests far easier and, in some cases, allowed us to proceed with cases that we might earlier have declined to pursue. Unfortunately, as time has passed, the government of the United Kingdom has been the recipient of increasingly sharp criticism in the press and in Parliament over having given the United States the beneficial designation without a showing of reciprocal support for an improved extradition relationship through United States approval of the new treaty. Moreover, a number of significant defendants in pending extradition cases from the United States are starting to raise the allegation of a "flawed" designation process in the lower courts and on appeal. We therefore

hope that this hearing will lead to speedy approval of the new treaty and its entry into force in the immediate future.

We understand that some have raised questions about certain provisions of the treaty. We will be pleased to respond to any such questions. The Departments of Justice and State believe that this treaty will significantly improve our extradition relationship with the United Kingdom without undermining in any way the commitment of the United States to the protection of individual human rights and the fulfillment of our international obligations. As we have emphasized earlier, the provisions of the new treaty do no more than place our extradition relationship with the U.K. on a par with other nations with which we have modern treaties.

## The United States-Israel Extradition Protocol

The Protocol with Israel, signed on July 6, 2005, amends the 1962 Convention on Extradition ("Convention") that is currently in force and brings it up to the standards of our modern extradition practice. Like the new U.S.-U.K. Treaty, the Protocol establishes a "dual criminality" approach, carrying the obligation to extradite for all offenses that are punishable in both treaty partners' countries by imprisonment for a period of one year, or by a more severe penalty. This approach replaces the outmoded "list" regime of our current Convention, which limits extradition to those crimes enumerated in the text. Dual criminality treaties carry the advantage of reaching the broadest range of felony offense behavior, without requiring the repeated updating of the treaty as new forms of criminality emerge. This is particularly important as United States authorities investigate and prosecute crimes related to terrorism, trafficking in persons, high-tech crimes, and other recent trends. The Protocol will make such

crimes as material support of terrorism, money laundering, computer crimes and a broader range of sex offenses against children extraditable.

- Further, the Protocol significantly streamlines the process of requesting extradition by establishing that extradition documents containing hearsay will be admissible in court. Permitting the formal documents in support of extradition requests to contain hearsay evidence will alleviate the burden on United States prosecutors of preparing often voluminous packages for Israeli courts; United States courts have long accepted hearsay in extradition proceedings. The Protocol also expands the list of crimes excluded from the political offense exception to extradition to bring it into line with our modern practice. It establishes that a murder or other of the most serious violent crimes shall not constitute a political offense. Likewise, offenses as to which we are obligated to extradite or prosecute under the terms of a multilateral international agreement – such as offenses under ten U.N. anti-terrorism treaties – may not be considered political offenses for which extradition is barred.

The extradition of Israeli nationals has been problematic for the United States since Israel enacted a 1978 law that conflicted with the Convention and barred the extradition of Israeli citizens. The 1997 case of United States national Samuel Sheinbein who was charged with murder in the State of Maryland, fled to Israel and successfully avoided extradition by claiming Israeli citizenship, highlighted the issue and led to a change in Israel's extradition law. While the Israeli legislation does not entirely eliminate restrictions on the extradition of nationals, it provides a much-improved framework for dealing with fugitives who claim Israeli citizenship. First, offenders are no longer able to avoid extradition by claiming citizenship after committing an offense in the United States; limitations on extradition apply only if the defendant establishes that he was a citizen and resident of Israel at the time of the offense. Second, the limitations on

6

extradition are significantly modified: as long as we are able to assure that the defendant will be returned to Israel to serve his sentence, Israeli citizens may be extradited to stand trial. The Protocol accommodates the approach of Israel's legislation.

