```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK

----------------------------X
                            :
UNITED STATES OF AMERICA,   :
                            :   10-CR-433 (SLT)
          v.                :
                            :   June 3, 2010
JONATHAN BRAUN,             :
                            :   Brooklyn, New York
               Defendant.   :
                            :
----------------------------X


    TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
        BEFORE THE HONORABLE VIKTOR V. POHORELSKY
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        BENTON J. CAMPBELL, ESQ.
                           UNITED STATES ATTORNEY
                           BY: STEVEN L. TISCIONE, ESQ.
                           ASSISTANT U.S. ATTORNEY
                           225 Cadman Plaza East
                           Brooklyn, New York  11201


For the Defendant:         GERALD L. SHARGEL, ESQ.
                           ROSS KRAMER, ESQ.




Audio Operator:


Court Transcriber:         ARIA TRANSCRIPTIONS
                           c/o Elizabeth Barron
                           375 Salt Point Turnpike #5D
                           Poughkeepsie, NY 12603
                           (215) 767-7700



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
 1              THE CLERK: Criminal cause for detention hearing.
 2   USA v. Braun, 10-CR-433.
 3              Counsel, please note your appearances.
 4              MR. TISCIONE:  Steven Tiscione for the government.
 5              MR. SHARGEL:  Gerald Shargel and Ross Kramer for
 6   Mr. Braun.  Good afternoon, your Honor.
 7              THE COURT:  Good afternoon.
 8              I think the only matter is the question of
 9   detention; am I correct about that?
10              MR. SHARGEL:  That's correct.
11              MR. TISCIONE:  There's actually also an
12   application for an order of excludable delay.
13              THE COURT:  Oh, okay.
14              MR. SHARGEL:  Which we've executed.
15              THE COURT:  All right.  Should I take care of that
16   first?  That will be the easiest thing to take care of, I
17   think.
18              MR. TISCIONE:  Fine.
19              THE COURT:  I do have an application to exclude
20   time between today and June 17, that is time under the
21   Speedy Trial Act, and it's premised on plea negotiations, as
22   well as trial preparations, given the complexity of the
23   case.
24              Is June 17 the first appearance before Judge
25   Townes?
```

1          MR. SHARGEL:  That's the next appearance before

2   Judge Townes, your Honor.

3          MR. TISCIONE:  It is, your Honor.

4          THE COURT:  All right.  This document, the

5   application, appears to be signed by Mr. Braun, as well as

6   his counsel.

7          Did you sign the document, Mr. Braun?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Under federal law have the right to

10  have your trial in this case begin within seventy days after

11  your first appearance on the indictment, and by signing this

12  document you're agreeing that the 14 days between today and

13  June 17 will not be counted when computing that seventy-day

14  deadline.

15         Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And for the reasons proposed, the

18  entry of this order serves the ends of justice so I've

19  entered it.

20         All right.  Now, to the question of detention

21  pending trial, I did receive and have reviewed a letter

22  submitted by the government, dated May 31.  I'm presuming

23  that counsel for Mr. Braun received that as well?

24         MR. SHARGEL:  Yes, we have.

25         THE COURT:  Is there anything that the government

 1    wishes to add to the letter at this point?

 2            MR. TISCIONE:  Your Honor, at this time I think I

 3    would defer to Mr. Shargel.  Since the government has filed

 4    a lengthy detention letter, I think our position has been

 5    made clear.  Obviously, I would appreciate an opportunity to

 6    respond to anything Mr. Shargel says on the question of

 7    bail, but I believe I'll turn it over to him.

 8            THE COURT:  All right.  Mr. Shargel?

 9            MR. SHARGEL:  Your Honor, before we get to

10    conditions, I would like to address the government's

11    submission, the submission of May 31, 2010.  Because I say

12    with all respect that this submission is filled with

13    inaccuracies, mis-statements, mis-information, and I'd like

14    to tell you precisely why.

15            On the question of risk of flight, I'll address

16    the risk of flight first.  The government suggests that Mr.

17    Braun is a risk of flight because, principally, they

18    prominently displayed at the beginning of the letter at page

19    three, or here at the beginning of the letter at page three.

