UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X

 UNITED STATES OF AMERICA

        - against -

 JONATHAN BRAUN,                       Cr. No. <u> 10-433 (SLT)</u>

                  Defendant.
- - - - - - - - - - - - - - - - - X


**GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION
FOR RECONSIDERATION OF THE ENTRY OF A
PERMANENT ORDER OF DETENTION PENDING TRIAL**


                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201


Steven L. Tiscione
SreeVamshi Reddy
Assistant U.S. Attorneys
     (Of Counsel)

**PRELIMINARY STATEMENT**

Defendant Jonathan Braun appeals from an order by United States Magistrate Judge Viktor V. Pohorelsky on June 3, 2010, granting the government's motion for pre-trial detention under 18 U.S.C. §§ 3141 et seq.

Based on the significant jail time the defendant faces, his access to substantial amounts of untraceable cash, his frequent international travel, his expressed intent to flee the country if released on bond and the fact that he previously fled from the United States, the defendant poses a risk of flight that cannot be mitigated by any condition or combination of conditions.

In addition, as leader of an international drug trafficking organization, the defendant employed threats and the actual use of violence to collect his drug debts and to deter fellow co-conspirators from cooperating with the government. Accordingly, he should also be detained as a danger to the community.

**STATEMENT OF FACTS**

I.   Procedural History

In May 2010, a grand jury in the Eastern District of New York returned a four-count indictment charging the defendant Jonathan Braun with: (i) conspiracy to import in excess of 1,000 kilograms of marijuana; (ii) conspiracy to distribute in excess

1

of 1,000 kilograms of marijuana; (iii) distribution and possession with intent to distribute in excess of 100 kilograms of marijuana; and (iv) conspiracy to launder the proceeds of narcotics trafficking.

Braun was arrested at his parents' home in Staten Island on May 26, 2010. He was arraigned on the indictment the following day, and a detention hearing was scheduled before Magistrate Judge Viktor V. Pohorelsky on June 3, 2010. During the detention hearing before Judge Pohorelsky, the defendant proposed a bail package consisting of a $1 million appearance bond secured by at least one property, the signatures of nine sureties, home detention with electronic monitoring and the use of Global Positioning Device ("GPS"). Judge Pohorelsky rejected the defendant's proposed conditions of release and held that "no combination of conditions can secure Mr. Braun's presence." (T. 24).[1] Accordingly, Judge Pohorelsky entered a permanent order of detention, which is the subject of the instant motion for reconsideration.

II.   Background of the Investigation and Charges

The government proffers the following facts in support of its motion for a permanent order of detention. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000)

---

[1] Citations to (T. __) refer to the transcript of the detention hearing before Judge Pohorelsky on June 3, 2010 (attached as Exhibit G to Def. Mot.).

(government entitled to proceed by proffer in detention
hearings); <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir.
1995) (same).

Since approximately November 2007, the DEA Task Force
has been investigating several international organizations
involved with the large-scale trafficking of hydroponic marijuana
from Canada into the United States.  The investigation, which has
included the use of court-authorized wire interceptions,
information obtained from reliable sources of information,
physical surveillance and multiple seizures of narcotics and
narcotics proceeds, has revealed that the defendant Jonathan
Braun is the leader of a drug trafficking organization that has
smuggled more than one hundred **tons** of marijuana into the United
States, mostly through the Akwesasne Native American reservation
along the U.S.-Canadian border.

Specifically, the investigation has revealed that Braun
and his organization obtain massive quantities of marijuana from
sources of supply in Canada and utilize a multitude of
sophisticated trafficking methods to smuggle the narcotics into
the United States.  Among other methods, Braun and his
organization employ a multitude of drivers and boatmen to smuggle
the narcotics onto the Akwesasne Native American Reservation,
which straddles the United States and Canada.  The organization
then uses vehicles with hidden compartments to transport the

marijuana from the Reservation to stash houses in Queens and Staten Island, New York, from which the marijuana is then distributed throughout the metropolitan New York area (and numerous other major metropolitan areas in the United States) by street-level distributors.

During the course of the investigation, law enforcement officers identified multiple vehicles used by the organization to pick up, transport and distribute narcotics and narcotics proceeds. Officers conducted traffic stops of several vehicles used by the organization and executed search warrants on numerous stash houses in which Braun stored narcotics and narcotics proceeds, resulting in the seizure of more than one thousand pounds of marijuana and in excess of $1 million in United States currency believed to be narcotics proceeds.

The investigation has further revealed that Jonathan Braun has personally orchestrated the importation of at least 100,000 kilograms of high-grade Canadian hydroponic marijuana in just the last three years alone. During that time period, Braun has coordinated weekly shipments of marijuana from Canada into the Eastern District of New York, distributed the marijuana to other co-conspirators in the New York metropolitan area and elsewhere, and transported tens of millions of dollars in drug proceeds back to his sources of supply in Canada. To facilitate the transportation and distribution of narcotics and narcotics

proceeds, Braun employed the services of numerous co-conspirators who used boats, private airplanes and other vehicles with hidden compartments to smuggle the drugs across the border, transport the marijuana to customers in the Eastern District of New York and launder the drug proceeds back across the border to Canada.

Braun also maintains close ties to several international organized crime groups.  Physical and electronic surveillance throughout the investigation revealed that Braun was personally negotiating with high-level members of the three most powerful organized crime groups in Canada.  According to Canadian law enforcement officials, these three organizations control virtually the entire drug trade in Montreal: they coordinate the pricing of all narcotics flowing into or out of Montreal; carve out drug distribution territories and smuggling routes; and are collectively responsible for importing millions of kilograms of marijuana into the United States, as well as engaging in firearms trafficking, cocaine smuggling and a host of violent crimes.

