**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**-------------------------------------------------------X**

**UNITED STATES OF AMERICA**

        **-v.-**                                **10 CR 433 (KAM)**

**JONATHAN BRAUN,**

                      ***Defendant.***

**-------------------------------------------------------X**


**MEMORANDUM IN SUPPORT OF**
**28 U.S.C. § 2255 MOTION TO VACATE SENTENCE**


                                        **MARC FERNICH, ESQ**.
                                        810 Seventh Ave.
                                        Suite 620
                                        New York, NY 10019
                                        (212) 446-2346
                                        maf@fernichlaw.com

                                        *Counsel for Jonathan Braun*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

**UNITED STATES OF AMERICA**

         -v.-                       **10 CR 433 (KAM)**

**JONATHAN BRAUN,**

                      ***Defendant.***
--------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF
## <u>28 U.S.C. § 2255 MOTION TO VACATE SENTENCE</u>

### <u>STATEMENT</u>

Jonathan Braun moves to vacate his 10-year sentence under 28 U.S.C. § 2255 based on ineffective assistance of counsel. The Second Circuit has stayed Braun's sentencing appeal pending this motion's filing and disposition.[1]

Pleading guilty to marijuana importation and money laundering conspiracies – and timely accepting full responsibility for his role in those crimes – Braun ███████ ████ █ ███████████ █████████ ████ ████

---

[1] *See* Ex. A.

████████████████████████████████████████████████

████████████████████████████████████████.[2]

In imposing the 10-year sentence – unusually heavy for a ████████████████████ – this Court relied significantly on a pair of anonymous letters, docketed under seal in Aug. 2018 and April 2019,[3] accusing Braun of grave personal and professional misconduct while released on bail awaiting sentencing.[4]

But as the accompanying sworn statements attest, defense counsel – and thus Braun himself – were unaware of the anonymous letters prior to the May 28, 2019 sentencing hearing. And upon their revelation at the hearing, counsel failed to request the letters' production, object to their consideration or seek a continuance to investigate and confront their central allegations of misconduct. Had counsel taken the latter steps, documentary evidence shows, those allegations – which the Court found

---

[2] *See* Ex. B.

[3] ECF Nos. 146, 154-55.

[4] *See* Sent. Tr. (Ex. C) 11-15, 33.

"very concerning" and "very serious"[5] – would've been readily discredited instead of going entirely unrebutted.

Counsel's deficient performance thus fueled a sentence based on materially false information, violating Braun's Fifth and Sixth amendment rights to due process and effective assistance of counsel. This Court therefore must vacate the 10-year sentence previously imposed and sentence Braun anew.

## **RELEVANT BACKGROUND**

### **Braun's** ███████████████████

By the time of Braun's oft-adjourned sentencing in May 2019, his case had been pending almost nine years to the day – largely because of his ██████████████████████████████████. As the

███████████████████████████████████████

██████████████████████████████

████████████████████████████
████████████████████████████
██ ████ █████ ████ █████ ██ ████
████ █████ ████ ███ █████ ██ ███
████████████████████████████
████████████████████████████
██████ ██████ █████ ███████

---

[5] *Ibid.* 11, 33; *see also* Court Closure Tr. (Ex. D) 5 ("anonymous letters from detractors … raise very serious concerns").



.[6]

## The Court's Reliance on Anonymous Allegations

In a preliminary proceeding directly before the sentencing hearing, the Court announced that it had received "anonymous letters" from people "who have issues with Mr. Braun, who have felt that he mistreated them or has treated them harshly or has done things that some of these letter writers claim are illegal in terms of threatening

---

[6] Ex. B at 3.

behavior."[7] These "anonymous letters from detractors," the Court added ominously, "raise[d] very serious concerns" about Braun's "activities in the community since he was released on bail."[8]

Early in the sentencing hearing, the Court explained that it found two of the letters' anonymous allegations especially troubling. "[V]ery concerning," the Court said, was a "lawsuit by an individual who alleges that just this past summer, at an engagement party, Mr. Braun intentionally shoved him off a two-story balcony and he sustained very serious injury."[9] If "those allegations were true," the Court asked rhetorically, wouldn't "pushing someone off a balcony" amount to "additional" uncharged "criminal conduct"?[10] "It's an allegation," the Court acknowledged, "but it's an allegation that resulted in a lawsuit."[11]

Another pressing "concern[,]" the Court indicated, was a second suit claiming that Braun had threatened a rabbi with physical and

---

[7] Ex. D 4-5.

[8] *Ibid.* 5.

[9] Ex. C 11.

[10] *Ibid.* 12.

[11] *Ibid.*

reputational harm – by "community" exposure and "embarrass[ment]" as a lying thief – over a delinquent business debt.[12]

## Counsel Mishandle the Anonymous Letters

The Court's receipt of anonymous letters against Braun came as an avowed surprise to defense counsel and their client. Though docketed under seal in Aug. 2018 and April 2019, the letters' existence eluded Braun's lead counsel of record prior to sentencing, chiefly because copies had been forwarded to an email address he doesn't normally use.[13]

Unaware of the letters' existence, lead counsel never disclosed it to Braun or reviewed them with him. Nor did counsel discuss with Braun the letters' contents or a potential response. As a result, Braun was similarly unaware, prior to sentencing, of any anonymous letters filed against him with the Court.[14]

Braun's May 28, 2019 sentencing was to take place while lead counsel was honeymooning abroad. But despite the case's nine-year history and a string of prior sentencing postponements, lead counsel did

---

[12] *Ibid.* 12-14.

[13] Meringolo Dec. ¶¶ 4-5.

[14] *Ibid.* ¶ 6; Braun Aff. ¶ 3.

6

not seek to delay the hearing again to accommodate his unavailability. Instead, expecting the sentencing to be routine and uneventful given Braun's ████████████████████████████████ lead counsel tasked a young associate attorney to cover it in his absence.[15]

Though the junior associate had participated only peripherally in Braun's case – with little knowledge of its facts and circumstances – lead counsel, himself unaware of the anonymous letters' existence, never told her about it or reviewed them with her either. Nor did he discuss with her the letters' contents or a potential response. As a result, she too was unaware of the letters prior to sentencing.[16]

Braun and the junior associate first learned of the anonymous letters when the Court broached them during the sentencing hearing and preliminary proceeding. Upon their revelation, however, the junior associate failed to request the letters' production, object to their consideration or seek a continuance to inspect, investigate and address

---

[15] Meringolo Dec. ¶¶ 7-8; Cappellino Dec. ¶ 7; Braun Aff. ¶ 4.

[16] Meringolo Dec. ¶ 9; Cappellino Dec. ¶¶ 5-6, 8.

them. As a result, Braun was unable to contest or counter the anonymous allegations, leaving them wholly unrefuted.[17]

## The Anonymous Allegations Inform Braun's 10-Year Sentence

After "carefully" and "thorough[ly]" investigating the balcony and rabbi allegations for almost a year, the government advised the Court that it had "nothing further" to "present" that would "either be additional criminal conduct or otherwise materially impact sentencing…. The FBI has not gathered any additional fact … that we'd be prepared to present [at] a *Fatico* hearing … or otherwise proceed in a different manner…. [T]he [g]overnment isn't prepared … to say that he has done something that merits a *Fatico* hearing, that merits additional reporting to the Court … to consider as part of sentencing, or otherwise consider other options with regard to ███████████████████."[18]

---

[17] Braun Aff. ¶¶ 3-4; Cappellino Dec. ¶ 9.

[18] Ex. C 11-12, 14-15; *see also* Ex. B. 4 (several-month investigation yields "[in]sufficient information to conclude that Mr. Braun has committed additional criminal conduct of which the court should be advised, nor that he has committed any additional conduct that would constitute ███████████████████"); Cappellino Dec. ¶ 6.

But despite the prosecutor's repeated disclaimers, the Court went on to underline the anonymous balcony and rabbi allegations in handing down Braun's 10-year sentence:

> As I noted and we discussed previously, I received anonymous reports of very serious allegations regarding Mr. Braun's behavior in this [private commercial financing] business and his relationship to the business. There's, again, anonymous reports that he has an interest in the business. His wife, I believe, also works in a similar but not the same business. And a recently filed lawsuit in Richmond County alleges that he physically attacked someone in July of 2018 by pushing him off a one-story deck at an engagement party.

> Finally, another lawsuit, in Dutchess County, alleges that he threatened physical violence and reputational harm against a person from whom the [d]efendant was attempting to collect a debt in October 2017 to December 2017 and June 2018.[19]

## Documentary Evidence Belies the Anonymous Balcony and Rabbi Allegations

As Braun's accompanying affidavit and its annexed exhibits establish, the anonymous balcony and rabbi allegations are false.

---

[19] Ex. C 33.

About a month before the July 2018 engagement party in question, Braun's first cousin by marriage, Matias Fortgang, asked Braun to lend him a large sum of money, around $60,000-$70,000. Braun declined. When Braun rebuffed his renewed request at the party, Fortgang became physically and verbally abusive, aggressively confronting and loudly berating Braun. In the course of his belligerent ranting, Fortgang fell backward off a one-story deck, tumbling some six feet to the ground.[20]

In a consensually recorded call with Braun's father shortly after his fall, Fortgang more than doubled his financial demand, threatening to "GO[] TO THE COPS" unless he received $150,000 overnight. Half an hour later he sent wiring instructions by text message. Fortgang perpetuated his extortion attempt a few days afterward, repeating his demand to Braun's wife in another recorded call.[21]

Treatment records from Staten Island University Hospital – produced informally by Fortgang's civil counsel – confirm Braun's account of the party incident and further dispel the anonymous

---

[20] Braun Aff. ¶ 6 & Ex. A.