We have already had experience in several cases utilizing this approach, and found it to be workable. The Council of Europe Convention ("COE Convention") on the Transfer of Sentenced Persons, to which both the United States and Israel are parties, provides the framework for the transfer of Israeli citizens back to Israel to serve their sentences. Specifically, since 1999, the United States has extradited a total of 20 fugitives from Israel, of whom 15 were Israeli nationals (including dual United States-Israeli nationals). Of those 15 Israelis, following their United States trials we have transferred 5 back to Israel under the COE Convention; 6 are serving their sentences in the United States because Israel determined that they were not residents of Israel at the time of their crimes; 1 was not transferred because his United States sentence was too short to allow for processing and transfer; and 3 cases remain pending in the United States. This approach of permitting extradition of nationals on condition of their return for service of sentence is similar to that in the 1983 United States-Netherlands extradition treaty. However, the Protocol with Israel has the significant additional benefit that Israel has explicitly agreed to enforce the United States sentence, even if it exceeds the maximum penalty under Israeli law.

The Protocol incorporates a variety of procedural improvements in extradition practice. Like the new U.K. treaty, the Protocol streamlines the procedures for "provisional arrest" by permitting such emergency requests to be made directly between the respective Justice authorities, without requiring initial resort to the diplomatic channel. Another similar provision contained in the Protocol is "temporary surrender". The Protocol allows a person found

7

extraditable, but who is already in custody in the requested State on another charge, to be temporarily transferred to the requesting State for purposes of trial. As discussed previously, this provision is designed to overcome the problem of delaying extradition while a fugitive is serving a sentence abroad, during which time the case underlying the extradition request may become stale – or completely unviable – because of the unavailability of witnesses or other evidentiary difficulties.

### The Mutual Legal Assistance Treaties

The two MLATs before this Committee will expand the United States's complement of law enforcement mechanisms designed to strengthen our ability to obtain evidence and other forms of assistance from overseas in support of our criminal investigations and prosecutions. I realize the Committee has become acquainted with the significant benefits MLATs provide to the international law enforcement community since the first such treaty came into force in 1977. We now have over 50 MLATs in force. Accordingly, I will briefly review only some of those benefits in this statement.

Our practical experience with MLATs over the years has demonstrated that they are generally more efficient than other formal means of international legal assistance, specifically including letters rogatory, as MLAT requests do not require a court order and they are not routed through diplomatic channels. MLATs establish a direct channel of communication between Central Authorities – usually contained within the respective treaty partners' Departments of Justice – and they confer a binding legal obligation to provide assistance if the requirements of the treaty are met. MLATs are broad in scope, and provide for assistance at the investigatory stage, usually without the requirement of dual criminality. These treaties pierce bank secrecy and provide a mechanism for addressing legal and policy issues such as confidentiality,

8

admissibility requirements for evidence, allocation of costs, confrontation of witnesses at foreign depositions and custodial transfer of witnesses. Significantly, MLATs provide a framework for cooperating in the tracing, seizure and forfeiture of criminally-derived assets.

Despite these and other benefits, we realize that MLATs in themselves are not the solution to all aspects of law enforcement cooperation. They are similar to extradition treaties in that their success depends on our ability to implement them effectively, combining comprehensive and updated legal provisions with the competence and political will of our treaty partners. Our recognition of the importance of effective treaty implementation led to the development of a consultation clause that we include in our MLATs, to ensure that we will have regular dialogues with our treaty partners on the handling of our cases.

While the two MLATs before the Committee share certain standard features, their specific provisions vary to some extent. The transmittal packages explain these variations, which are the result of negotiations over a period of years with countries that have a different legal system from that of the United States and represent a different law enforcement priority for the United States.

I would like to highlight how each of the MLATs before the Committee reflects our international law enforcement priorities:

### The United States-Germany MLAT

The United States-Germany MLAT, signed on October 14, 2003, is the first such treaty between our countries and is the culmination of a lengthy negotiation. Upon its entry into force, the MLAT will enhance the existing mutual assistance relationship characterized by longstanding, collegial, but discretionary cooperation, and establish an obligation to provide assistance in the investigation and prosecution of offenses including terrorism, drug trafficking,

9

fraud, and other serious crimes. The treaty provides for a broad range of cooperation in criminal matters, including taking the testimony or statements of persons; providing documents, records, and articles of evidence; locating or identifying persons; serving documents; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution to the victims of crime and collection of fines; and any other form of assistance not prohibited by the laws of the State granting the assistance. Also, enforcement agencies such as the SEC that have authority to refer matters to the Department of Justice for criminal prosecution may make requests under the MLAT.