20    The government states that there was in May of 2009, and my

21    own investigation revealed that this was mid-May 2009, that

22    Mr. Braun fled to Israel to avoid apprehension.  And the

23    word that I think was carefully chosen is "immediately,"

24    that you'll see on page 3, that he "immediately" fled to

25    Israel to avoid apprehension.

1          That is plainly wrong because we have Mr. Braun's

2    passport here.  I've handed it up to your Honor, and you'll

3    see that he left at the end of July of 2009, which is hardly

4    "immediately," and it's hardly probative of the fact that he

5    was fleeing from apprehension or arrest.  I can submit this

6    to the Court at the present time, the passport, and it shows

7    that it was on July 24, 2009 that Mr. Braun went to Israel.

8          It's worthy of note that I am submitting to the

9    Court his passport because the letter that the government

10   submitted is replete with suggestions that Mr. Braun had

11   access to false travel documents, that he was able to travel

12   in other names.  Well, that's flatly wrong.  He went to

13   Israel and he came back from Israel with the passport, the

14   only passport that he has, issued to him with his picture,

15   his name, his lawful passport.

16         It's also true that during this period of time he

17   traveled to other countries.  That's true, to Canada, and we

18   have entries in his own name regarding the travel to Canada.

19   In January of 2010, he went to the Bahamas.  Again, we have

20   the passport which demonstrates that he traveled under his

21   own name.

22         There came a time in the spring of 2010 when he

23   was arrested in Staten Island on a driving charge, a

24   reckless driving charge.  The case was resolved in the

25   Staten Island court, and Mr. Braun retained counsel and

1  appeared in court, and he was under his own name and he

2  never used another name.

3           But the unkindest cut of all, if you will, is in

4  support of the proposition that he was using false

5  identification documents or that he had access to false

6  identification documents.  The prosecution heralds what it

7  found during the search of his house and said that there

8  were five driver's licenses, five driver's licenses, that

9  were obviously fraudulent.

10          Well, a check with motor vehicles would reveal

11 that each one of those documents was issued by the New York

12 State Department of Motor Vehicles.  Not only were they not

13 obviously fraudulent, they were not fraudulent at all.  And

14 moreover, as the government itself acknowledges in the

15 letter, they're all in his name; all, as they say,

16 identical, and do not provide any other identification, do

17 not provide identification in another name.  They were all

18 lawful, legitimate driver's licenses that were obtained

19 after driver's licenses were lost.  They lend no support to

20 the proposition that Mr. Braun was a risk of flight.

21          He went to California during this period of time

22 when they say that he was fleeing arrest and traveled, went

23 to airports, all on his own name.  All of the travels,

24 whether it be Canada, or Israel, or California, or the

25 Bahamas, were all in his own name.  And there is no

1    suggestion, there is no proof, there is no evidence that he

2    ever traveled under another name.

3           Let me go back and tell you about Mr. Braun and

4    let me put before you the nature and circumstances of this

5    individual.

6           The fact is that he has lived in the same house

7    with his parents his entire life.  He's 27 years old and

8    he's lived in the same place.  You can see from the

9    appearance -- his family is in the courtroom.  This is

10   tightknit family who is willing to support him, who is here

11   to support him, people who are here, eight or nine people,

12   who are willing to sign a bond.  And they have, again by

13   their mere presence here today, evidenced their support of

14   him.

15          But more importantly, I'm going back to his own

16   characteristics and his own history and characteristics.  He

17   has one prior arrest, a misdemeanor that resulted in an ACD,

18   a marijuana arrest when he was 19 years old, and it resulted

19   in an adjournment in contemplation of dismissal.  It was

20   dismissed, the case was dismissed and the record sealed.

21   That's his criminal history.

22          As I said a moment ago, he still lives with his

23   parents.  His mother is a New York City school teacher.

24   She's a first-grade teacher.  His father is a shoe salesman.

25   These are modest people.  They're willing to put up their

1   house.  They're willing to put up a house that they've owned

2   for over thirty years.  Their various family members,

3   including a ninety-year-old parent is in the house, and Mr.

4   Braun's sister is in the house.  There is moral suasion

5   here, ample moral suasion, not only with respect to his

6   parents, but with respect to family members who are willing

7   to sign the bond.

8          Mr. Braun is currently unemployed; that's true,

9   but he has a history, a long history, of employment.  He

10  owned his own business for seven or eight years, a cellular

11  phone store.  He worked in selling software to pharmacies in

12  New Jersey.  He also worked in another retail business

13  related to cellular phones.  So he's had a history of

14  employment.