In May 2009, DEA agents raided a stash house in Staten Island controlled by Braun.  A search of the house resulted in the seizure of more than 600 pounds of hydroponic marijuana and approximately $500,000 in United States currency.  According to several reliable cooperating witnesses, corroborated by travel records and numerous intercepted communications, Braun fled to Canada and Israel after his stash house was raided.  Braun

5

remained in hiding abroad for months before returning to the United States.  While abroad, Braun continued to direct the operations of his drug organization by using encrypted blackberry devices to communicate with his underlings and drug customers.

Upon his return to the United States following this self-imposed exile, Braun continued to direct the importation of massive quantities of illegal narcotics and the laundering of millions of dollars in drug proceeds.  At its height, within the last year, Braun's organization raked in more than six million dollars **per week**.

On the day of his arrest, Braun was intercepted coordinating no less than three separate marijuana shipments. DEA agents were able to interdict one of these shipments once it arrived in New York, resulting in the seizure of approximately 50 pounds of hydroponic marijuana.  A search warrant executed the same night on a Staten Island residence owned by Braun's parents revealed $77,000 in U.S. currency wrapped in rubber bands,[2] narcotics packaging materials, over 16 cellular telephones and blackberry devices (at least two of which had been used by Braun to send text messages regarding drug shipments and payments that were intercepted by law enforcement) and drug records documenting

---

[2] In its initial detention memo filed shortly after the defendant's arrest, the government conservatively estimated that the amount of U.S. currency seized in Braun's residence was approximately $30,000.  A final count of the currency by Brinks Security revealed that the actual amount was $77,000.00.

6

Braun's participation in large-quantity shipments of hydroponic marijuana for several years.

III. <u>The Initial Bail Hearing</u>

On June 3, 2010, Magistrate Judge Pohorelsky conducted a detention hearing to determine whether the defendant could be released on bail conditions that would assure his appearance and the safety of the community and other persons.  Judge Pohorelsky carefully considered a written submission from the government and a report prepared by pretrial services, and listened to extensive oral argument from both sides.  At the conclusion of the hearing, Judge Pohorelsky ordered the defendant detained and made the following findings:

> The government has convinced me that no combination of conditions can secure Mr. Braun's presence.  The government has pointed to what I believe is substantial evidence of Mr. Braun's involvement in this conspiracy, which involves really huge amounts of marijuana, which means that there are huge amounts of money that he has access to.  Five hundred thousand dollars was seized in one seizure alone.
> The scale of this enterprise convinces me that there are substantial funds that Mr. Braun is likely to have access to, all of which could be used, of course, to pay any losses that may be suffered by those who are prepared to put up their homes and more importantly to facilitate any travel and any effort to hide his whereabouts.
> So I'm not convinced that there is clear and convincing evidence that he would be a danger because he would harm somebody physically.  I don't buy that part of the government's argument, but the government has persuaded me that there is substantial evidence of Mr. Braun's involvement in a high level, very sophisticated operation involving millions and millions of dollars of

7

> drugs, which makes him a risk of flight that
> cannot be overcome.

(T. at 24-25).

## ARGUMENT

I.  <u>Legal Standard</u>

A district court's review of a magistrate judge's detention or release determination is *de novo*, <u>see</u> <u>United States v. Leon</u>, 766 F.2d 77, 80 (2d Cir. 1985), but the Court should "carefully consider[]" the findings made during a detention hearing before the magistrate.  <u>See</u> <u>United States v. Agnello</u>, 101 F. Supp.2d 108, 110 (E.D.N.Y. 2000).

Under the Bail Reform Act, 18 U.S.C. §§ 3141 <u>et seq.</u>, federal courts must order a defendant's pre-trial detention upon determining that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  A finding of dangerousness must be supported by clear and convincing evidence.  <u>See</u> <u>United States v. Gotti</u>, 219 F.Supp.2d 296 (E.D.N.Y. 2002); <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir. 1995); <u>United States v. Rodriquez</u>, 950 F.2d 85, 88 (2d Cir. 1991); <u>United States v. Chimurenga</u>, 760 F.2d 400, 405 (2d Cir. 1985).  In contrast, a finding of risk of flight need only be supported by a preponderance of the evidence.  <u>See</u> <u>United States v. Sabhani</u>, 493 F.3d 63, 75 (2d Cir. 2007); <u>Chimurenga</u>, 760 F.2d at 405.

8

In a case in which the defendant is charged with one of the crimes enumerated in Section 3142(f)(1), "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." Title 18, United States Code, Section 3142(e)(3). To properly rebut this presumption, the defendant needs to show that "the specific nature of the crimes charged or ... something about their individual circumstances" establishes the defendant is not a danger or likely to flee. <u>United States v. Dominguez</u>, 783 F.2d 702, 707 (7th Cir. 1986).

Moreover, any attempt by the defendant to defeat the presumption does not eliminate the presumption entirely. <u>See</u>, <u>e.g.</u>, <u>United States v. Hare</u>, 873 F.2d 796, 798 (5th Cir. 1989) ("presumption is not a mere 'bursting bubble' that totally disappears from the judge's consideration after the defendant comes forward with evidence").

On appeal, defendant argues that "the Government fails to cite any Second Circuit authority for [the] proposal" that the presumption "should still be considered even after it has been rebutted." Def. Mem. at 18. Yet the defendant's own memorandum cites with approval on one page the very same legal authority he denies the existence of on another page. <u>See</u> Def. Mem. at 4 (quoting <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir.

9

2001) (holding that "Once a defendant has met his burden of production relating to [the factors of his danger to the community and risk of flight], <u>the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court</u>.") (emphasis added)).