[21] *Ibid.* ¶ 7 & Ex. B-C.

allegations. Collectively, the records indicate that Fortgang "[f]ell" from a "one-story balcony" and landed on "an air conditioner."[22]

And far from suffering debilitating bodily injury, recent video and photographic evidence shows Fortgang fully ambulatory, performing physical activity such as dancing at a wedding, pulling garbage cans and lifting trash bags. Finally, as for the spurious civil suit Fortgang filed against Braun, his failure to post a meager $500 court bond has put it on indefinite hold.[23]

Then there are the anonymous claims about the rabbi and his delinquent business debt. Court records demonstrate that the creditor – Richmond Capital Group, LLC, not Braun personally to the extent the anonymous letters suggest otherwise – resorted to lawful process to collect the debt, obtaining a $14,662.77 "judgment by confession." The rabbi and his congregation subsequently paid the judgment in "full," thereby acknowledging the debt was legitimately owed, and withdrew

---

[22] *Ibid.* ¶ 8.

[23] *Ibid.* ¶ 9 & Ex. D-E.

their motion to vacate the judgment. Those steps resolved the dispute between the parties and ended the litigation that ensued.[24]

## ARGUMENT

**DEFENSE COUNSEL PERFORMED DEFICIENTLY IN FAILING TO ADEQUATELY MONITOR BRAUN'S DOCKET, KEEP ABREAST OF KEY CASE DEVELOPMENTS OR RESPOND APPROPRIATELY WHEN THE ANONYMOUS LETTERS CAME TO LIGHT, YIELDING A SENTENCE TAINTED BY MATERIALLY FALSE INFORMATION**

Criminal defendants are constitutionally entitled to the "Assistance of Counsel," including a corollary right to *effective* assistance that extends through sentencing.[25] Those guarantees are breached when counsel render deficient performance – meaning objectively unreasonable representation falling below prevailing professional norms – that causes prejudice – meaning a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.[26] Both familiar *Strickland* prongs are satisfied here.

---

[24] *Ibid.* ¶ 10 & Ex. F.

[25] U.S. Const. amend. VI; *Strickland v. Wash.*, 466 U.S. 668, 687-88 (1984); *Lafler v. Cooper*, 566 U.S. 156, 164-65 (2012).

[26] *Lafler*, 566 U.S. at 162-63; *Strickland*, 466 U.S. at 687-88.

By their own sworn admission, Braun's attorneys performed deficiently in myriad ways:

1.     Lead counsel failed to adequately monitor Braun's docket or keep abreast of important case developments, leaving him and his client unaware that anonymous letters alleging serious misconduct by Braun had been filed with the Court.[27]

2.     Though sentencing in the nine-year-old case had been postponed numerous times, lead counsel failed to seek a further adjournment to accommodate his unavailability. Instead he delegated the critical sentencing hearing to a young associate attorney substantially unfamiliar with the case and similarly unaware of the anonymous letters.[28]

---

[27] Compare *ante* 6-7 & nn. 13-14, 17 and sources cited with, *e.g.*, ECF Rule #9 ("It remains the duty of the attorney for a party to review regularly the docket sheet of the case"), quoted at https://ecf.nysd.uscourts.gov/cgi-bin/login.pl (as visited 10/2/19) (internal quotation marks omitted).

[28] Compare *ante* 6-7 & nn. 15-16 and sources cited and ECF No. 161 (associate attorney appearing just four days before sentencing) (5/24/19) with *Lafler*, 566 U.S. at 164-65 (counting sentencing among the "critical stages of a criminal proceeding"; "*any* amount of additional jail time has Sixth Amendment significance") (citation, internal quotation marks and brackets omitted) (emphasis supplied).

3.    When the letters' existence and "very concerning"[29] allegations emerged at sentencing, the junior associate failed to respond or confront them – appropriately or at all. Most conspicuous, she neglected to request copies of the letters for examination, object to their consideration or seek a continuance to explore and address their veracity.[30]

*Strickland*'s prejudice prong is also met. Though the anonymous balcony and rabbi allegations were easily discredited,[31] counsels' assorted lapses cost Braun a chance to impugn their accuracy, leaving it completely unchallenged.[32] In consequence, the Court based Braun's sentence partly on materially false information,[33] denying him due process. As the Second Circuit reaffirmed just last month, "[d]efendants have a constitutional right to be sentenced based on accurate information

---

[29] Ex. C 11, 14.

[30] Compare *ante* 7-8 & n.17 and sources cited with *Strickland*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

[31] *See ante* 9-12 & sources cited.

[32] *See ibid.* 8 & n.17 and sources cited.

[33] *See ibid.* 9 & n.19 and source cited.

14

rather than guesses."[34] Conversely, a judge's reliance on "inaccurate, material information" is "ground for vacating a sentence, because it may constitute a denial of due process" – especially where, as here, "the defendant lacks an opportunity to reply."[35] A "sentence based" even "*in part* on material misinformation," the Circuit aptly reminded, "may not stand."[36] It follows that Braun deserves "an opportunity" – in the form of a fresh sentencing hearing – "to rebut the factual assumptions relied on by the judge."[37]

Punctuating the prejudice wrought by counsels' derelictions, Braun's 10-year sentence vastly exceeds those imposed on both his guilty-pleading marijuana codefendants[38] and, as the charts annexed as Exhibit E illustrate, nearly all the defendants[39] in a trio of related cases – two of

---

[34] *U.S. v. Doe*, Nos. 17-1814-cr(L), -1868-cr (CON), __ F.3d __, 2019 WL 4251878, at *3 (CA2 Sept. 9, 2019) (citation and internal quotation marks omitted).

[35] *Ibid.* (citations, internal quotation marks and footnote omitted).

[36] *Ibid.* at *4 (citation and internal quotation marks omitted).

[37] *Ibid.* (quoting *U.S. v. Gonzalez*, 661 F.2d 488, 495 (CA5 1981)).

[38] Jeremy Fistel (time served) and Elbi Cespedes (18 months).

[39] The few exceptions are Jimmy Cournoyer (continuing criminal enterprise plea); Alessandro Taloni (equivalent sentence – no apparent ▇▇▇▇); John Venizelos (similar sentence – no apparent ▇▇▇▇; alleged obstruction of justice); and Enis

which ████████████████████████████████████████████.[40] The 10-year sentence (120 months) also dwarfs the national median – just 47 months as of 2016 – for ██████████ drug trafficking defendants ███████ ██████████████████████████████████████[41] These stark disparities confound the consistency, predictability and proportionality our sentencing scheme strives to achieve.[42]

After all, Braun is a first offender[43] whose crimes of conviction – though undeniably serious – are over nine years old.[44] Meanwhile, as the Court agreed, he has "demonstrated a desire to lead a law-abiding life."[45] To that end, Braun entered a timely guilty plea and fully "accept[ed] …

---

Djurcovic (consolidated sentencing on two separate indictments, one evoking consecutive prison time for obstruction of justice).

[40] *See ante* 3-4 & n.6 and source cited.

[41] *See* U.S. Sentencing Commission Quarterly Data Report–FY 2016 at 23, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2016_Quarterly_Report_Final.pdf (as visited 10/2/19).

[42] *See* 18 U.S.C. § 3553(a)(6) (directing courts to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

[43] Ex. C 20, 35.

[44] PSR ¶ 1.

[45] Ex. C 35.

responsibility for his offense."[46] He ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████ ████ █████ ██████ █████ █████ █████ ██ ██████.[48] He

scrupulously "complied with all Court-ordered conditions of [pretrial]

release."[49] And on a personal level, he started a family and became a

"loving father," actively "involved" in his three young "children's lives."[50]

In short, Braun has "changed his life" and grown into a "responsible and

---

[46] *Ibid.* 19.

[47] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████.

[48] *See ante* 3-4 & n.6 and source cited.

[49] PSR ¶ 4.

[50] Ex. C 30-31.

determined" man – markedly different from the immature "young" adult who ran afoul of the law nine years ago and more.[51]

As for the operation's sophistication and scale and Braun's leadership role,[52] the Guidelines already take those factors into account.[53] And far from "distinguishing"[54] Braun from other "narcotics traffickers,"[55] his dated resort to "violence and threats of violence"[56] – however indefensible – was not uncommon in a business where guns are considered "tools of the trade."[57]

The upshot of the last two paragraphs? The anonymous allegations' influence on the 10-year sentence ultimately imposed – occasioned by

---

[51] *Ibid.*

[52] *See ibid.* 28-29, 36.

[53] *See* PSR ¶¶ 25-26, 28.

[54] Ex. C 29; *see also id.* 36.

[55] *Ibid.*

[56] *Ibid.*

[57] *U.S. v. Ryan*, 935 F.2d 40, 43 (CA2 2019) (citation and internal quotation marks omitted).

defense counsels' gaffes in handling them – seems apparent if not inescapable.[58]

## CONCLUSION

The Court should vacate Braun's 10-year prison term and sentence him anew.

Dated:     New York, NY
           Oct. 3, 2019

Respectfully submitted,

**MARC FERNICH, ESQ**.
810 Seventh Ave.
Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

*Counsel for Jonathan Braun*

---

[58] *See* Ex. C 11 (Court stressing that party incident occurred "just this past summer"); *Lafler*, 566 U.S. at 164-65 ("*any* amount of additional jail time has Sixth Amendment significance") (citation, internal quotation marks and brackets omitted) (emphasis supplied).

EXHIBIT A

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of September, two thousand and nineteen.

Before:      Joseph F. Bianco,
             *Circuit Judge.*

_____

United States of America,

         Appellee,

      v.

Jonathan Braun,

         Defendant - Appellant.

_____

**ORDER**

Docket No. 19-1684

Appellant moves this Court for an order holding this appeal in abeyance pending the filing and disposition of a motion for post-conviction relief in district court. He also seeks leave to file the instant motion under seal.

IT IS HEREBY ORDERED that the motion is GRANTED.