In addition, this is the first United States MLAT to include special investigative techniques among permissible types of assistance. Specifically, Article 12 establishes that the Parties may use telecommunications surveillance, undercover investigations, and controlled deliveries, in accordance with their domestic law, in execution of requests for assistance. This provision was included at Germany's request, to assert the Federal government's legal authority, vis-a-vis the States, to undertake such actions on behalf of foreign authorities.

### The United States-Japan MLAT

The United States-Japan MLAT was signed on August 5, 2003, and is the result of nearly a decade of negotiations. The treaties with Germany and Japan complete our network of MLATs with our partners in the Group of Eight (G-8). Japan's legislative body, the Diet, has ratified the treaty, which is Japan's first MLAT, and enacted the necessary domestic legislation to implement it. The treaty will enhance law enforcement cooperation between our countries in the investigation and prosecution of a wide variety of crimes, including terrorism, drug trafficking, child exploitation and obscenity, antitrust violations, fraud, crimes against the environment, and

10

others. Like other treaties in force, and the United States-Germany MLAT also presented for the Committee's consideration today, the United States-Japan MLAT obligates the Parties to assist one another in investigations, prosecutions and other proceedings in criminal matters through the taking of testimony; producing documents and other items of evidence; inviting persons to testify in the requesting state; transferring persons in custody for testimony and other purposes; assisting in proceedings relating to forfeiture and any other assistance permitted under the laws of the requested party and agreed upon by the Central Authorities. In addition, concerning certain proceedings related to criminal offenses, Article 1(3) permits assistance in connection with an administrative investigation of suspected criminal conduct (e.g., the Securities and Exchange Commission's investigation of suspected securities fraud) in appropriate circumstances.

A salient feature of the MLAT is the designation in Article 2 of two Central Authorities for Japan. The Central Authority is a key ingredient to the success of any mutual assistance relationship, as it is the entity that governs the execution of requests. For the United States, the Attorney General or a designee is the Central Authority; this duty has been delegated to the Office of International Affairs within the Department's Criminal Division. For Japan, the two designated Central Authorities are the Minister of Justice and the National Public Safety Commission, which oversees Japan's National Police Agency. A related Exchange of Notes sets forth the kinds of requests that each agency, headed by a co-equal, Cabinet-level official, will handle. During the negotiations, the Japanese delegation explained that this unusual, dual Central Authority approach will give their police the ability, in certain circumstances, to request assistance under the MLAT without going through the Ministry of Justice. They based their rationale on internal Japanese policies and the manner in which criminal cases are investigated

and prosecuted in the Japanese legal system. This approach will have no negative effect on the process of making United States requests to Japan, or on Japan's execution of our requests. In fact, it memorializes our current practice and, as the Exchange of Notes states, the United States may continue to consult directly with the Japanese Ministry of Justice concerning any United States request under the treaty. The MLAT follows a modern dual criminality approach, with the limited exception of requests involving conduct not constituting a criminal offense under the laws of the requested Party and requiring compulsory process to execute. In such cases, the requested Party may deny assistance.

## Conclusion

We appreciate the Committee's support in our efforts over the years to strengthen and enlarge the framework of treaties that assist us in combating international crime. We at the Department of Justice view extradition and mutual legal assistance treaties as particularly useful tools in this regard. In addition, as our network of international law enforcement treaties has grown in recent years, we have focused increasing efforts on implementing our existing treaties, with a view to making them as effective as possible in the investigation and prosecution of our most serious crimes, including those related to terrorism. We join our colleagues from the Department of State in urging the prompt and favorable consideration of these treaties, to enhance our ability to fight transnational crime. I will be pleased to respond to any questions the Committee may have.