15         So under the circumstances, the notion that he is

16  a risk of flight is nonsensical.  There is no suggestion

17  that he is a risk of flight.  There is no suggestion that he

18  used false travel documents.  There is no suggestion that he

19  had fled to avoid apprehension.  He went to Israel for a

20  period of time.  And as I said -- and I emphasize this and I

21  repeat this because the government so strongly urges this as

22  indication that he actually took flight when he didn't to

23  suggest that he had left immediately after a stash house was

24  raided in May of 2009.  I think that the same --

25         And by the way, your Honor, under 3142C(b)(1),

1   where one of the conditions -- and obviously, I'll be

2   talking about conditions in a moment -- where one of the

3   conditions suggested right in the statute is that the

4   defendant be in the custody of another person.  And in this

5   situation we have, as I said, his parents, who are willing

6   to assume that supervision as set forth in the statute.

7          So, in addition to the question of risk of flight,

8   the government claims that they've proven by clear and

9   convincing evidence that he is a danger to the community.

10  And I respectfully submit to your Honor that, once again,

11  the notion that he's a danger to the community, the

12  submission by the government is wholly, wholly, inadequate.

13         They say that he's a danger to the community

14  because he will resume or there's a likelihood that he will

15  resume his criminal activities, and they cite the

16  proposition that to be a danger to the community, it doesn't

17  have to be a physical danger.  Well, the government can make

18  that contention in any case.  And in any case where someone

19  is charged with a serious crime -- and I'm not minimizing

20  the seriousness of the crime that's alleged in this

21  indictment.  But nevertheless, the government could always

22  say that someone poses a substantial likelihood, as they say

23  here, that he'll resume his criminal activities.

24         They go on to say that according to a cooperating

25  witness CW1, that the cooperating witness has stated, quote

1  -- and I quote from their letter, "In sum and substance,"

2  that Mr. Braun threatened and assaulted a worker, and it

3  appears that the claim is that this happened in California.

4  There is nothing in this letter that suggests how CW1 knows

5  this.  There is nothing in this letter to suggest how CW1

6  came to this information, and there is no suggestion that

7  CW1 is reliable in this regard.  And the notion that this

8  was said "in sum and substance" leaves a question mark as to

9  what occurred here.  CW1 is not corroborated by any other

10  evidence whatever.

11        And then the government goes on to say at page 6

12  of the letter that a criminal associate, and text messages

13  with a criminal associate, who is his ex-girlfriend, and

14  text messages are quoted to suggest that somehow he's a

15  danger to the community because he is interfering with this

16  criminal associate.

17        This is, as I said a moment ago, an ex-girlfriend,

18  and reference is made to the ex-girlfriend later on in the

19  letter.  Reference is made to what, essentially, was the

20  equivalent of a lovers' spat.  There was an argument that he

21  was having with his girlfriend and text messages were being

22  hurled back and forth.  There is nothing to suggest by clear

23  and convincing evidence that there is a danger or Mr. Braun

24  poses a danger.

25        But as we know, the question in a case like this

1   with a presumption and in order to rebut the presumption,

2   there are conditions that we are submitting.  And here is

3   the bail package that I am submitting, your Honor.  I am

4   submitting a bail package, a million-dollar bond signed by

5   nine suretors with real property in excess of a million

6   dollars to support that bond.

7        I am suggesting that the signature of these

8   suretors presents ample moral suasion.  The people who are

9   willing to sign the bond are people who have owned their

10  homes, in some instances, for a very long period of time.

11  In some instances, they are the principal assets of these

12  people, and the moral suasion here is very strong. I am also

13  suggesting a bracelet with a GPS, which has proved to be

14  efficacious.

15       The government cites cases that are twenty or more

16  years old going back to the 1990s or even earlier where the

17  Second Circuit Court of Appeals had essentially written in a

18  negative way about home detention.  But as everyone in this

19  courtroom knows, the efficaciousness of home detention and

20  the use of home detention has become familiar in this

21  courthouse.