The Bail Reform Act enumerates several additional factors that the judicial officer shall take into account in determining whether there are conditions of release that will reasonably assure the appearance of the defendant or the safety of the community: (1) the nature and circumstances of the crimes charged; (2) the evidence of the defendant's guilt; (3) the history and characteristics of the defendant, including, *inter alia*, financial resources, community ties, history relating to drug or alcohol abuse and criminal history; and (4) the nature and seriousness of the danger posed by the defendant's release. <u>See</u> 18 U.S.C. § 3142(g).

The defendant is charged with three counts of narcotics trafficking, one of the crimes enumerated in Section 3142(f)(1); thus, there is a presumption that he should be detained as both a risk of flight and a danger to the community.  For the reasons discussed below, Braun is unable to rebut that presumption and should be detained regardless of any proposed conditions of release.

II.  All of the Relevant Factors Support the Determination that
     no Condition or Combination of Conditions Can Assure the
     <u>Defendant's Presence and the Safety of the Community</u>

     A.   <u>Nature and Circumstances of the Crimes Charged</u>

          Jonathan Braun is charged with being the leader of an
international drug trafficking organization and is personally
responsible for importing in excess of 110 tons of illegal
narcotics into the United States.  Thus, while "none of the
charges in the Indictment are for murder, murder conspiracy,
extortion, gun possession, forced labor, or for harboring illegal
aliens," Def. Mem. at 3, the seriousness of the charges in this
case can hardly be equated to the white-collar fraud offenses
that permeate most of the cases relied on by defense counsel in
support of his contention that the defendant "poses no risk of
flight."  Id. at 4.

          Indeed, it is axiomatic that in evaluating risk of
flight, it is appropriate to consider the potential sentence that
the defendant is facing.  <u>See</u>, <u>e.g.</u>, <u>United States v. Dodge</u>, 846
F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe
sentence" heightens the risk of flight).

          Based on the immense quantity of drugs involved in the
offense, the defendant's leadership role in a vast international
conspiracy, and his laundering of tens of millions of dollars in
drug proceeds, the defendant faces an offense level <u>exceeding</u> the
highest level recognized in the United States Sentencing

11

Guidelines.  <u>See</u> U.S.S.G. §§ 2D1.1(c)(1), 2S1.1(a)(1), 2S1.1(b)(2)(B) and 3B1.1(a).  Thus, even assuming the defendant falls within criminal history category I, he faces a likely advisory Guidelines range recommending **life** in prison.  At the bare minimum, Braun faces a mandatory 10-year sentence if convicted of any of the charged narcotics offenses.  Given the massive penalties he faces, the defendant has a powerful and undeniable motive to flee.

    B.   <u>Evidence of the Defendant's Guilt</u>

       The evidence against Braun is overwhelming.  Braun and his co-conspirators have been intercepted on both wiretaps and consensually monitored recordings discussing the importation and distribution of marijuana and the payment of millions of dollars in drug proceeds.  Braun has been captured on surveillance on numerous occasions engaging in narcotics-related activities.  Indeed, on the night of his arrest alone, DEA agents intercepted a myriad of wire and electronic communications in which Braun directed three separate importations of marijuana, seized 50 pounds of marijuana from one of these shipments, and found two encrypted blackberry devices in the defendant's possession which contained text messages discussing these same narcotics shipments.

       Moreover, DEA agents executed a search warrant on the residence in Staten Island where Braun was arrested and found,

12

among other things, $77,000 in U.S. currency wrapped in rubber bands, narcotics packaging materials, over 16 cellular telephones and blackberry devices (at least two of which had been used by Braun to send text messages regarding drug shipments and payments that were intercepted by law enforcement) and drug records documenting Braun's participation in large-quantity shipments of hydroponic marijuana for several years.  In particular, the drug ledgers found in Braun's residence reference hundreds of separate marijuana shipments totaling tens of thousands of kilograms.  The records also documented Braun's access to and movement of substantial amounts of cash.  For example, a single entry in the ledger (which contains dozens of similar entries) reflected Braun's payment of over $450,000 in transportation costs for marijuana shipments over a specified period of time.

In addition, numerous former members of Braun's criminal enterprise have agreed to cooperate with the government and provided detailed information regarding the scope and magnitude of Braun's narcotics trafficking activities.  Each of these cooperating witnesses has proven to be reliable and their information has been substantially corroborated by independent evidence.  Each of these witnesses worked for Jonathan Braun and at Braun's direction, these witnesses collectively imported, distributed, purchased, sold and/or transported thousands of kilograms of marijuana and laundered tens of millions of dollars

13

in drug proceeds.

      C.   <u>History and Characteristics of the Defendant</u>

         Beginning at the initial bail hearing and continuing in the motion papers filed in support of his motion for reconsideration, the defendant has consistently portrayed himself as a mere "27-year old" "young man" who has "lived in the same house with his parents his entire life," "still lives with his parents," "who is not out on his own, who has never had his own house, who does not own his own car, who does not have any assets overseas, who does not have any property overseas or in any other jurisdiction;" and a man with "upstanding moral character and solid family [and] strong community ties" whose family "are pillars of the community."
(T. at 7, 13-14; Def. Mem. at 19, 20).  The evidence paints a far different picture.

         The evidence reveals that this "27-year old young man" who has "lived in the same house with his parents his entire life," has criminal connections reaching into the darkest corners of the Montreal underworld.  Physical and electronic surveillance, intercepted wire communications and text messages, drug ledgers and information provided by multiple independent witnesses establish that Braun personally negotiated and conspired with high-level members of **all three** of the powerful organized crime groups that control the flow of illegal narcotics

into, from and through Montreal.  Canadian law enforcement sources estimate that these three groups alone are responsible for importing millions of kilograms of hydroponic marijuana into the United States.