For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court

EXHIBIT B







EXHIBIT C

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 10-CR-433(KAM)
                               :
                               :
                               :
        -against-             : United States Courthouse
                              : Brooklyn, New York
                               :
                               :
JONATHAN BRAUN,               : Tuesday, May 28, 2019
                              : 11:00 a.m.
           Defendant.         :
                               :
                               :
                               :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: RICHARD P. DONOGHUE, U.S. ATTORNEY
                    EASTERN DISTRICT OF NEW YORK
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                    BY:  CRAIG HEEREN,
                        Assistant United States Attorney

For the Defendant:   MERINGOLO & ASSOCIATES, PC
                        375 Greenwich Street
                        New York, New York 10013
                    BY:ANJELICA BIANCA CAPPELLINO, ESQ.

Court Reporter:      LINDA A. MARINO, OFFICIAL COURT REPORTER
                     225 Cadman Plaza East/Brooklyn, NY 11201
                     lindacsr@aol.com

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

Proceedings                                     2

THE COURTROOM DEPUTY:  This is criminal cause for
sentencing, 10-CR-433, USA v. Jonathan Braun.

Will the Government's attorney please state your
appearance?

MR. HEEREN:  Craig Heeren on behalf of the United
States.  Good morning again, your Honor.

THE COURT:  Good morning.

MS. CAPPELINO:  Angelica Cappelino on behalf of
Jonathan Braun.

THE COURT:  Good morning.

And good morning, Mr. Braun.

THE DEFENDANT:  Good morning.

THE COURT:  And for the record again, do you speak
and understand English without any difficulty?

THE DEFENDANT:  Yes, I do.

THE COURT:  Please raise your right hand and take an
oath to either affirm or swear that you will tell the truth.

(Defendant sworn or affirmed.)

THE COURT:  Just to be clear, the Government did not
submit an order for me to accept the guilty plea that
Mr. Braun entered before Judge Pohorelsky, did it?

MR. HEEREN:  That's right, your Honor.  I'm sorry, I
forgot to include it.

THE COURT:  I'm prepared to make a statement here
that I have reviewed the transcript of Mr. Braun's guilty plea

as well as the consent that he signed to have Judge Pohorelsky
hear his guilty plea on November 3, 2011, and I do accept
Mr. Braun's guilty plea to Count One and Count Six of the
superseding indictment.

Mr. Braun, as you can see, we have a court reporter
here, who is making a transcript of today's proceedings.  That
transcript will be part of the official judicial record in
this case if you choose to exercise your appellate right.

In preparation for your sentencing today, I've
reviewed the superseding indictment, the transcript of your
plea proceeding before Judge Pohorelsky on November 3, 2011;
the preliminary order of forfeiture; the February 28, 2018,
presentence investigation report; the February 28, 2018,
Probation Department sentencing recommendation; the July 24,
2018, addendum to the presentence report; as well as
Mr. Braun's sentencing memorandum and the numerous letters of
support that were attached to his submission and additional
submissions from Mr. Braun's counsel; and the Government's
sealed sentencing memorandum; as well as numerous anonymous
submissions by members of the public regarding Mr. Braun's
sentencing.

Have I overlooked any submissions?

MS. CAPPELINO:  No, your Honor.

MR. HEEREN:  No, your Honor.

THE COURT:  I'd like to confirm that Mr. Braun is a

United States citizen, so we need not address ICE notification or the likelihood or certainty of removal; is that correct?

       MR. HEEREN:  That's the Government's understanding, yes.

       MS. CAPPELINO:  Yes, your Honor.

       THE COURT:  Thank you.

       Mr. Braun, as you know, you have a right to counsel throughout these proceedings.

       Are you satisfied with your counsel?

       THE DEFENDANT:  Yes.

       THE COURT:  And have you discussed today's sentencing proceedings as well as all of the submissions submitted in relation to your sentencing?

       THE DEFENDANT:  Yes, your Honor.

       THE COURT:  Are there any unresolved conflicts, contentions, motions, or other issues that I should address between Mr. Braun and his counsel before we proceed?

       THE DEFENDANT:  Not at the moment.

       THE COURT:  Mr. Braun does appear to be fully aware and alert and following these proceedings closely.

       Does defense counsel agree with that observation?

       MS. CAPPELINO:  Yes, your Honor, I do.

       THE COURT:  Do you know of any reason why we should not proceed with your client's sentencing today?

       MS. CAPPELINO:  No, I do not.

Proceedings                                            5

THE COURT:  You may also remain seated when you address me, if it's easier.

MS. CAPPELINO:  Thank you.

THE COURT:  I want to confirm that there are no victims associated with Mr. Braun's offense that would be entitled to victim notification or restitution; is that correct?

MR. HEEREN:  That is correct, your Honor.

THE COURT:  Mr. Braun, have you read all of the submissions by the Government and your attorney and Probation regarding your sentencing here today?

THE DEFENDANT:  Yes, I did, your Honor.

THE COURT:  Did you have any difficulty understanding those submissions?

THE DEFENDANT:  No.

THE COURT:  Did you have a chance to discuss all of those submissions with your lawyer.

THE DEFENDANT:  I did so.

THE COURT:  Are you ready to be sentenced?

THE DEFENDANT:  I am.

THE COURT:  Mr. Braun, as you know, you entered a plea of guilty on November 3, 2011.  I have reviewed that transcript.

You may recall that Judge Pohorelsky placed you under oath and asked you questions about your understanding of

the charge to which you pled guilty, the sentencing exposure
that you face as a result of your guilty plea, as well as
whether any threats or promises were made to induce you to
plead guilty.  You were also asked to state what you did in
connection with each of the counts to which you pled guilty
specifically, Counts One and Six.

       Were the statements that you made to the judge on
that date true?

       THE DEFENDANT:  Yes, they, in fact, were.

       THE COURT:  Do you know of any reason why your plea
should not be considered valid?

       THE DEFENDANT:  No.

       THE COURT:  Do you wish to dispute or contest your
plea of guilty?

       THE DEFENDANT:  No, I do not.

       THE COURT:  I've reviewed the transcript of the plea
hearing and found, as Judge Pohorelsky did when he recommended
that I accept Mr. Braun's plea to Counts One and Six, that his
plea of guilty was knowing and voluntary and based upon a full
understanding of his rights and the consequences of his plea
and that there was a factual basis for his plea of guilty to
Counts One and Six, which I have accepted.  That is to the
superseding indictment.

       Count One charges that between November 1, 2007, and
May 26, 2010, Mr. Braun conspired with others to import a

controlled substance into the United States from a place
outside which involved 1,000 kilograms or more of marijuana in
violation of 21 U.S. Code Sections 952, 960(a)(1), 963, and
960(b)(1(G).

Count Six charges that between November 1, 2007, and
May 26, 2010, Mr. Braun conspired with others to conduct
financial transactions affecting interstate and foreign
commerce which involved the proceeds of marijuana trafficking,
in violation of 21 U.S. Code Sections 841(a)(1), 841(b)(1)(A)
(vii), 841(b)(1)(B)(vii), 841(b)(1)(C), 846, 952(a), 960
(a)(1), 960(b)(1)(G), 960(b)(3), and 963.

Mr. Braun conducted these transactions knowing that
the property involved in the financial transactions
represented the proceeds of unlawful narcotics trafficking,
with the intent to promote the carrying on of narcotics
trafficking, contrary to 18 U.S. Code Section
1956(a)(1)(A)(i), and knowing that the transactions were
designed to conceal and disguise the nature, location, source,
ownership, and control of the proceeds of the trafficking,
contrary to 18 United States Code Section 1956(a)(1)(B)(i).

Count Six also charges that Mr. Braun conspired with
others to transport, transmit, and transfer monetary
instruments and funds from a place in the United States or
outside the United States to and through Canada, with the
intent to promote the carrying on of narcotics trafficking, in

Proceedings                                          8

violation of 18 U.S. Code Section 1956(a)(2)(A), knowing that
the monetary instruments and funds involved in the
transportation, transmission, and transfer represented the
proceeds of some form of unlawful activity, and knowing that
the transportation, transmission, and transfer were designed
to avoid transaction reporting requirements, in violation of
18 U.S. Code section 1956(a)(2)(B)(2).

Now, sir, you have the right to have what's called a
*Fatico* fact-finding hearing, which is a hearing at which the
parties may offer evidence relevant to sentencing.  That
generally comes up when there's some dispute, but it is
something you're entitled to have.

Would you like to have a fact-finding hearing
pursuant to the *Fatico* case?

You have given up your right to such a hearing
regarding the quantity of marijuana to be used in calculating
your sentence, and that was during your November 3, 2011,
plea.  But you're welcome to have such a hearing if you'd
like.

Would you like such a hearing?

THE DEFENDANT:  No.

THE COURT:  You also have a right to make a personal
statement.  I don't believe there was a written statement in
the submissions that were provided to the Court regarding your
sentencing, but if you'd like to be heard at this time, I'm

Proceedings                                    9

happy to hear from you.

THE DEFENDANT:  Your Honor, I just wanted to let you know and the Court know that I'm really sorry for my wrongdoings in the past, and I've changed a whole lot of bit since then and I have many, many reasons to continue to do good in the future in my current lifestyle.

I appreciate it.

THE COURT:  I would say that certainly the letters that you submitted speak about the transformation or how you've changed your life since the dates alleged in the superseding indictment, and we'll address that in a moment.

I think that is all a consideration that I've taken seriously, given that you have a family and community that supports you and they speak well of you and how you've made efforts to get on a law-abiding path.

So, thank you for your statement.

Does the defense attorney wish to be heard.

MS. CAPPELINO:  I'll be very brief, your Honor.  I know your Honor read the multiple submissions.

I'll just note that Mr. Braun was arrested almost nine years to the day.  He was 27 years old at the time.  Now he stands before you at age 36, a completely different man. He's now a father to three young children, a husband, and a successful business person.

This has been a long road.  He was in prison for

Proceedings                                      10

about 20 months pending bail.  He's been on house arrest for

quite a bit of time, five years.  He's been compliant

throughout the entire time.  He really wants the opportunity

to continue on this path, to continue to be an exemplary

citizen, and a community member.

          So, we respectfully ask your Honor to consider those

circumstances.  Thank you.