22       It's only two weeks ago that the Second Circuit

23  Court of Appeals in United States v. Persico remanded, as

24  your Honor may know, remanded a case where bail had been

25  denied at the district court level, and the condition

1    proposed there was remanded on another legal ground, but the

2    condition proposed there was house arrest and the Second

3    Circuit said not a negative word about house arrest.

4          The idea of house arrest and complete house

5    arrest, as I said a moment ago, has become familiar in this

6    district, as well as in the Southern District.  And

7    according to the pretrial services people, the

8    efficaciousness of house arrest is now well familiar, and

9    the efficaciousness of using a GPS particularly in Staten

10   Island, where there is no interference from tall buildings

11   -- that's sometimes argued in the Southern District of New

12   York.  The efficaciousness of house arrest with GPS has been

13   recognized and I think it's appropriate in this case.

14   Obviously, there would be a surrender of the passport.

15         But in addition to all that, the moral suasion, as

16   I said a moment ago, the moral suasion that exists with

17   respect to the number of people who are willing, responsible

18   people, who are willing to come forward and not only sign

19   the bond, but place their property is very profound I

20   respectfully submit.

21         So I think that under all of the circumstances,

22   the government has not shown by a preponderance of the

23   evidence risk of flight.  It has not shown by clear and

24   convincing evidence danger to the community.  I think that

25   under the circumstances of this case, the presumption has

1  been rebutted.  The government goes in a paragraph arguing

2  that this is not a "bursting bubble" presumption, that you

3  should still consider the fact that this is a narcotics case

4  where there is a ten-year minimum mandatory sentence as

5  charged.

6          First, you will note that the government doesn't

7  cite any Second Circuit authority for that proposition

8  whatever, and that each one of the cases they cite, each one

9  of the out-of-circuit cases that they cite, are more than

10  twenty years old.

11          So the first point that I'm making, given all of

12  these circumstances, is that the government has not met its

13  burden even with the presumption that it has under the

14  statute and that we have rebutted the presumption.  That's

15  number one.

16          But, number two, the question then is: Are there

17  conditions which will satisfy any concerns about danger or

18  risk of flight.  And I submit, particularly in light of this

19  showing, which is, I respectfully submit, inadequate, that

20  the conditions are more than ample to allay any concern

21  about risk of flight or danger to the community.

22          So I think under those circumstances -- you know,

23  Judge, it's not everyday that in a case with the charges

24  contained in this indictment that a young man comes before

25  you, 27 years old, here with his family to support him, a

1    tightknit, close family, a man who lives with his parents,

2    who is not out on his own, who has never had his own house,

3    who does not own his own car, who does not have any assets

4    overseas, who does not have any property overseas or in any

5    other jurisdiction.

6          He is a lifelong resident of New York.  His roots

7    are deeply placed in Staten Island.  They can't be more

8    deeply placed.  He was born in Brooklyn and lived in Staten

9    Island, as I said earlier, from the moment of his birth 27

10   years living in Staten Island.

11         And I think under those circumstances with those

12   roots so deeply placed in the New York community, with the

13   support of his family, with the proposition that you would

14   have more than ample collateral for a million-dollar bond,

15   with the proposition that the people are willing to come

16   forward and essentially want -- so many people are here

17   because they wanted to share.  There were people who came

18   forward and said, "I want to be part of this bond.  I want

19   to be part of this bond.  I want to be part of this process

20   because we want to show that we support our family member."

21         And I think that under those circumstances, with

22   house arrest, a GPS, a million-dollar bond, surrender of the

23   passport, that he should be released.

24         THE COURT:  All right.  Mr. Tiscione, did you have

25   anything you wanted to say in response?

1          MR. TISCIONE:  I did, your Honor.

2          First, I would draw your Honor's attention to the

3    pretrial services report.  And I think what's most notable

4    about the pretrial services report in this case is actually

5    the information that's not contained in here; specifically,

6    the fact that the defendant refused to provide any

7    information about his finances and his history of drug use.

8    Both of those are important factors that are typically

9    considered when considering how great a risk of flight

10   someone is, how likely they are to comply with conditions

11   that might be set, and if a bond is able to be set, the

12   amount of bond that's appropriate.

13          And based on the evidence that's been proffered by

14   the government in its detention letter, I submit to your

15   Honor that the defendant refused to answer those questions

16   because to answer those routine questions truthfully would

17   have revealed the enormous flight risk that the defendant

18   posed.  The few questions he did answer to pretrial services

19   officers were peppered with half truths and outright lies.