The evidence reveals that this defendant who "still lives with his parents" and "who is not out on his own," runs a vast criminal enterprise stretching across the continental United States and abroad.  Braun's narcotics activities spanned all five boroughs of New York City and Long Island, Massachusetts, Florida, California and multiple locations in Canada.  In just the one-month period prior to his arrest, intercepted communications, law enforcement surveillance and travel records established that Braun traveled to Miami, California and Las Vegas to direct the operations of his drug business, negotiate with sources of supply, coordinate the international shipment of narcotics and meet with individuals who were assisting Braun launder his illicit proceeds.

The evidence reveals that this defendant "who is currently unemployed," "who does not own his own car" or have any "assets" or "property," in fact, has multiple luxury automobiles (including, among others, a BMW convertible and a Bentley) and lavish jewelry (including a rose-gold Rolex President II watch worth approximately $40,000).  Moreover, the defendant and his underlings have used boats, vehicles with sophisticated hydraulic

traps and even private jets to smuggle their drugs and drug money.

In short, the evidence belies the defendant's suggestion that he is of "upstanding moral character" and a "pillar of the community."

      1.  Braun's Access to Considerable Financial Resources

The Bail Reform Act specifically lists the defendant's "financial resources" as a factor to consider when determining flight risk.  18 U.S.C. § 3142(g)(3)(A).  This is with good reason.  As a number of courts have recognized, access to "considerable means" and "foreign connections" make it possible for a defendant "to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences."  United States v. Botero, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985).

The defendant imported strains of high-grade hydroponic marijuana that are among the most potent and desirable in the world.  Years of genetic manipulation and refinement of cultivation methods have resulted in a dramatic increase in the level of delta-9-tetrahydrocannabinol ("THC") - the active controlled substance in marijuana that produces its characteristic psychoactive effects.  For comparisons purposes, studies performed by the Drug Enforcement Administration and the National Institute on Drug Abuse Cannabis Potency Monitoring

Project (administered by the University of Mississippi)
established that the average THC content of marijuana grown in
the 1970's was approximately 2 to 3%.  The same levels of THC are
also seen in "ditchweed" - a term the DEA uses to refer to wild,
scattered marijuana plants with no evidence of planting,
fertilizing, tending or cultivation.  In contrast, the University
of Mississippi reports that samples of hydroponic marijuana from
Canada, the exact same marijuana trafficked by the defendant,
have THC levels that are consistently **over 30%.**

        If called to do so, an expert witness from the Drug
Enforcement Administration would testify that high-grade
hydroponic marijuana manufactured in Canada, of the same type and
quality imported by the defendant, can retail for upwards of
$8,000 per pound when sold on the street in the United States.
Accordingly, the 100,000 kilograms of marijuana the defendant
imported and distributed in just the last three years alone has a
conservative retail value of approximately **$1.72 billion dollars.**
It is neither an exaggeration nor hyperbole to state that the
defendant and his criminal enterprise generated illegal proceeds
exceeding the Gross Domestic Product of a small country.[3]

_____

        [3]  In fact, according to the most recent statistics
published by the World Bank and the International Monetary Fund,
more than thirty countries worldwide have a total GDP of less
than $1.72 billion dollars.  <u>See</u> "The World Bank: World
Development Indicators Database: Gross Domestic Product," July 1,
2009; "International Monetary Fund, World Economic Outlook
Database: Nominal GDP list of countries," April 2010.

Just the marijuana seized during this investigation
alone (which represents only a fraction of the narcotics Braun
imported and distributed) has an estimated value of more than
eight million dollars.

Multiple cooperating witnesses, intercepted wire
communications, text messages retrieved from encrypted
blackberries in the defendant's possession at the time of his
arrest and drug ledgers found in his parents' home in Staten
Island conclusively establish that Braun personally handled tens
of millions of dollars in drug proceeds.  Several cooperating
witnesses have personally observed or assisted Braun in
collecting, counting, vacuum-sealing and transporting millions of
dollars of United States currency.  Indeed, according to several
independent sources, including an individual who worked directly
under Braun for several years, the defendant's organization, at
its height, was taking in more than $6 million dollars, in cash,
every week.  Just one stash house alone held more than half a
million dollars in cash that was seized by the DEA.

The defendant has made no effort to rebut this
evidence.  Braun refused to provide any information to Pretrial
Services regarding his finances.  Defendant's thirty-one page
memorandum does not contain a single reference to any legitimate
employment by the defendant in the last three years, and provides

no explanation for why $77,000 in cash, bound in rubber bands, was found in the defendant's residence together with narcotics packaging materials and drug ledgers.

Most disturbingly, the majority of this considerable wealth remains unaccounted for.  Despite compelling evidence to the contrary, Braun continues to maintain that he has no assets or financial resources of any kind. (T. 13-14).

Considering this evidence, Judge Pohorelsky appropriately reasoned that Braun poses a flight risk that cannot be mitigated by any conditions of release: "The scale of this enterprise convinces me that there are substantial funds that Mr. Braun is likely to have access to, all of which could be used, of course, to pay any losses that may be suffered by those who are prepared to put up their homes and more importantly to facilitate any travel and any effort to hide his whereabouts." (T. 25).

2.   Braun's Substantial Foreign Ties, Previous
Flight and Expressed Intent to Flee if Released

In evaluating a defendant's potential risk of flight, the Court must consider any overseas connections the defendant may have which would facilitate flight.  See, e.g. United States v. Stroh, 2000 WL 1832956 (D. Conn. Nov. 3, 2000) (finding pre-trial detention warranted for a money launderer because, like in narcotics offenses, the "individuals involved often have substantial ties outside the United States").