          THE COURT:  I think the record reflected that he was

in custody for 16 or 17 months, if I'm not mistaken.  It

wasn't 20 months.

          MS. CAPPELINO:  Excuse me, your Honor, I'm sorry.

          THE COURT:  I have the dates, if anyone needs

clarification.  I'll address that now since there seems to be

a disconnect between what Probation has reported and what

Mr. Braun's counsel has stated.

          MS. CAPPELINO:  I apologize, I'm probably off by two

months.  I'll adopt whatever is in the PSR.

          THE COURT:  Let's make it clear for the record.  He

was arrested, after fleeing justice, on May 26, 2010 and he

was released on November 4, 2011.  He was in custody for 17

months.

          MS. CAPPELINO:  Thank you for clarifying, your

Honor.

          THE COURT:  Does the Government wish to be heard?

          MR. HEEREN:  Briefly, your Honor.  Thank you.

                    LAM     OCR     RPR

Proceedings                                              11

          I just want to speak on an issue raised at the
earlier proceeding, which is the additional conduct related to
the Defendant that was raised both in public reporting as well
as in some anonymous letters to the Court.

          The Government obviously takes all of that very
seriously, as we would do in any instance involving
allegations or implications at least of crime of any sort.
We've looked into it, we have been investigating it, and the
Government's position at this time, based on the facts we've
been able to gather, there's nothing further for the
Government to the present to the Court that would either be
additional criminal conduct or otherwise materially impact
sentencing.

          THE COURT:  Let me address some of these matters,
since you brought it up.

          There is a lawsuit by an individual who alleges that
just this past summer, at an engagement party, Mr. Braun
intentionally shoved him off a two-story balcony and he
sustained very serious injury.  It's not clear whether the
police were called.

          But that is very concerning.  There's a lawsuit.

          Have you spoken to that victim, the Plaintiff in
that case?

          MR. HEEREN:  Your Honor, I'm not sure if we
specifically spoke to the victim.  The FBI has been

investigating that as well as the other allegation against
him.

THE COURT:  Would you agree that if those
allegations were true, it would be additional criminal
conduct, pushing someone off a balcony?

MR. HEEREN:  Yes, your Honor.

THE COURT:  It's an allegation, but it's an
allegation that resulted in a lawsuit.

MR. HEEREN:  Yes, your Honor, I think that would
be -- I think it's likely that would be criminal conduct, yes.

THE COURT:  And the FBI is looking into it since
last summer, but what?

MR. HEEREN:  The FBI has not gathered any additional
fact such that we'd be prepared to present a *Fatico* hearing on
this or otherwise proceed in a different manner at sentencing.

THE COURT:  Do you know if they've talked to the
victim?

MR. HEEREN:  I don't, your Honor.

THE COURT:  There is also an affidavit that was
submitted in a lawsuit that was filed.  Let me just get that
for the record, *Richmond Capital Group LLC, v. Congregation*
*Shule, Inc., d/b/a Congregation Shule and Avraham Lesches,*
L-E-S-C-H-E-S, filed in Dutchess County under Index No.
2018-51838.

The affiant in that case states that Mr. Braun made

Proceedings                                    13

threats to him pursuant to a business transaction in which the
Defendant fell behind in payments.  This was a rabbi of a
congregation who borrowed money to make renovations to his
shule.  And he received calls, as alleged in his affirmation
under penalty of perjury, that Mr. Braun called and said:  I
know everyone in your Chabad-Lubavitch community.  I'm going
to come down there and beat the shit out of you in 770 Eastern
Parkway so that people know you're a thief, liar, and
dishonest.

          Also, there are calls with representatives;
specifically, Ms. Gregg, who works with Mr. Braun, or did at
time, in which this individual attempted to work out a payment
plan and, after that, in December 2017, received another
threatening and harassing call in which Mr. Braun allegedly
said:  I'm coming to Crown Heights.  I'm going to beat the
shit out of you abdomen publicly embarrass you.  I will hang
papers all over the lampposts in Crown Heights stating you are
a liar and a thief.  I'm going to tell me you are running an
illegal operation and a scam.

          So, I don't know that I have to read further, but
these were threats, alleged threats.

          Another call in June of 2018, this is just last
summer, in which Mr. Braun allegedly said, and I'm not going
to quote all the vulgarities, but:  I'm going to make you
bleed.  You're going to regret the day you met me.

And he chastises this individual for sending a
lawyer, who he refers to in derogatory terms, she's female:
I'm going to make you suffer for every penny, et cetera.

So, these or concerns.

Did you investigate or speak to this individual?

MR. HEEREN:  Yes, we did, your Honor.  I don't know
if that specific individual was spoken to.

The FBI, this was the primary focus of the
investigation which took so long, the practices of the
industry that Mr. Braun is in and the conduct that was alleged
of him.

It's my understanding that several different
individuals involved were interviewed.  I believe Mr. Lesches
was interviewed; I'm not certain sitting here today.  I can
check that for the Court, if you want.  I believe there was a
fairly thorough investigation of that done.

It's obviously deeply troubling.  It's why the
Government took it so seriously, these accusations against
Mr. Braun.  Additionally, it's the -- we've met with Mr. Braun
as well and spoken to him directly about the conduct, and he's
obviously denied it.

So, we've done a fairly thorough investigation.  And
at this point in time, your Honor, regardless of the fact that
it's deeply troubling, the Government isn't prepared at this
point, based on the facts that we've been able to gather, to

say that he has done something that merits a *Fatico* hearing,
that merits additional reporting to the Court of those facts
to consider as part of sentencing, or otherwise consider other
options with regard to the agreement.

But we have investigated it carefully, your Honor.

THE COURT:  All right.

MR. HEEREN:  With regard to the rest of the
sentencing, your Honor, I think the Government largely rests
on our papers, which are under seal for the reasons given in
the letter itself.

THE COURT:  All right.  Thank you.

Mr. Braun, as I noted, has the right to have
friends, family, and supporters present in the courtroom.  I
will assure those who did submit letters that I've read all of
those letters and they certainly are encouraging in terms of
validating Mr. Braun's statement here today that he has
changed since the days when he was engaged in the activity
that brought him before this court.

Is there anyone here that I should acknowledge,
Mr. Braun?

MS. CAPPELINO:  No, your Honor, thank you.

THE COURT:  I'd like to just publicly thank all of
those who took time out of their schedules to write letters
stating that Mr. Braun is important to his family.  His
parents speak lovingly of their son, his siblings also, his

Proceedings                                              16

wife, in-laws, friends, and members of his community.  So, I
do appreciate the time that was taken to think about and write
a letter on behalf of Mr. Braun.

          Now, neither party has objected to the PSR's
calculation of the guidelines calculation.  The Government
noted in its sentencing submission that the total offense
level estimated during the plea proceeding was two points
lower than that calculated by the PSR, although it did not
dispute the accuracy of the presentence report calculation.
I'll just review those calculations now.

          For violation of Title 21 U.S. Code Section 952(a)
and Title 18 U.S. Code Section 1956(a)(1)(B), the PSR
calculated Mr. Braun's advisory adjusted offense level as 42
and 44 respectively for Counts One and Six.  It then grouped
the counts, pursuant to Guideline 3D1.2(c).  The presentence
report also applied an acceptance of responsibility reduction
of three levels, resulting in a total offense level of 39.

          The presentence report notes that Mr. Braun has a
Criminal History Category of I, having no prior criminal
connections.  A total offense level of 39 with a Criminal
History Category of I yields a guideline imprisonment range of
262 to 327 months.

          Now, the additional enhancements have been added to
the sentencing guidelines since the time of the offense of
conviction.  If I were to use the current guidelines it would

Proceedings                                    17

create an ex post facto clause violation; therefore, I will
use the guidelines in effect at the time of Mr. Braun's
offense and not the 2018 guidelines.

So, for example, the current guidelines would add an
enhancement for his use of violence during the course of this
offense.  Although it does not factor into the guidelines
calculation, it is information that I must consider and do
consider.

So, under Guideline 1B1.11, I relied on the 2009
guidelines, which were in effect at the time of Mr. Braun's
offense.  I've given respectful consideration to the 2009
sentencing guidelines and compute Mr. Braun's offense level
and adjustments as follows:

For a violation of 21 U.S. Code Section 952(a),
conspiracy to import marijuana, I considered guideline
2D1.1(a)(5).  Because Defendant's offense involved importation
of at least 10,000 but not more than 30,000 kilograms of
marijuana, Section 2D1.1(c)(2) establishes a base offense
level of 36.

Because Mr. Braun unlawfully imported or exported a
controlled substance under circumstances in which an aircraft
other than a regularly scheduled commercial airline was used
to import or export the controlled substance, there is an
increase of two levels, pursuant to Section 2D1.1(b)(2)(A).

And we'll talk about that in a minute, but Mr. Braun

Proceedings                                    18

used very sophisticated means to smuggle drugs into the United

States, including using a Native American reservation, he used

motor vehicles with hidden compartments, he used boats, and he

used private aircraft.  So, he had access to airline pilots,

boat captains, and people who were willing to drive cars with

tracked devices to smuggle drugs into the United States.

Because Mr. Braun used this aircraft, he receives

two additional points.

In addition, Mr. Braun was an organizer or leader of

the criminal activity that involved five or more participants

or was otherwise extensive.  Mr. Braun played an aggravating

role in the offense, and there is an increase of four levels

because he was a leader and this distinguishes him from many

defendants I see who are not leaders but, rather, a lower

level courier or a lower level distributor.  But he was at the

top of this drug smuggling enterprise.

Now, the adjusted offense level that we calculate

for Count One is 42.

For Count Six, which is a violation of 18 U.S. Code

Section 1956(a)(1)(B), money laundering conspiracy, I

considered Guideline 2S1.1(a), which adopts the offense level

for the underlining offense from which the laundered funds

derived, and, therefore, establishes a base offense level of

38.  Section 1B1.5 explains that a cross-reference refers to

the entire offense guideline, including special offense

Proceedings                                    19

characteristics.