20   And I will just point to two examples of that.

21          First, he stated that he's lived his entire life

22   with his parents in Staten Island, except for a brief time

23   in which he traveled back and forth to California.  In fact,

24   the defendant lived in Florida for a time.  He spent a

25   considerable amount of time in Canada.  He lived abroad in

1   Israel and Canada while he was avoiding law enforcement

2   agents after a raid on his stash house in 2009.

3          Secondly, the defendant mentions that he owns or

4   used to own a cellular phone company.  And it is true that

5   he did own that business, and that business did, in fact,

6   sell cellular telephones, but it also served as a vehicle

7   for the defendant to launder millions of dollars in drug

8   proceeds and to provide and supply his criminal associates

9   and underlings with untraceable, undocumented, and

10  unsubscribed telephones and Blackberry devices to commit

11  their criminal acts.

12          In response to some of the conditions that Mr.

13  Shargel has proposed, I would note to your Honor first that

14  electronic monitoring will not prevent the defendant's

15  flight.  Electronic monitoring and home detention cannot the

16  defendant from fleeing.  All they can do is tell us after

17  he's already fled.

18          And as your Honor will probably already know, but

19  if not, I'm sure pretrial services can inform you of this,

20  the realistic circumstances of these electronic monitoring

21  units is that by the time anyone who is in a position to do

22  anything about it is finally notified that the defendant has

23  left, it's already too late.  He's probably already across

24  the border or somewhere overseas, and there's absolutely

25  nothing that we can do about it.

1          There has not been a single case that I know of

2     where somebody who has been on electronic monitoring that

3     has fled was prevented from fleeing because the electronic

4     monitoring bracelet was there.  It doesn't prevent them from

5     leaving the house.  It doesn't prevent them from leaving the

6     country.  All it does is notify us after they've left.

7          Second, I would note Mr. Shargel had mentioned

8     that some of the text messages that were outlined in the

9     government's detention letter were nothing but a lovers'

10    spat, and the government will acknowledge that some of those

11    text messages were with the defendant's or what appeared to

12    be the defendant's ex-girlfriend.

13         However, the government would also note that that

14    same individual was a member of the defendant's drug

15    organization who received hundreds of thousands of dollars

16    of drug proceeds on behalf of the defendant.  So it's not

17    simply a case of the defendant and a girlfriend having a

18    fight.  This is, in effect, a member of his organization who

19    was threatening to rat him out to the police.

20         And I think it is significant that the response

21    that the defendant made to this individual is that if you

22    make my life uncomfortable, I will do the same to you in a

23    much worse way.  Now, those words can be subject to

24    interpretation, but given the context that they're in, I

25    don't think there's any doubt that that is a serious risk of

1    the defendant tampering with witnesses or harming witnesses

2    or potential witnesses.

3            Now, as set forth in the government's letter,

4    there are a number of cooperating witnesses in this case,

5    who have previously had very strong and ongoing criminal

6    ties to this defendant.  There is a very real risk that if

7    the defendant is released on any conditions of bond, he will

8    attempt to tamper, obstruct, or even harm these witnesses.

9    And the fact that he's on home detention with electronic

10   monitoring is not going to stop that because the defendant

11   would not do the dirty work himself.  He would get one of

12   his underlings to do it.

13           And the fact is that this defendant was able to

14   control his entire criminal empire even though he was on the

15   run from the police and living abroad for several months.

16   And he was able to do this because this organization has

17   used elaborate electronic devices to maintain communications

18   with each other.  Typically, they used encrypted Blackberry

19   devices where the phone features of the Blackberry devices

20   are deliberately removed, so they can only be used to

21   transmit pin-to-pin messages to other Blackberries on the

22   server.

23           And the investigation has revealed that,

24   typically, members of this organization will actually

25   purchase the server itself and a number of Blackberry

1   devices connected to that server, which are only connected

2   to each other and can only be used to send pin-to-pin

3   messages to other Blackberries on that network.

4        But the reason why this is important, your Honor,

5   is because this shows that the level of sophistication that

6   is particularly high.  Now, there are many drug

7   organizations that employ sophisticated means to commit

8   their crimes, but I do think that this is -- what we're

9   seeing in this case is something entirely new and it's

10  entirely more sophisticated and more difficult for law

11  enforcement to monitor.