In May 2009, DEA agents raided a stash house in Staten

19

Island controlled by Braun.  A search of the house resulted in the seizure of more than 600 pounds of hydroponic marijuana and $500,000 in United States currency, and resulted in the arrests of several members of Braun's drug organization.[4]  According to several reliable cooperating witnesses, Braun fled from the United States immediately after the stash house was raided because he believed law enforcement agents would soon connect him to the drugs and money if they had not done so already.

Braun himself described his flight to a number of independent witnesses, each of whom provided detailed information to DEA agents, which has been substantially corroborated by travel records and intercepted communications.

Specifically, Braun, who was living in Florida at the time, was immediately notified about the seizure by a criminal co-conspirator who observed federal agents arrive at the house to execute the search warrant.  Shortly after being alerted to the seizure, Braun and several co-conspirators rented a car and drove directly to the Canadian border – a drive of more than 25 hours. Once he arrived at the border, Braun was smuggled across the St. Lawrence River into Canada by one of his criminal co-

---

[4] In his motion papers, the defendant makes a point of repeating, on several different occasions, that three of the individuals arrested in connection with this seizure were released on bail, but conveniently neglects the fact that all three defendants worked *under* Braun, at *Braun's* direction and were caught in possession of drugs and money owned by *Braun*.

conspirators.  As described by Braun, his associate owned houses
on both sides of the river (i.e. one on the U.S. side and one on
the Canadian side).  In the dead of night, dressed entirely in
black and utilizing a motorless boat, Braun was ferried across
the river into Canada, and remained there for several months,
hiding out in one of the properties owned by his Canadian
associate.  Braun subsequently traveled to Israel in July 2009
and continued to remain abroad before finally returning to the
United States in the Fall of 2009.

         At the initial bail hearing the defendant argued that
"there is no suggestion that he . . . fled to avoid
apprehension"; rather, he simply "went to Israel for a time." (T.
8).  The identical argument is parroted in the defendant's
current motion papers, without any explanation as to what Braun
was allegedly doing when he "went to Israel for a time." (Def.
Mem. at 10).  In fact, the government has proffered extensive
evidence of the defendant's flight, including information
provided by multiple, completely independent and reliable
witnesses.  Moreover, the defendant's own intercepted
conversations corroborate these witnesses.  Braun was intercepted
on court-authorized wiretaps discussing his flight on multiple
occasions.  For instance, in conversations with his ex-
girlfriend, Braun was intercepted discussing leaving the country
for several months.  In response, Braun's girlfriend stated that

21

she "waited months" for Braun "when u were fleeing the country" and "on the run."  In subsequent intercepted text messages, Braun's girlfriend again stated that Braun was "doing illegal sh*t" and "fleeing countries" – clear evidence that Braun's international travel to Canada and Israel were not undertaken for leisure, a religious pilgrimage or some other innocuous purpose. They are exactly what they appear to be: attempts to flee the United States and hide abroad until he could reasonably assure himself that the "heat" was off and he could safely return.

In addition to this particular instance of international flight to avoid arrest, Braun has made numerous international trips within the last few years, and has strong ties to several foreign countries, including Israel and Canada. ICE records document that Braun has made frequent international trips and Braun admits, as he must, that he took flights to Israel, Canada, the Bahamas and California (among other destinations) within the last year.  Nowhere in the record is there any explanation as to how an individual who is "currently unemployed" (T. at 8), "does not own his own car," has no "assets" or "property" (Id. at 14), and whose only documented employment history is a cellular telephone business he sold three years ago could possibly afford this parade of domestic and international travel.

Perhaps even more troubling than his previous flight to

avoid prosecution, Braun has specifically expressed an intent to flee if released on bail.  In the context of discussing what he would do if he were ever arrested, Braun specifically told a cooperating government witness that he would "never do time in jail."  Braun went on to explain that "for 10 grand I could get a fake passport" and be "on a beach somewhere where there is no extradition," still "making money" by typing on his "computer" [a code word Braun used to refer to his encrypted blackberry devices].[5]

In response, defense counsel contends that he must "question the cooperating witness" to "get to the truth of the alleged statements." (Def. Mem. at 11).  This is not a trial; nor even an evidentiary hearing.  It most certainly is not an appropriate forum for defense counsel to fish for information about the government's case or the identity of its cooperating witnesses.  The government is entitled to rely on its proffer of evidence and has no intention of revealing the identity of any of its cooperating witnesses at this time, particularly in light of the serious safety concerns posed by the defendant's demonstrated acts of violence and witness tampering discussed below.

For purposes of evaluating the weight such evidence

---

[5] As discussed in the government's initial detention memo, the defendant was able to direct the operations of his criminal enterprise even while he remained in hiding abroad through the use of encrypted blackberry devices to communicate to his underlings and drug customers.

should be given at this stage of the criminal proceedings, the government proffers the following additional facts.  This cooperating witness was a criminal associate working directly under Braun for several years, was intimately involved in the drug business controlled by Braun and had personal contact with Braun on a regular basis.  The information provided by this witness has proven to be reliable in the past, has been substantially corroborated by, among other evidence, intercepted wire and electronic communications, and has directly led to multiple seizures of drugs and drug money.

Braun spends a considerable portion of his motion papers regaling the court with a history of the "Law of Return" and the various permutations of the extradition treaty between the United States and Israel. (Def. Mem. at 5-9).  This entire argument completely misses the point of the government's basis for requesting detention.  With Braun's access to virtually unlimited financial resources, ties to some of the most influential (and wealthy) organized crime groups in Canada and expressed intention to flee to "somewhere where there is no extradition," the fact that Israel (only one of the foreign countries in which Braun has strong ties), has extradited a relative handful of criminal defendants to the United States is of no consequence.  Extradition treaties presume the ability to locate and apprehend the defendant.  Braun's far-reaching

24

criminal associations and access to substantial and untraceable funds grant him the ability to essentially disappear and live a very comfortable life anywhere he chooses.