The base offense level for Count Six is 38.  Because he was convicted under 18 U.S. Code Section 1956(a)(1)(B), there's an increase of two levels, pursuant to Section 2S1.1(b)(2)(B).

Now, the special offense characteristics involve Mr. Braun's role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  He played an aggravating role as an organizer or leader, and there's an increase of four levels for the money laundering offense.  Count Six's adjusted offense level is, therefore, 44.

Under Application Note 6 of Section 2S1.1 and Section 3D1.2(c), Counts One and Six are closely related and should be grouped.  Section 3D1.3 states that the offense level applicable to counts grouped together pursuant to Section 3D1.2(c) is the offense level for the most serious of the counts in the group; that is, the highest offense level. The combined group offense level for the Defendant's conviction is 44 based on the Count Six offense level.

Because Mr. Braun demonstrated acceptance of responsibility for his offense, I will grant him a three-level reduction under Guidelines 3E1.1(a) through 3E1.1(b).  Under Section 3D1.5, this adjustment applies to the combined offense level.

And although not explicitly stated, the presentence
report appears to have calculated the combined offense level
as 42 based on the import conspiracy charge and applied the
acceptance of responsibility adjustment to that number rather
than the combined offense level of 44.  So, they made an
error, I believe.  The combined offense level of 44 is based
on the money laundering charge.

The Court applies this adjustment to its
independently calculated combined offense level of 44 based on
the Count Six money laundering charge, and then I deduct three
points from 44.  That results in a total offense level of 41.

Mr. Braun has no known prior arrests or convictions
apart from the instance offense and, therefore, has a criminal
history score of zero.  That results, under Chapter 5, Part A,
of the Guidelines and a Criminal History Category of I.

The sentencing options are as follows:  For Count
One, the maximum statutory sentence is life, the minimum
imprisonment is ten years, 21 U.S. Code section 960(b)(1)(G);
for Count Six, the maximum term of imprisonment is 20 years
and there is no minimum, U.S. Code Section 1956(a)(1)(B)(1).

The advisory guideline for a total offense level of
41 and a Criminal History Category of I results in a guideline
range of imprisonment between 324 months and 405 months.

The supervised release term for Count One is at
least five years under 21 U.S. Code Section 960(b)(1)(G).

Proceedings                                   21

Now, the Court may determine that the Defendant has
satisfied mitigating factors under the criminal code.  And if
that is the case, the statutory minimum does not apply.  The
Probation Department states also that in that instance, the
Defendant would not be bound by the statutory minimum term of
supervised release.

One of the factors that is considered under the
criminal code, 3553, was whether or not the Defendant used
violence or credible threats of violence, which is clear from
the presentence report and not in dispute.  So, I'm not
convinced that he qualifies under 3553 for the consideration.

The Government, if you want to be heard on this
point, I'm happy to hear from you.

MR. HEEREN:  No, your Honor.

THE COURT:  There's no evidence that he didn't
commit violence; is that correct?

MR. HEEREN:  That's right, your Honor.  There were
threats of violence, I believe.

THE COURT:  Well, he whipped someone with a belt,
right?

MR. HEEREN:  Right.

THE COURT:  That's an event of violence; would you
agree?

MR. HEEREN:  Yes, your Honor.

THE COURT:  Count Six provides that I may impose a

Proceedings                                22

term of supervised release of not more than three years, under
18 U.S. Code Section 3583(b)(2).  Multiple terms of supervised
release shall be imposed concurrently.  And as Mr. Braun was
advised by Judge Pohorelsky during his plea hearing, the terms
of custody may be imposed consecutively rather than
concurrently.

        The guidelines provide that the offense in Count One
is Class A felony, so the guideline range for a term of
supervised release is between three and five years under the
Guideline 5D1.2(a)(1).  Count Six provides that the offense is
a Class C felony and, therefore, the guideline range of
supervised release is between two and three years under
Guideline 5D1.2(a)(2).

        There is no restitution as there are no identifiable
victims in this case.

        And under Count One, the drug trafficking charge,
Mr. Braun is not eligible for probation because it is
expressly precluded by law under 21 U.S. Code Section 960
(b)(1)(G) and 18 United States Code 3561(a)(2).  And under the
guidelines -- let me just talk about Count Six.

        Count Six provides that Mr. Braun is ineligible
under the criminal code for probation because he will be
sentenced at the same time to a term of imprisonment for the
same or different offense, and that's 18 U.S. Code 3561(a)(3).
Multiple terms of probation would run concurrently, but that's

Proceedings                                          23

not applicable here because he is not eligible under the
criminal code for probation.

          Count One of the advisory guidelines would provide
that because probation's expressly precluded by the criminal
code, he cannot be given a sentence of probation under
Guideline 5E1.1(b)(2).  And for Count Six, he's not eligible
for probation for the same reasons under Guideline
5E1.1(b)(3).

          The fine provisions under the criminal code for
Count One provide for a maximum fine of $10 million under 21
U.S. Code Section 960(b)(1)(G).  And for Count Six, the
maximum fine is $500,000 under 18 U.S. Code Section
1956(a)(1)(B)(i).

          The guidelines provide that for an offense level of
41, the fine range for this offense is between $25,000 and
$250,000, Guideline 5E1.2(c)(3).  The maximum fine in the
guidelines does not apply if the Defendant is convicted under
a statute allowing a maximum fine greater than $250,000, which
is the case in this instance both with regard to Count One and
Count Six.

          Judge Townes, my predecessor on this case,
previously signed a preliminary order of forfeiture on
April 9, 2013, in which Mr. Braun consented to forfeit the
following.  This is cash that was seized from various stash
houses or during arrests:  First, $477,565 in United States

Proceedings                                    24

currency seized on May 11, 2009; $77,000 in United States
currency seized on May 26, 2010 from the Defendant's
residence; $504,100 in United States currency seized
February 14, 2011, from multiple safety deposit boxes
controlled by the Defendant; and $32,500 in United States
currency voluntary surrendered on April 1, 2011.  These are
collectively referred to as the forfeited assets.

        On May 10, 2019, the Government requested that I
vacate the order of preliminary forfeiture because the assets
had already been administratively forfeited by the Drug
Enforcement Administration.

        So, I grant that application and Judge Townes'
previous order of forfeiture dated April 9, 2013, will be
vacated, if it hasn't already been vacated.

        The special assessment requires Mr. Braun pay $100
on each count of conviction, for a total of $200.

        I urge you to pay that immediately.

        Mr. Braun, I'd like to advise you that you have the
right to appeal your sentence.  Any appeal must be filed
within 14 days of judgment being entered in your case.  If you
cannot afford to pay the cost of an appeal, you may apply for
relief to do so as a pauper.  I don't believe, based on the
recent financial statement you submitted, again, without
reference to your wife's assets, which are also substantial
purportedly, based on the probation report, that you would

qualify to have the appellate fee waived.

But if you request the Clerk of Court to do so, he
will file a notice of appeal on your behalf.  And I'd ask the
Defendant's lawyer to please make sure that her client's
appellate rights are protected if he choses to exercise those
rights.

Now, I don't know whether there is any property that
was seized from Mr. Braun at the time of his arrest and
whether we have to address return of that property.

MR. HEEREN:  I'm not aware of any property that was
seized at that time.  I don't believe there's anything.

MS. CAPPELINO:  I agree, your Honor.

THE COURT:  To the extent he may have a passport of
the United States or any other country --

MR. HEEREN:  If there is, that would be in the
possession of pretrial, I believe.  If not, I'll go back to
the DEA and speak to them as well.

THE COURT:  Is there anything, Mr. Braun, that
should be returned to you?

THE DEFENDANT:  No.

MS. CAPPELINO:  Just the passport, your Honor,
nothing else.

THE COURT:  That's held until he finishes serving
his entire sentence, including any supervised release.

Now, in addition to giving respectful consideration

Proceedings                                    26

to the advisory guidelines, which are no longer mandatory,
I've also given consideration to the factors set forth in the
criminal code, 18 U.S. Code Section 3553(a).

I first considered the nature and circumstances of
Mr. Braun's offense, and I find that his offenses are very
serious.

And I understand the point made by one of his
supporters that marijuana is no longer illegal in many states,
but we don't have a situation -- Mr. Braun earlier had a legal
medical marijuana business which he gave up in exchange for a
high volume illegal marijuana trafficking organization.

Now, he entered a plea of guilty to Count One of the
superseding indictment for a violation of 21 U.S. Code Section
952(a), which charged conspiracy to import large quantities of
marijuana, in excess of 10,000 kilograms.  Count One charges
that between November 1, 2007, and May 26, 2010, Mr. Braun
conspired with others to import marijuana into the United
States from a place outside which involved 1,000 kilograms or
more of marijuana, in violation of 21 U.S. Code Section
952(a), 960(a)(1), 963, and 960(b)(1)(G).  The PSR reports
that Mr. Braun trafficked more than $6 million of marijuana
per week.

That is a lot of marijuana.  And, I would note, in
excess of 10,000 kilograms.

Mr. Braun also entered a plea of guilty to Count Six

Proceedings                                            27

of the superseding indictment for the violation of 18 U.S.
Code Section 19569(a)(1)(B), which is a money laundering
conspiracy, which charges that between November 1, 2007, and
May 26, 2010, he conspired with others to conduct financial
transactions affecting interstate and foreign commerce which
involved the proceeds of narcotics trafficking.  And I've
already reviewed the criminal code sections under Title 21
that he violated in addition to 18 U.S. Code.

          Mr. Braun conducted these transactions knowing that
the property involved in the transactions represented proceeds
of unlawful narcotics trafficking and intended to promote the
carrying on of narcotics trafficking in violation of Section
1956(a)(1)(A)(1) of Title 18.  He knew that the transactions
were decide to conceal and disguise the nature, location,
source, ownership, and control of the proceeds.