12       There's absolutely no way to intercept those

13  communications because the server is located overseas and

14  it's owned by the criminal conspirators.  The only way to

15  see anything from these Blackberries is to actually seize

16  them from a member of the organization, and then you can

17  look at some of the saved text messages that are on there,

18  and that's exactly what we've done in this case.  And in

19  particular, we seized two Blackberries from the defendant at

20  the time of his arrest, which contained numerous text

21  messages talking about marijuana shipments.

22       In particular, on the night of his arrest, a

23  shipment of fifty pounds of marijuana was brought down from

24  Canada to New York at the defendant's direction to an

25  individual in the New York area.  That shipment was

1    intercepted by law enforcement; it was seized.  There was

2    fifty pounds of marijuana in it and text messages discussing

3    that specific transaction were recovered on the Blackberry

4    that was found on the defendant at the time of his arrest,

5    and that's just one piece of evidence for one transaction.

6           The detention letter goes into great detail about

7    some of the other evidence in this case, and I think it's

8    particularly important to look at some of the other evidence

9    that was found at the defendant's house, which I note

10   that Mr. Shargel hasn't mentioned at all.

11          Like the fact that there was $30,000 in cash

12   wrapped in rubber bands just lying around his house.  That,

13   I submit to you is not the typical thing for someone to

14   have.  There was also extensive drug records in the house.

15   Those drug records reflect hundreds of marijuana shipments,

16   thousands and thousands of kilograms of marijuana, hundreds

17   of thousands of dollars in drug payments and money that this

18   defendant had access to and was moving into the country, out

19   of the country, from here to California, from here to

20   Florida and back.

21          The defendant has access to an extensive amount of

22   money, virtually unlimited funds.  If these records and the

23   evidence in this case is taken into account about the amount

24   of drugs that this defendant has trafficked -- and I think

25   it's also worthwhile to note that at the time of his arrest,

1    the defendant had 16 cell phones, including these two

2    encrypted Blackberry devices that I've already spoken about.

3            Again, while the fact that the defendant had 16

4    telephones doesn't in and of itself suggest that he's a

5    criminal, taken in context and with all of the other

6    evidence, it is certainly suggestive of, number one, the

7    fact that he's engaging in illegal activities; and number

8    two, that it's going to be very easy for him to get access

9    to another encrypted Blackberry or another means of

10   communication that he will be able to use from his home to

11   direct his underlings to either continue their drug business

12   or attempt to threaten, intimidate, or even harm witnesses

13   in this case.

14           And I think the only way to prevent that, the only

15   way to insure that the defendant will not tamper with

16   witnesses or continue operating his criminal enterprise is

17   to have him detained as the MDC where all of his

18   communications could be monitored and he won't have access

19   to use encrypted Blackberry devices and 16-plus prepaid cell

20   phones to direct his underlings.

21           THE COURT:  All right.

22           MR. SHARGEL:  May I respond?

23           THE COURT:  Yes.

24           MR. SHARGEL:  Well, first, I know full well that

25   both sides are permitted to submit evidence by proffer.  I

1    understand that.  But what you've heard from Mr. Tiscione

2    over the past minutes is essentially Mr. Tiscione's parade

3    of horribles of what could happen and what might happen, and

4    he pushes buttons like obstruction of justice, and if he

5    doesn't do something, he could get his underlings to do

6    something.  And the fact remains that when I challenge him

7    on danger to the community about the information supplied by

8    a cooperating witness, we hear nothing about the basis for

9    the assertions that Mr. Tiscione is making, number one.

10            Number two, Mr. Tiscione points to the pretrial

11   services report and notes that there's no financial

12   information.  That was on my advice, as I would advise any

13   client not to supply financial information where there is no

14   opportunity to fully -- that what it is should be on that

15   form.  And with respect to drug use, that was on my

16   recommendation.

17            But the point is that the very pretrial services

18   report that Mr. Tiscione points you to is a report that

19   recommends release on bond.  The Pretrial Services Agency

20   recommends release in this case.  So I think particular note

21   should be taken of that.

22            And with respect to risk of flight and the fact

23   that a bracelet doesn't address risk of flight, I would

24   respectfully suggest that the pretrial services officer

25   present in the courtroom report to your Honor about how many

1    people are on pretrial release with bracelets or home

2    detention because that is frequent in this district.  It

3    happens all the time, all the time.  It's familiar and Mr.