Given Braun's expressed intent to flee, his prior act of fleeing the United States, his access to vast sums of drug proceeds, his strong ties to multiple foreign jurisdictions and the lengthy incarceration Braun faces if convicted, the government respectfully submits that no condition or combination of conditions will be sufficient to guarantee his appearance in court.

C.   <u>Nature and Seriousness of the Danger Posed by Release</u>

Braun is charged in multiple conspiracies in connection with his importation and distribution of marijuana.  The evidence reveals that he has been a high-level leader in an international drug organization for several years and is directly responsible for the importation and distribution of at least one hundred thousand kilograms of marijuana.  This fact alone makes Braun a presumptive danger to the community.

Moreover, as a leader in the organization, the defendant persevered in his drug importation activities despite seizures of some of his drug shipments by law enforcement and prosecutions of co-conspirators.  Indeed, Braun continued to control and direct the organization despite being on the run in a foreign country and hiding from law enforcement for nearly a

year. Therefore, there is little reason to conclude that the defendant's drug importation schemes will cease as a result of the defendant's arrest and there is a substantial likelihood that, if released, Braun will resume his illegal activities.

In addition, Braun has used threats and actual violence to collect drug debts and prevent his criminal underlings from cooperating with law enforcement. As just one example of Braun's pattern of violent and threatening acts, the government proffered evidence in its initial detention memo regarding an incident in which Braun violently beat one of his workers who lost $100,000 worth of Braun's marijuana.

In response to this evidence, defendant now argues that "the Government has not furnished any information with respect to the reliability of the witness or his/her account of this alleged incident. It is not known how CW1 came across such information and there appears to be no corroboration of this story." (Def. Mem. at 14-15). The defendant goes on to contend that "[e]ven the Government's own language indicates a lack of credibility of the details of this account, '. . . in sum and substance . . .'" (Id. at 15).

This incident was described to DEA agents by <u>multiple</u> independent witnesses, all of whom worked directly for Jonathan Braun, all of whom heard about the beating from Braun's own description of the event, and each of whom has provided

26

information that has proven to be reliable and has been corroborated by other evidence.

According to these witnesses, Braun found out that one of his stash houses in California had been robbed. Against Braun's explicit instructions, the worker Braun had assigned to guard the stash house brought another individual to the location who subsequently robbed it and stole more than $100,000 worth of Braun's marijuana. When Braun was apprised of the situation, he contacted the "kid" who was watching the stash house and demanded that the "kid" pay Braun for the loss. After the "kid" told Braun that he wasn't going to pay $100,000 to replace the product he had lost, Braun immediately booked a flight to California for himself and a criminal associate that served as Braun's "enforcer" in the drug organization. Braun and his enforcer arrived at the stash house early the next morning, surreptitiously gained entry and found the "kid" sleeping in his bed. Braun then took off his belt and proceeded to viciously whip his worker with the belt. At one point, the "kid" tried to get away from Braun, but Braun's enforcer pushed him back down onto the bed so that Braun could continue the beating. In Braun's own words, his brutal assault left the "kid's" entire body "black and blue."

After administering this violent whipping, Braun ordered the "kid" to pay him the money he "owed." Braun stated

that he didn't care how the "kid" got the money and directed the
worker to get it from his "mother . . . grandmother . . .
whoever."  Braun further threatened the "kid" by stating: "Tell
your parents I'll send someone to go pick up the money."  Braun
did, in fact, send one of his workers to collect money from the
worker's relative, including a crippled family member.  Braun
also personally went to the kid's parents' house to collect the
remainder of the $100,000.  As a result of Braun's threats and
actual acts of violence, the debt was eventually repaid to Braun
in full.

       Braun's use of violence is further demonstrated by
intercepted text messages in which he threatened a criminal
associate after the associate indicated that she was going to
inform law enforcement about Braun's criminal activities.  Among
other things, the associate sent the following messages to Braun:
"you will get what the f*ck is coming to you";  "you deserve to
be locked in a cage like the animal you are"; "[you'll] get what
u deserve"; "[your] family will b so proud of [their] son"; "your
money is not going to be worth d*ck"; and "[you'll] see what
happens to bad people."  In addition, the associate and Braun
exchanged numerous text messages in which they discussed Braun
coming to the associate's place of business, "breaching security"
and attempting to assault the associate in front of her "boss."
The associate also indicated that she was going to get a

"restraining order" against Braun based on the assault and stated: "If I lose my job because of this – you will regret it and that is a promise."  Subsequent text messages and telephone conversations made it clear that the associate's threat to Braun about getting what he deserves and regretting his assault at the associate's job was a reference to the associate going to the police to inform them of Braun's criminal activities.

In response to the associate's threats to go to the police, Braun replied: "I came [to your job] so you realize that I'm not playing . . . games."  Braun further stated "[I]f you interfere with my life and make me uncomfortable you will leave me no choice but to do the same back to you in a much worse way." Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that Braun was threatening violence against the criminal associate to prevent her from cooperating with law enforcement.

Defendant characterizes this extensive text message exchange as nothing more than "excerpts taken out of context during a lover's quarrel." (Def. Mem. at 15).  But nowhere in his lengthy memorandum does the defendant attempt to supply this allegedly missing "context" to what, on their face, appear to be overt and ominous threats.  In particular, Braun's statement that "[i]f you interfere with my life and make me uncomfortable you will leave me no choice but to do the same back to you <u>in a much</u>

29

worse way" (emphasis added), is subject to no other reasonable interpretation.  Defense counsel's supposition that Braun, the leader of a massive international drug trafficking organization, was referring to "a threat to take legal actions" (Def. Mem. at 15), is patently absurd.