          Count Six also charges that Mr. Braun also conspired
with others to transport, transmit, and transfer monetary
instruments and funds from a place within or outside the
United States back and forth between the United States and
Canada with the intent to promote the carrying on of his
narcotics trafficking enterprise.  And he knew that the
monetary instruments involved in this transportation,
transmission, and transfer of funds represented the proceeds
of unlawful activity.  And, again, this was done to evade
reporting requirements.

Proceedings                                    28

An investigation by the Drug Enforcement
Administration and other law enforcement agencies revealed
that Mr. Braun, along with others, orchestrated the
importation of thousands of kilograms of marijuana via weekly
shipments into the United States from Canada through Native
American reservation, by boat, aircraft, and motor vehicle.
Mr. Braun stipulated that he was responsible for over
10,000 kilograms of marijuana being imported and that his
operation lasted for a period of over three years.

In May 2009, DEA agents raided a stash house in
Staten Island that was controlled by Mr. Braun and seized over
600 pounds of marijuana and approximately $500,000 in cash.
Because of this raid, Mr. Braun fled to Israel and then to
Canada, where he hid out for several months before returning
to the United States.

While he was abroad -- and this is important --
Mr. Braun continued to direct the operations of his drug
organization by using encrypted cell phones to communicate
with his associates and customers.  Throughout the operation,
Mr. Braun personally negotiated with high level members of
organized crime groups regarding the trafficking of marijuana.

Agents discovered that at the height of the drug
conspiracy, Mr. Braun was trafficking more than $6 million
worth of marijuana per week.  He was also responsible for
laundering drug proceeds before the money was transported back

LAM      OCR      RPR

Proceedings                                    29

to Canada to maintain his suppliers.  The Government

calculates that Mr. Braun was personally responsible for

laundering roughly $14 million in drug proceeds.

Mr. Braun employed threats and the actual use of

violence to collect drug debts and to deter fellow

co-conspirators from cooperating with the Government.  For

example, after a stash house in California was raided by law

enforcement and had over $100,000 worth of marijuana seized,

Mr. Braun and a co-conspirator flew to California.  There, the

co-conspirator held down the person who had been in control of

the stash house while Mr. Braun whipped him with a belt and

threatened this man with harm and also threatened his family's

well-being if he did not repay the value of the marijuana.

Again, this is distinguishing him from many of the

narcotics traffickers that appear before me:  One, his

leadership role; two, the sophistication of the operation;

and, three, the actual employment of violence and threats of

violence against those he feared were either going to

cooperate or who would lose assets, including the marijuana.

Second, I've also considered Mr. Braun's personal

characteristics, family history, and circumstances.

Unlike many of these Defendants, Mr. Braun was born

into a loving home.  His parents, Jacob and Helene Braun,

raised him without want or need or deprivations.  They resided

on Staten Island.  His father was a shoe sales manager and his

mother a first grade teacher.  They are aware of their son's arrest and conviction and remain supportive.

His older sister Michelle Schwartz is a pharmacist and his younger sister Shannon Miller is a teacher.  They are both married with children and they are both aware of their brother's arrest and speak very lovingly of their brother and remain supportive of him.

As I said, he grew up in an intact middle income household on Staten Island.  He had a happy childhood, free of neglect, abuse, or want.  He was raised in an Orthodox Jewish. He observed the Sabbath with his family every week.  He's very close to his family.

In January 2014, Mr. Braun married Miriam Hurwitz she is employed as a merchant cash advance broker.  Mr. Braun describes is marriage as a happy one and states that he and his wife are supportive of one another.

As of March 2018, they had a three-year-old daughter and a one-year-old son and they were expecting the birth of a third child, who arrived in July 2018.  Their daughter participates in occupational and speech therapy and their son participates in early education programs to receive therapy for speech and motor skill development.

Mr. Braun's wife describes her husband as responsible and determined and a good person and a loving father.  She notes that he is involved in the children's lives

Proceedings                                          31

and says that she would not be able give them the life that
they would like for their children if he is not present and
able to provide financial assistance.  She refers to
Mr. Braun's criminal activities as part of his old life from
when he was young and she believes that he has changed his
life.

        Mr. Braun is in good health and he suffers from no
ailments.  He was diagnosed as a child with attention deficit
disorder and attention deficit hyperactivity disorder, but his
parents opposed giving him medication for these conditions.
He now treats these conditions with Adderall and Xanax.  He's
never received mental health treatment, although he and his
wife do participate in marital counseling for normal marital
issues and stressor.  His wife reports that the counseling is
going well.

        Mr. Braun as a single glass of wine with his dinner
on Friday nights.  He began smoking marijuana at age 14 and
stopped shortly before his arrest.  He estimates that he
smoked marijuana four times per week.  He also first used
powder cocaine at the age of 17 and used cocaine two to three
times per week, although he would occasionally go extended
periods without using it at all.  The last time he used
cocaine was just prior to his arrest.

        From 2007 to 2009, Mr. Braun used MDMA three times
per year and he tried Oxycodone once in his early twenties.

                    LAM      OCR      RPR

He did not use these drugs again.  Mr. Braun has been tested
for drugs as part of his pretrial reporting requirements and
no violation of his release has been detected based on the use
of elicit drugs.

        Mr. Braun attended high school in Brooklyn from 1998
to 1999 but left to take early admission to the College of
Staten Island.  He attended the College of Staten Island from
2000 to 2002 but withdrew from school to open his own
business.  He did obtain his New York State GED diploma in
2002.

        He worked at a cellular telephone store from 2000 to
2002 and opened his own cell phone business in 2002.  The
business operated until 2009, when he sold the business to an
employee and moved to Los Angeles.  He invested the proceeds
of his cell phone business in a medical marijuana dispensary,
although he sold his share of the dispensary back to his
business partner after nine months.

        At this point, he began shipping quantities of
marijuana from California to New York and eventually started
to illegally import marijuana from Canada to New York.  He
ceased this criminal conduct when he was arrested on May 26,
2010.

        He was released on bond on November 4, 2011, and he
has attempted to start a business selling shoes online and
over the phone between November 2011 and March 2013.  He then

Proceedings                    33

spent three months working as a senior funding specialist for
a small business financing firm.  From July 2013 to
December 2013, he was employed as a senior funding specialist,
director of sales and marketing, at a business that provided
private financing to other businesses.  Then starting in
December 2013, he back working as a manager/risk analyst for
his current employer, which facilitates private lending to
small businesses.

          As I noted and we discussed previously, I received
anonymous reports of very serious allegations regarding
Mr. Braun's behavior in this business and his relationship to
the business.  There's, again, anonymous reports that he has
an interest in the business.  His wife, I believe, also works
in a similar but not the same business.  And a recently filed
lawsuit in Richmond County alleges that he physically attacked
someone in July of 2018 by pushing him off a one-story deck at
an engagement party.

          Finally, another lawsuit, in Dutchess County,
alleges that he threatened physical violence and reputational
harm against a person from whom the Defendant was attempting
to collect a debt in October 2017 to December 2017 and
June 2018.

          Mr. Braun requests that I sentence him below the
guideline, to a sentence of ten years imprisonment, which is
the statutory mandatory minimum required by Count One.  The

Proceedings                                          34

Government, which notes the total offense level estimated at
the plea hearing was two levels lower than the offense level
calculated in the PSR, does not object to the Court's
consideration of the guidelines estimate range that was
calculated at the plea hearing for purposes of sentencing.

Now, the plea hearing revealed a guideline range of
sentence between 210 to 262 months, as opposed to the 262 to
327 months suggested by the PSR.

The Government has also indicated that I may
consider other factors in determining Mr. Braun's sentencing,
including, as we know, the guidelines, which are not
mandatory.  So, I may sentence Mr. Braun to a sentence below
the advisory guidelines.

Now, the Court independently calculated Mr. Braun's
advisory guideline level and offense levels.  My calculation
of level 41 and Criminal History Category I resulted in a rage
of sentence between 324 months and 405 months.  This is,
again, even higher than that estimated at the plea hearing and
that calculated by the Probation Department, given that I
think the PSR mistakenly didn't use the highest offense level
in Count Six.

I've taken into consideration the Government's
position regarding the authorized and unopposed sentencing
options as well as the defense request for a ten-year
sentence, which is the mandatory minimum sentence and well

below the advisory guidelines sentence.

          After giving respectful consideration to the
advisory guidelines and all of the factors set forth in
1B U.S. Code 3553(a), I will impose a sentence that falls
below the advisory guideline range for Count One and
Count Six.

          In light of all of the circumstances of this case,
Mr. Braun has demonstrated a desire to lead a law-abiding
life.  Although Mr. Braun's crimes are very serious, he's not
been charged with other crimes in the years since he was
released on bond.

          There was a report of an arrest or a situation where
he was driving without -- is it driving on a suspended license
or -- he was driving and his license had been suspended
because of the failure to pay some traffic ticket, which was
cleared up, and that is not something that I considered an
issue for sentencing purposes.

          I note that he has a family, he has young children,
two of whom may require special therapy for speech and other
issues.  The owner of the business where Mr. Braun works
reports that he works very long hours; over twelve hours a day
at times.  His wife also reports that he tries to put the
children to bed on a regular basis and that he drops them off
at school every day.  I understand that he's important to his
parents and his nieces and nephews and his siblings and his

Proceedings                                         36

many friends.

        Based on the all of the foregoing and because of
Mr. Braun's role in this offense, which, again, distinguishes
him from many others who appear before me, given his role in
this offense and the use of violence, the fact that there was
sophisticated means employed, and in light of the defense
request for a mandatory ten-year sentence and the large
disparity between mandatory the ten-year sentence and the
sentencing guidelines, which would impose a very onerous
sentence, I believe a below-guideline sentence is warranted.

        I'm going to sentence Mr. Braun to the mandatory
ten-year sentence on Count One and three years on Count Six.
These sentences will be served not consecutively but, rather,
concurrently.  He was in custody for one year and five months,
from May 26, 2010, to November 4, 2011.  He will receive
credit for that time previously served against his sentence
that was imposed today.