4    Tiscione is arguing like it were ten years ago and no one

5    was familiar with employing the electronic bracelet.

6           And the GPS is new, and the GPS is something that

7    has been embraced, as I understand it from conversations

8    with members of the Pretrial Services Agency.  It's been

9    embraced by the Pretrial Services Agency in this district.

10   They want to promote its use in this district, and it has

11   proved to be efficacious.

12          There is no suggestion by Mr. Tiscione -- he

13   references the fact that anyone who left who had been under

14   house arrest and fled hasn't been captured again.  I don't

15   know where these statistics are coming from.  Actually, I

16   heard no statistics.  I don't know how many people because I

17   think the number is close to zero.  I don't know how many

18   people have fled from home detention.

19          And I respectfully submit that this is frequently

20   used.  There are mafia RICO cases pending in this district

21   right now where people are released on conditions and the

22   condition be home confinement with a bracelet.  In the most

23   serious kinds of cases, cases even involving charges of

24   homicide, people have been released here and in the Southern

25   District in those cases under home detention.  So home

1  detention has proved efficacious.

2          The travel to Israel, now there is no more

3  reference in Mr. Tiscione's argument about false documents.

4  He was there for six weeks.  I don't think under any

5  analysis or anyone's view of the case that being in Israel

6  for six weeks, as documented by his passport, amounts to

7  living in Israel.

8          I don't believe that traveling to Florida or

9  traveling to California or traveling to the Bahamas, again,

10 under one's own name, one's own passport, is living in other

11 jurisdictions.  He has -- and I stand by that proposition --

12 he has, in fact, been living with his parents for 27 years.

13         Mr. Tiscione said, well 16 cell phones.  By the

14 way, he was in the cell phone business.  But 16 cell phones

15 in his house doesn't mean he's a criminal.

16         Judge, with all respect, this detention hearing is

17 not to determine whether this defendant, whether my client

18 Mr. Braun, is a criminal.  It's to determine whether he's

19 entitled to pretrial release on conditions.  That's what the

20 detention hearing is about.  And I think under all of these

21 circumstances, we have shown and we have met our burden of

22 rebutting the presumption.

23         THE COURT:  The government has convinced me that

24 no combination of conditions can secure Mr. Braun's

25 presence.  The government has pointed to what I believe is

1  substantial evidence of Mr. Braun's involvement in this

2  conspiracy, which involves really huge amounts of marijuana,

3  which means that there are huge amounts of money that he has

4  access to.  Five hundred thousand dollars was seized in one

5  seizure alone.

6          The scale of this enterprise convinces me that

7  there are substantial funds that Mr. Braun is likely to have

8  access to, all of which could be used, of course, to pay any

9  losses that may be suffered by those who are prepared to put

10  up their homes and more importantly to facilitate any travel

11  and any effort to hide his whereabouts.

12          So I'm not convinced that there is clear and

13  convincing evidence that he would be a danger because he

14  would harm somebody physically.  I don't buy that part of

15  the government's argument, but the government has persuaded

16  me that there is substantial evidence of Mr. Braun's

17  involvement in a high level, very sophisticated operation

18  involving millions and millions of dollars of drugs, which

19  makes him a risk of flight that cannot be overcome.

20          So that's the ruling.  Detention is ordered.

21          MR. SHARGEL:  Will we have something from the

22  Court in writing that I could use to press an appeal to the

23  district court?

24          THE COURT:  I'm going to enter an order, which

25  will refer to the record.

1          MR. SHARGEL:  Very well.

2          THE COURT:  Certainly, the Court is relying on the

3    assertions made by the government with respect to the

4    evidence of Mr. Braun's involvement in this conspiracy and

5    the amounts of money that this conspiracy has generated.

6    The government has also persuaded me that it has substantial

7    evidence of intercepted conversations and intercepted other

8    kinds of communications that substantiate Mr. Braun's

9    involvement in this conspiracy.

10          There's no question about his travel, that he has

11   traveled.  That means he has access to people in places in

12   foreign countries where he could find a "sucker," if that's

13   the right word.  So those are all considerations.  The

14   government has persuaded me under its submission and with

15   the further statements made today, so I'm relying on all of

16   it.

17                    * * * * * * * * *

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18     I certify that the foregoing is a correct transcript

19   from the electronic sound recording of the proceedings in

20   the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                         June 4, 2010