Defendant goes on to cite a myriad of cases involving mafia members accused of violent crimes who nonetheless were released on bail, contending that "[i]n consideration of the aforementioned defendants' obtainment of bail . . . there rests no principled basis for withholding bail from Mr. Braun." (Id. at 16 - 17).  With nothing more than a cursory description of the relevant charges, no mention whatsoever about the actual bail conditions imposed in these cases and no meaningful analysis of the individual circumstances of each particular defendant (such as their age, infirmity, the weight of the evidence against them to name just a few of the relevant factors), these citations carry little, if any, weight.

In any event, the legislative history of the Bail Reform Act indicates that danger to the community is not limited to violent crimes, but to any crimes that would harm the community.  See Senate Report at 3195-96 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about

safety be given a broader construction than merely danger of harm involving physical violence.") (emphasis added). Thus, a finding of dangerousness does not require a showing that the defendant personally engaged in violence. See, e.g., United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993); United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985).

The Second Circuit has addressed the issue of pre-trial detention in assuring the safety of the community against a defendant who has engaged in obstruction of justice in the form of attempting to tamper with witnesses. In United States v. LaFontaine, 210 F.3d 125, 2000 WL 373949, *8-9 (2d Cir. Apr. 12, 2000), the district court revoked the defendant's bail based on evidence that LaFontaine had sought to influence witnesses while released on bond. The defendant appealed, arguing that in the context of a non-violent, white-collar case, elaborate release conditions, including home detention, electronic monitoring, phone tap and relocation to a different state would assure the safety of the community. Id. at *8. The Second Circuit upheld the lower court's revocation of bail. The Court ruled that "we have held that a record of violence or dangerousness [in the sense of violence or threats aimed against witnesses] is not necessary to support pre-trial detention." Id. (citing Ferranti, 66 F.3d at 543 and United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991)). The Court noted that in United States v.

31

<u>Gotti</u>, 794 F.2d 773, 779 & n.9 (2d Cir. 1991), the Second Circuit held that a "single incident of witness tampering constituted a 'threat to the integrity of the trial process, rather than more generally a danger to the community,' and was sufficient to revoke bail." <u>LaFontaine</u>, 2000 WL 373949, at *9 (quoting <u>Gotti</u>, 794 F.2d at 779 n.5).  The court further observed that, as in <u>Gotti</u>, "pre-trial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness." <u>LaFontaine</u>, 2000 WL 373949, at *9; <u>see also</u> <u>United States v.</u> <u>Agnello</u>, 101 F. Supp. 2d 108 (E.D.N.Y. 2000) (reversing magistrate judge and ordering detention based, in part, on evidence that the defendant attempted to obstruct justice in a prior case).

As in <u>Gotti</u> and <u>LaFontaine</u>, Braun's attempt to influence witnesses is a direct "threat to the integrity of the trial process" and alone justifies his detention.  <u>LaFontaine</u>, 2000 WL 373949, at *9 (quoting <u>Gotti</u>, 794 F.2d at 779 n.5); <u>see also</u> <u>United States v. Poulsen</u>, 521 F. Supp.2d 699, 703 (S.D. Ohio 2007) (reasoning that <u>LaFontaine</u> stands for the proposition that "the very act of witness tampering may satisfy the 'dangerousness' requirement for detaining a defendant pretrial, due to the threat such conduct poses to the integrity of the

trial process."); <u>United States v. Rowe</u>, 2003 WL 21196846 (S.D.N.Y. 2003) (holding that, under <u>LaFontaine</u>, "[w]itness intimidation is a type of activity that supports a finding of danger to the community").

The risk that Braun will attempt to influence or harm witnesses is particularly high in this case.  The government has numerous cooperating witnesses against Braun, all of whom have expressed serious concerns as to their safety in light of Braun's violent tendencies and threats to harm anyone who "crosses" him.  Indeed, at least one cooperating witness has already been threatened with physical violence by a member of Braun's drug organization.  Moreover, the government has identified numerous co-conspirators and associates of Braun who could potentially become witnesses.  Since not all of these potential witnesses have yet been located and interviewed, protecting them from undue influence or threats of violence is especially important.

In sum, Braun's demonstrated use and threatened use of violence against co-conspirators and potential witnesses, coupled with the general presumption of dangerousness concomitant with his status as the leader of a large drug trafficking organization establishes by clear and convincing evidence that Braun is a danger to the community and should be detained.

III. <u>Defendant's Proposed Bail Package is Deficient</u>

Defendant contends that the government "has not demonstrated by a preponderance of the evidence that no conditions could be imposed that would sufficiently ensure Mr. Braun's attendance at trial" because the government "has not explored" all possible "constraints" including "a personal recognizance bond, home detention, electronic monitoring of Mr. Braun's communications, and monitored travel for religious services and/or medical appointments." (Def. Mem. at 16). Since the government had no prior notice that defendant was proffering any of these "constraints" until the moment that the conditions were first proposed by Braun's counsel *during* the detention hearing, the government did not have any meaningful opportunity to "explore" these conditions in its initial written submission to the Court. As the transcript of the detention hearing will attest, however, the government addressed the inadequacy of each of these conditions, at length, during the detention hearing before Judge Pohorelsky.

The only proposed conditions of release that require any independent discussion are the use of home detention with electronic monitoring, and the amount and security of the proposed bond. For the reasons set forth below, neither of these proposed conditions will reasonably mitigate the defendant's risk of flight or danger to the community.

34

A.  Home Detention is Insufficient to Prevent the
Defendant's Flight or Attempts to Influence Witnesses

Defendant proposes that the Court release him under
conditions of home detention including "electronic monitoring of
Mr. Braun's communications" "monitored travel for religious
services and/or medical appointments" (Def. Mem. at 16) and some
type of elaborate "GPS bracelet" that would somehow track his
movements (T. at 11 - 12), but offers absolutely no suggestions
as to how such elaborate conditions can logistically be
accomplished.