        With regard to supervised release, he will serve
fire years for Count One and three years for Count Six.
That's a total of five years since those sentences will be
served concurrently.

        Mr. Braun will submit his person, property, house,
residence, vehicle, papers, computers that he uses at home or
in his business, other electronic communications and devices
and data storage devices or media, his office, and other

Proceedings                                    37

places that he occupies to a search condition by a United
States Probation Officer.  Failure to submit to this condition
will be grounds for revocation of supervised release.

        You must advise any other occupants that their
premises may be subject to searches pursuant to this
condition.  An officer may conduct a search pursuant to this
condition only when the officer has reasonable suspicion that
Mr. Braun has violated a condition of his supervision and that
the areas to be searched contain evidence of the violation.
Any search must be conducted in a reasonable time and in a
reasonable manner.

        Mr. Braun must comply with the fine that I will be
imposing.  You must pay that fine immediately; and if not
immediately, interest will accrue and you will pay it pursuant
to the schedule that I will impose.

        Upon request, Mr. Braun must provide the U.S.
Probation Department with truthful and complete disclosure of
all of his financial records, including comingled income,
expenses, assets, and liabilities, and include yearly tax
returns; federal, state, and local.

        With the exception of the financial accounts
reported and noted within the presentence report and his sworn
financial disclosure, he is prohibited from maintaining or
opening any additional individual or joint checking, savings,
or other financial accounts in his name or the names of any

Proceedings                                      38

obligees.  And this applies to any personal or business
purpose.  He must first disclose and seek approval from and
obtain approval from a United States Probation Officer.

He must cooperate with Probation in the
investigation of his financial dealings and shall provide
truthful monthly statements of his income and expenses.  If
he's going to declare expenses for the family, then he must
also declare income and assets of the family, including his
wife.  Mr. Braun shall cooperate in the signing of any
necessary authorizations to release information which would
permit the U.S. Probation Department to access his financial
records.

All financial disclosures are subject to penalties
of perjury and any false statements to Probation or the
Government will also result in separate criminal charges if he
does not disclose truthfully the extent of his assets, and
that additional criminal conduct would be grounds to violate
or revoke supervised release.

I will not impose restitution given that the
Government has not identified any victims.

The forfeiture has already been effected by the Drug
Enforcement Administration.

Mr. Braun shall pay a $100,000 fine, which is due
and payable immediately.  If he cannot pay that immediately,
he shall pay it at a minimum rate of ten percent of his gross

Proceedings                                              39

monthly income while he is on supervised release or -- I'm,
sorry let me start over.

        He must pay it at the rate of 10 percent of his
gross monthly income or $25 per quarter while he is in
custody, whichever is greater.  He has an opportunity to earn
money while in custody.

        Starting on the first day of the first month of his
release, Mr. Braun shall continue his payments at the minimum
monthly rate of at least $2,500 per month or 15 percent of his
gross monthly income after deductions required by law, which
ever is greater.

        When I say "deductions required by law," I mean
federal, state, or local income taxes, as well as Social
Security and federal unemployment taxes.  Whatever is left, he
pays the greater of 15 percent of that or $2,500 per month.

        He must also pay immediately a $200 mandatory
special assessment in the amount of -- for each of Counts One
and Six.  So, $100 on each count total $200 in mandatory
special assessments.

        In addition, is the Government prepared to dismiss
Counts Two to Five?

        MR. HEEREN:  Yes, your Honor.  Before we do so, just
for the record, I want to understand, the Court's
consideration includes the consideration of the Government's
motion contained in its sealed letter as well?

I believe that's the case, I just want to make sure that's clear.

THE COURT:  Absolutely, I did consider it.

MS. CAPPELINO:  Actually, your Honor, if I could just add, I know we had some supplemental submission, and I am sorry, I think your Honor mentioned this at the beginning, but we submitted something June 13, 2018, and I believe that was received.

THE COURT:  Yes, we did review that as well.

MS. CAPPELINO:  Thank you.

I know this is probably a disappointment for Mr. Braun's family members who asked, basically, for leniency, which I think under the guidelines and given the other considerations it is.  It doesn't seem like a lenient sentence, but I considered all of the factors that were provided and before me.

I think we should discuss a surrender date, if not immediately.  Between now and the date he surrenders, he should be wearing a home monitoring or home detention electronic monitoring, given evidence in the presentence report that he previously fled from justice and generated a lot of money that I don't think the Government has fully accounted for.

And, so, we can talk about a surrender date, but it would be subject to the conditions imposed when he was

Proceedings                                    41

released on bond, which required home incarceration with
location monitoring except leave permitted by Probation for
court appearances, attorney visits, medical appointments.  Or
if there's a regular work schedule, that can be accommodated.

        MR. HEEREN:  Your Honor, I think you had asked me a
moment ago if we had anything to dismiss.  We do.

        The Government dismisses the remaining counts in the
underlying indictment at this time.

        THE COURT:  Counts Two through Five of the
superseding indictment and the underlying indictment will be
dismissed.

        MR. HEEREN:  Thank you, your Honor.

        THE COURT:  So, let's talk about a surrender date.
Generally, the BOP takes six weeks to designate somebody.  He
can self-surrender or I can order that he surrender here to
the marshals and they can transport him to the facility.

        MR. HEEREN:  Your Honor, in light of the Defendant's
significant time being out of custody, and, with some
exceptions, largely complying with his conditions, the
Government doesn't object, provided the conditions that the
Court announced, if he prefers a surrender date.  The
Government has no objection to that.

        THE COURT:  All right.

        MS. CAPPELINO:  Your Honor, we request a
self-surrender date in three months.

Proceedings                                    42

          THE COURT:  May I be told why such a long period of
time is necessary?

          Usually it's six to eight weeks.

          MS. CAPPELINO:  So Mr. Braun can get his employment
situation and his family's situation under control and he can
set up accordingly in terms of those factors, we request 90
days or -- whatever the Court would prefer, but 90 days would
be ideal.

          THE COURT:  That's the end of August?

          MS. CAPPELINO:  Yes, your Honor.

          THE COURT:  August 25?

          MS. CAPPELINO:  That's fine, your Honor.  Thank you.

          THE COURT:  And he'll self-surrender or does he want
to surrender here?

          THE DEFENDANT:  I'll self-surrender.

          MS. CAPPELINO:  He'll self-surrender to the
designation, your Honor.

          THE COURT:  I'll ask defense counsel to confirm
Mr. Braun has surrendered to the facility on August 25.  I
think it's before 2:00 p.m. or noon.

          Would he prefer that I recommend a designated
facility?

          MS. CAPPELINO:  Anything within the tri-state area,
your Honor, as close as possible facility.

          THE COURT:  I will recommend a facility that will

                      LAM      OCR      RPR

Proceedings                                    43

make it more convenient for family visits.

        MS. CAPPELINO:  Thank you, your Honor.

        THE COURT:  Is there anything else I need to address before we adjourn?

        MR. HEEREN:  Nothing from the Government, your Honor.

        MS. CAPPELINO:  Nothing from the defense.

        THE COURT:  All right.  Thank you.

        MR. HEEREN:  Thank you, your Honor.

        MS. CAPPELINO:  Thank you.

        THE COURT:  Is the pretrial services officer present?

        THE DEFENDANT:  They asked that I go there after this.

        THE COURT:  Defense counsel, accompany Mr. Braun to the pretrial services office so he can get set up with location monitoring?

        MS. CAPPELINO:  Certainly.

        (Matter concluded.)


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


      /s/ Linda A. Marino         May 29, 2019
        LINDA A. MARINO           DATE

EXHIBIT D

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 10-CR-433(KAM)
                               :
                               :
                               :
       -against-               : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
JONATHAN BRAUN,                : Tuesday, May 28, 2019
                               : 10:00 a.m.
          Defendant.           :
                               :
                               :
                               :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR MOTION TO SEAL COURTROOM
BEFORE THE HONORABLE KIYO A. MATSUMOTO
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: RICHARD P. DONOGHUE, U.S. ATTORNEY
                    EASTERN DISTRICT OF NEW YORK
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                    BY:  CRAIG HEEREN,
                         Assistant United States Attorney

 For the Defendant:   MERINGOLO & ASSOCIATES, PC
                      375 Greenwich Street
                      New York, New York 10013
                      BY:ANJELICA BIANCA CAPPELLINO, ESQ.




Court Reporter:      LINDA A. MARINO, OFFICIAL COURT REPORTER
                     225 Cadman Plaza East/Brooklyn, NY 11201
                     lindacsr@aol.com

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

Proceedings                               2

1          THE COURTROOM DEPUTY:  This is criminal cause for A

2     motion to seal the courtroom, Docket 10-CR-433, USA v.

3     Jonathan Braun.

4          Will the Government's attorney state your

5     appearance, please?

6          MR. HEEREN:  Good morning, your Honor.  Craig Heeren

7     on behalf of the United States.

8          THE COURT:  Good morning.

9          THE COURTROOM DEPUTY:  And Defendant?

10         MS. CAPPELLINO:  Good morning, your Honor.  Anjelica

11    Cappellino on behalf of Jonathan Braun.

12         THE COURT:  Good morning.

13         Good morning, Mr. Braun.

14         THE DEFENDANT:  Good morning.

15         THE COURT:  Sir, do you have any difficulty speaking

16    or understanding English?

17         THE DEFENDANT:  No, none.

18         THE COURT:  We are here preliminarily to address the

19    defense motion for courtroom closure during his sentencing.

20    And in support of that application, Mr. Braun, through

21    counsel, has submitted a letter and also exhibits, which I've

22    reviewed.

23         Now, I note that the issue of courtroom closure is

24    one that the Second Circuit has addressed previously.