As previously discussed in its initial detention memo,
and explained at length during the detention hearing before Judge
Pohorelsky, the defendant and his organization have utilized
incredibly sophisticated methods to conduct their criminal
activities including the use of encrypted blackberry devices that
are impossible to intercept with the current technology available
to the DEA and other federal law enforcement agencies.  Indeed,
only a single laboratory in the world can even break the
encryption on such devices in order to let law enforcement
officers conduct judicially-authorized searches of the devices
after they are seized.  Not surprisingly, that laboratory is
located in Canada, near the headquarters of the corporation which
designs and manufactures blackberry devices (Research in Motion,
Ltd.).  Under the circumstances, there is no reasonable way to
electronically monitor the defendant's communications to ensure

35

that he is not continuing to manage the operations of his criminal organization or directing underlings to intimidate or tamper with witnesses.

Similarly, short of having twenty-four hour security by the U.S. Marshals Service, it is unclear how the government is supposed to supervise and monitor the defendant's travel for "religious services and/or medical appointments."

Finally, defense counsel insists that the defendant could be fitted with some type of "GPS bracelet" that would track his movements, but cites to no case in this district in which such a condition was imposed, makes no representation that Pretrial Services in this district has access to such a device or in any way explains how such a device, if it is even available for use in this district, differs from the traditional type of electronic monitoring bracelet used by Pretrial Services. Specifically, such devices will simply send a signal to a computer in the Pretrial Services office when the defendant has gone beyond the range of the monitoring unit connected to a telephone line in his/her residence.  The monitoring unit and bracelet do not provide "GPS" coordinates of the defendant's location and do nothing to prevent the defendant from leaving – they merely alert Pretrial Services after the defendant has already left.  In practice, by the time anyone who is in a position to do anything about it is finally alerted, it will

already be too late to stop a defendant who is determined to flee. For every case to which the defendant may cite demonstrating that home detention "has proved to be efficacious" (T. at 11.), the government can point to other cases in which defendants have successfully fled despite the "constraints" of home detention and electronic monitoring.[6]

The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. See United States v. Cinquemani, 100 F.3d 941 (2d Cir. 1996) (home detention and electronic surveillance can be circumvented); accord United States v. Marra, 165 F. Supp.2d 478, 486 (W.D.N.Y.2001); United States v. Agnello, 101 F. Supp.2d 108, 116 (E.D.N.Y. 2000); United States v. LaFontaine, 210 F.3d 125, 135 (2d Cir. 2000); see also United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir.

---

[6] As just one example, within weeks of posting a $1 million dollar bail and being released on home confinement with electronic monitoring, defendant Darli Velazquez-Armas, a suspected Cuban drug cartel member, skipped bail and fled on a private plane to the Dominican Republic. Authorities were alerted that he was potentially fleeing because his EM bracelet sent a "no response" signal to the monitoring station, indicating that the defendant had gone beyond the range of the transmitter. Nevertheless, despite the "warning" of the defendant's flight purportedly provided by the electronic monitoring, he successfully managed to leave the country and reach relative safely outside the jurisdiction of U.S. law enforcement. See United States v. Velazquez-Armas, Docket No. 07-20081-CR-ASG (S.D.Fl.), aff'd 335 Fed. Appx. 912 (11th Cir. 2009).

1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

In two other cases, the Second Circuit *reversed* release orders that imposed elaborate conditions similar to those proposed by the defendant here, precisely because those conditions failed to eliminate the risk of flight and danger to the community and were considered inferior to detention in achieving the goals of the Bail Reform Act. See United States v. Millan, 4 F.3d 1038, 1048-49 (2d Cir. 1993); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993).

Quoting from an earlier decision by Judge Glasser in which he rejected a proposal for a defendant's house arrest with elaborate conditions, the Orena Court observed that "home detention and electronic monitoring at best 'elaborately replicate a detention facility without the confidence of security such a facility instills.'" Orena, 986 F.2d at 632 (quoting United States v. Gotti, 776 F. Supp. 666, 672 (E.D.N.Y. 1991)).

Similarly, the elaborate conditions proposed by the defendant in this case, even if logistically feasible, merely replicate a detention facility without the confidence of security such a facility instills.

38

B.   <u>The Proposed Bond Amount is Woefully Inadequate</u>

          It is the government's position that no condition or combination of conditions, no matter how restrictive, are sufficient to permit the defendant's pretrial release in this case.  But even assuming that such conditions could be fashioned, the proposed bail package does not come close to mitigating the defendant's overwhelming risk of flight.  The defendant proposes a bail package of $5 million.  That is less money than passed through the defendant's organization in a single week.  It is a minuscule fraction of the $1.72 billion dollars in criminal proceeds generated by Braun and his enterprise over the last three years alone.  Moreover, the defendant intends to secure only a fifth of this already inadequate bond amount with property or other tangible assets.  As Judge Pohorelsky aptly noted, Braun's enormous accumulated drug proceeds "could be used, of course, to pay any losses that may be suffered by those who are prepared to put up their homes" or sign the bond as suretors. (T. at 25).  The paucity of the defendant's proposed bond compared to the criminal proceeds he generated would make such payments nothing more than another "cost of doing business" for running his international drug empire.

39

## CONCLUSION

For all of the reasons set forth above, and in the government's original detention memo filed on May 31, 2010, the Court should deny defendant Jonathan Braun's motion for reconsideration in its entirety and affirm the detention order issued by Magistrate Judge Pohorelsky.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: _____
Steven L. Tiscione
SreeVamshi Reddy
Assistant U.S. Attorneys
(718)254-6317/6276

40