25    Generally, the Court has recognized, as we should, the

LAM      OCR      RPR

Proceedings                                                        3

1    public's right to access pursuant to the First Amendment.  And

2    the Second Circuit has cautioned that closure and the power to

3    close a courtroom where proceedings are being conducted during

4    the course of a criminal prosecution is one to be very seldom

5    exercised and, even then, only with the greatest of caution

6    and under urgent circumstances for very clear and apparent

7    reasons.

8            Now, the Government has submitted a response in

9    which they indicate that it has neither requested permission

10   from the Deputy Attorney General, which is required in order

11   to close the courtroom, it has not sought nor attained

12   permission and sets forth its reasons why it does not believe

13   that closure is warranted.

14           First, I must consider what substantial possibility

15   of prejudice may exist to either the Defendant, the

16   Government, or a third party.  The types of examples include

17   the Defendant's right to a fair trial, which is not at issue

18   here; the privacy interests of the Defendant, victims, or

19   other persons.

20           Again, I make note that every Defendant who comes

21   before the Court has privacy interests, but, nonetheless, our

22   system of jurisprudence requires an open courtroom for most,

23   if not all, matters except, as we said, under the most

24   compelling circumstances.

25           I must also consider the integrity of significant

1  Government activities, such as an ongoing undercover
2  investigation or detection devices or other matters which may
3  pose dangers to the investigation or other people.  That is
4  not an issue here.

5        And I must also consider the need to protect grand
6  jury secrecy or ongoing investigations.  Those types of
7  concerns are not present in the application.  We don't have a
8  danger of alerting potential targets to investigations or
9  causing witnesses to become reluctant to testify or to expose
10  innocent folks or folks under investigation to public
11  embarrassment before the Government has concluded the
12  investigation.

13        So, with regard to the first prong of substantial
14  probability of prejudice, I don't find that the Defendant
15  seeking this closure has established a sufficient probability
16  of prejudice.  I understand that the attachments to the letter
17  may have raised concern on the part of Mr. Braun and his
18  family members; however, the Government has indicated that it
19  does not see any connection between those matters and
20  Mr. Braun's status here as a Defendant.

21        I will note that there does appear to be a fair
22  number of folks, based on the anonymous letters that I've
23  received and the media coverage, who have issues with
24  Mr. Braun, who have felt that he has mistreated them or has
25  treated them harshly or has done things that some of these

LAM    OCR    RPR

Proceedings                                          5

1   letter writers claim are illegal in terms of threatening

2   behavior.

3          The Government has looked into this?

4          MR. HEEREN:  Yes, your Honor.

5          THE COURT:  This financial type of situation and has

6   not found that -- well, we can address this later, I guess,

7   during the sentencing.  Let me just leave it there.

8          I think that some of those if not all of the texts

9   indicate that there are a number of people who dislike

10  Mr. Braun.  And I'm not prepared to find that there's any

11  connection necessarily to this case but, rather, just to his

12  activities in the community since he was released on bail.

13         So, even though I need not find whether there are

14  reasonable alternatives to closure because I haven't found

15  that Mr. Braun has satisfied the first prejudice prong, again,

16  balancing the public right of access and the need to ensure

17  that our court proceedings are open, I don't find that there's

18  any lesser alternative other than, obviously, during

19  sentencing the parties will be discreet about what they may

20  say in an open courtroom, bearing in mind that I've read every

21  single submission, both letters of support for Mr. Braun and

22  these anonymous letters from detractors, which, frankly, raise

23  very serious concerns.  But you can't do something with an

24  anonymous complaint.  And just based on the font used in the

25  letters, it appears they may be written by the same person.

Proceedings                                                         6

1        But those letters also list a number of other

2   possible avenues of investigation, and I'm trusting that the

3   Government has done what it needs to do to ensure that there

4   are no ongoing criminal activities and that Mr. Braun's safety

5   is not in jeopardy.

6        MR. HEEREN:  Yes, your Honor.

7        THE COURT:  So, in giving balance to the concerns

8   raised by Mr. Braun, and I'm saying that I understand very

9   well why he has those concerns, and the First Amendment right

10  of public access to court proceedings, I find that the balance

11  tips in favor of public access.

12       So, that being said, I respectfully deny the request

13  to close the courtroom.  I do know that when the Government

14  feels that there is the basis to seek closure, they do so,

15  although they do it sparingly.  And these are not applications

16  that I take lightly; I take them very seriously.

17       So, that being said, I will, as I said, respectfully

18  deny the application to close the courtroom, and I've

19  previously granted the applications to seal the applications

20  in support of the closure.

21       Is there anything I else I should address at this

22  time?

23       MS. CAPPELLINO:  No, your Honor.  Thank you.

24       MR. HEEREN:  No, your Honor.  Thank you.

25       THE COURT:  Just bear in mind, if I did close the

Proceedings                                           7

1    courtroom it would mean everyone has to leave except

2    Mr. Braun.  And the Defendant has the right to have friends

3    and supporters here during his sentencing, and I would want to

4    make sure that he has that support.

5              We were scheduled to commence the sentencing at I

6    believe it was 11; is that right?

7              MR. HEEREN:  Yes, your Honor.

8              THE COURT:  But if everybody is here, perhaps we can

9    move forward.

10             MR. HEEREN:  It's fine with the Government.

11             MS. CAPPELLINO:  Certainly.

12             THE COURT:  Do you want to take a few minutes?

13             MS. CAPPELLINO:  I don't think so your Honor.  We're

14   ready.

15             THE COURT:  All right.

16

17             (Matter concluded.)

18

19                        * * * * *

20

21   I certify that the foregoing is a correct transcript from the

22   record of proceedings in the above-entitled matter.

23

24       /s/ Linda A. Marino              May 29, 2019
         _____         _____
25          LINDA A. MARINO                    DATE


                    LAM      OCR      RPR

EXHIBIT E

| Defendants in *U.S. v. Cournoyer,* 12-CR-65 (SLT) | Sentence | Count |
|---|---|---|
| Jimmy Cournoyer | 27 years' imprisonment | Continuing Crimnal Enterprise (top count) |
| Mario Racine | Time served | Conspiracy to Import MJ |
| Bobby Gelebi | Time served | Conspiracy to Distribute |
| Jose Castillo-Medina | Time Served | Conspiracy to import MJ, Conspiracy to distribute, money laundering |
| Patrick Paisse | 48 months' imprisonment | Conspiracy to import |
| Alessandro Taloni | 10 years' imprisonment | Conspiracy to extort; distribute |
| John Taschetti | 20 months' imprisonment | Conspiracy to distribute MJ |
| Yousef Trig | Pending | |
| John Venizelos | 11 years' imprisonment | Conspiracy to Distribute MJ |

| Sentenced Defendants in *U.S. v. Curatola,* 10-CR-991 | Sentence | |
|---|---|---|
| Dominick Curatola | 60 months' imprisonment | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B); importation |
| German Chajchic | | |
| Michael Decresenzo | 60 months' imprisonment | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B) |
| Jose Castillo-Medina | 21 months' imprisonment | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B) |
| Elizabeth Jennings | | |
| Steven Martin | | |
| Kerry Iasparra | | |
| Brian Sullivan | 27 months' imprisonment | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B); |
| Gregory Ballin | 3 years' probation | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B) |
| Eric Preimer | 21 months' imprisonment | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B) |
| Michael Bradley | Time served | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B) |
| Joseph Campo | 3 years' probation | Conspiracy to distribute MJ – 21 U.S.C. 841(b)(1)(B) |
| | | |
| | | |

| Sentenced Defendants in *U.S. v. Square,* et al., 08-CR-916 (SLT) | Sentence Imposed |
|---|---|
| Sean Barilko | 70 months' imprisonment |
| Walter Baus | Time served |
| Benny Benedict | Time served |
| Brittany Benedict | 3 years probation |
| Jean Beneat | Time served |
| Floyd Bingham | Time served |
| Lois Joy Boots | Time served |
| Grover Brink | 1 year and 1 day imprisonment |
| Driton Camaj | Time served |
| Martin Camaj | 36 months' probation |
| Nick Camaj | Time served |
| Joseph Chicarelli | 5 years' probation |
| Katie Cook | Time served |
| Denise Cook | Time served |
| Clyde Cree | Pending |
| Kenneth Cree | Time served |
| David Cruz | 70 months' imprisonment |
| Enis Djurcovic | 28 years' imprisonment |
| Reed Drumm | Time served |
| Michael Fields | 12 months' and one day imprisonment |
| Guy Gantz | Time served (53 months) |
| Scott General | 15 months' imprisonment |
| Jonathan Goldfried | 18 months' imprisonment |
| George Iordan | Time served |
| Kim Ki Joo | 3 years probation |
| Andrew Kagan | 3 years probation |
| Jonathan Kaye | Time served |
| Mersim Kolenovic | Time Served |
| Tara Lazore | 3 years probation |
| Thomas Lazore | 15 months' imprisonment |
| John Marinos | 32 months' imprisonment |
| Arnold Mason | Pending |
| Derrick Maultsby | 12 months' imprisonment |
| Mihail Mesitidis | Pending |
| Robert Moore | 46 months' imprisonment |
| Robin Oakes | Time served |
| Wentenhawi Oakes | Time served |

| | |
|---|---|
| **Slobodan Pavicevic** | 24 months' imprisonment |
| **Harun Pejcinovic** | 4 years' probation |
| **Dennis Quinones** | 36 months' probation |
| **Carmelo Ruiz** | 33 months imprisonment |
| **Louis Russo** | 24 months' imprisonment |
| **Joseph Scavetti** | Time served |
| **Bruce Schultz** | Time served |
| **Gentian Shkurti** | 24 months imprisonment |
| **Mitchell Smoke** | 60 months' imprisonment |
| **David Square** | Time served |
| **Randolph Square** | Time served (CCE) |
| **David Sunday** | Time served – CCE – 168-210 months' guidelines range (safety valve eligible) |
| **Nicholas Sunday** | Time served |
| **Oren Sunday** | Pending |
| **Samantha Thompson** | Pending |
| **Darren Weingrow** | Time served |
| **Anthony Zingarelli** | Time served |