TH/RAB
F. #2025R00212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -                  Docket No. <u>10-CR-433 (KAM)</u>

JONATHAN BRAUN,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

<u>THE GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW</u>

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Tanya Hajjar
Rachel A. Bennek
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law following the revocation of supervised release hearing held by the Court on April 10, April 11, May 15 and June 13.  As set forth below, the testimony and evidence adduced at the hearing makes clear that the defendant Jonathan Braun violated the terms of his supervised release.  The government respectfully requests that the Court revoke the defendant's supervised release and set a date for sentencing.

BACKGROUND

The defendant Jonathan Braun pleaded guilty on November 3, 2011 to one count of conspiracy to import more than 1,000 kilograms of marijuana and one count of money laundering to promote the carrying on of narcotics trafficking. The defendant's conviction arose out of a Drug Enforcement Administration investigation into large-scale marijuana trafficking from Canada into the United States. Presentence Investigation Report Dated February 28, 2018 ("PSR") ¶¶ 6-15. The defendant trafficked more than $6 million in marijuana per week, using boats and private planes to smuggle the drugs across the border, and was responsible for laundering approximately $14 million in drug proceeds. Id. ¶¶ 8, 15. At the time of the defendant's arrest, law enforcement agents retrieved $77,000 in bundled cash, drug ledgers, 16 cellular telephones, and 5 identical fraudulent New York State driver's licenses from his residence in Staten Island. Id. ¶ 15. The defendant used threats and violence to collect his debts and deter cooperation with the government; after a stash house in California was raided by law enforcement, the defendant hit the individual who controlled the stash house with a belt and threatened him and his family if he did not repay the value of the seized marijuana. Id.

On May 28, 2019, the Court sentenced the defendant to ten years' custody; a five-year term of supervised release; a $100,000 fine, according to a payment plan specified by the Court; and a $200 mandatory special assessment. See Judgment, ECF Docket Entry No. 163. The Court ordered a payment schedule for the defendant's fine at the greater of (1) the minimum monthly rate of at least $2,500 per month; or (2) 15% gross monthly income after deductions required by law. Id. On January 19, 2021, the defendant's sentence of

imprisonment was commuted by the President to time served, but the remainder of the defendant's sentence, including his term of supervised release and fine, were left intact.

On April 1, 2025, the United States Probation Office submitted a report (the "VOSR Report") alleging that the defendant Jonathan Braun committed seven violations of his supervised release. The Probation Office filed a second report, dated May 1, 2025 (the "VOSR Supplement") adding three violations.[1]

- **Charges One, Two and Three**: On March 29, 2025, the defendant assaulted an individual (referred to herein as "Shammai") and his three-year-old son (referred to herein as the "Minor Victim") and endangered the welfare of the Minor Victim.

- **Charge Four**: On January 24, 2025, while at Mount Sinai South Nassau Hospital, the defendant attempted to punch a registered nurse in the emergency department (Brianna Peace) and swung an IV pole at her.

- **Charge Five**: On March 22, 2025, the defendant grabbed the arm of a man (Edward Miller) and threatened him during religious services at a temple.

- **Charges Six and Eight**: On February 15, 2025, the defendant went to the bedroom of the live-in nanny he and his wife employed (referred to herein as "Danelle"). The defendant held Danelle on her bed, groped her without her consent, and forced Danelle to touch his genitals.

- **Charge Seven**: Between approximately May and July 2024, the defendant, who was driving a white Lamborghini Urus and a black Ferrari, repeatedly evaded paying tolls on the Atlantic Beach Bridge.

- **Charge Nine**: Since commencement of his supervised release term on January 19, 2021, Braun failed to pay his court-ordered fine and has an outstanding balance of $77,200.

---

[1] Charge Ten, which alleged that the defendant left the Eastern District of New York without authorization from the United States Probation Department and the Court, was subsequently dismissed.

## APPLICABLE LAW

A sentencing court may revoke supervised release and impose a term of imprisonment if the court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release."  18 U.S.C. § 3853(e)(3).  "The preponderance standard requires proof that the defendant's violation of supervision was more likely than not."  United States v. Edwards, 834 F.3d 180, 199 (2d Cir. 2016) (internal quotation marks omitted).  Revocation proceedings are not considered "part of a criminal prosecution, and therefore, defendants in such proceedings are not entitled to the full panoply of rights that criminal defendants generally enjoy."  United States v. Carthen, 681 F.3d 94, 99 (2d Cir. 2012) (internal quotation marks omitted).  The Confrontation Clause and the Federal Rules of Evidence do not apply to revocation hearings.  United States v. Aspinall, 389 F.3d 332, 340-43 (2d Cir. 2004), abrogated on other grounds by United States v. Booker, 543 U.S. 220 (2005); Fed. R. Evid. 1101(d)(3).

As the trier of fact in a revocation hearing, the district court must decide whose testimony should be credited.  Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).  The court is "entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness."  Id.; see also Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952) ("[E]vidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story.").

<u>VIOLATIONS OF SUPERVISED RELEASE</u>

At the hearing held on four days in April, May and June, the government proved by a preponderance of the evidence that the defendant knowingly violated the terms of his supervised release.

I.    <u>Charges One, Two and Three</u> (March 29, 2025 Assault and Endangerment)

Charges One, Two and Three of the VOSR Report allege that the defendant committed (1) assault in the second degree, in violation of New York Penal Law § 120.05 (Charge One); (2) assault in the third degree, in violation of New York Penal Law § 120.00 (Charge Two); and (3) child endangerment, in violation of New York Penal Law § 260.10 (Charge Three).  As set forth below, the government has proven by a preponderance of the evidence that the defendant committed Charges Two and Three.

With respect to Charge One, although Shammai reported to law enforcement that the defendant hit the Minor Victim, <u>see</u> GX27, submitted a sworn statement that the child was assaulted, and provided law enforcement with a photograph of a red mark on the child's back, <u>see</u> GX28, both Shammai and his wife Sara denied having witnessed the assault of the Minor Victim.  Contemporaneous communications, however, significantly undermine their testimony that the Minor Victim may have "slipped."  Those communications also reflect that the defendant's mother told Shammai not to call the police about the incident and that Shammai would be "paid more" for not involving law enforcement.  GX31.  Although the government acknowledges that it has not proven Charge One, the government respectfully submits that in testifying at the revocation hearing, Shammai repeatedly sought to minimize the defendant's conduct and Shammai and Sara's testimony regarding the assault of their son was not credible and contradicted by Shammai's contemporaneous

communications.  In evaluating their testimony, the Court may "believe some parts and disbelieve other parts," Diesel Props, 631 F.3d at 52, and may find that the "implausibility of [their] story" may lead to the "permissible inference that the opposite of [that] testimony is true." Penick v. Filion, 144 F. Supp. 2d 145, 155 (E.D.N.Y. 2001) (concluding that opposite of witness's testimony was true having observed the witness's demeanor in context of evidentiary hearing on habeas petition).

A.    Relevant Facts

The testimony and exhibits presented at the evidentiary hearing make clear that on the morning of March 29, 2025, Shammai, his wife Sara, their four young children and their children's nanny were at the defendant's home when the defendant initiated a violent altercation during which the defendant struck Shammai's face, knocked him to the ground and kicked him, and then screamed expletives at Shammai's family and chased them out of his house.

The defendant's butler, Justin Dizon, testified that the defendant had a heated argument and then "tried to grab Shammai and they fell to the floor."  Transcript of Revocation Hearing ("Tr.") 8 (Dizon's testimony).  Shammai similarly testified that the defendant "got upset and he hit me."  Tr. 277.  After knocking Shammai to the ground, the defendant stood "over" Shammai, shouting at him.  Tr. 280 (Shammai testimony); see also Tr. 31-32 (Dizon testimony).  Shammai testified that the defendant "chased me out [of] the room and wanted me to leave his house."  Tr. 277.  The defendant then followed Shammai and yelled at him and his family.  See GX14.

As reflected in the video footage admitted at the hearing as Government Exhibit 12, the defendant, dressed in a bathrobe, chased Shammai through the kitchen and

kicked him repeatedly as Shammai attempted to escape.  GX12.  The defendant screamed, among other things, "I'll fuck you up," "Get the fuck out!", "You want to get fucked up?" and "You think you can take me?"  GX12.

Additional video footage depicts the defendant as he followed Shammai through the foyer of his home and into the section of the home where Shammai's wife and children were located.  GX13.  As the defendant continued into the part of the home where the children were located, as reflected on the audio of the footage, a child can be heard crying.  GX13 (at 00:25 to 00:45).  Subsequent video depicts Shammai, his wife, his children, and the children's nanny as they rushed from the defendant's home as the defendant pursued them.  GX14.  The defendant screamed that the "dirty fucking kids" need to "get the fuck out of here now" and that they were "not welcome."  GX14.  Shammai's wife and his nanny each held small children in their arms.  The Minor Victim, who was three years old at the time, walked quickly of the home and appeared visibly upset in video footage.  GX14.

Later that same day, Shammai made a report to the Nassau County Police Department that he and the Minor Victim had been assaulted, at which time law enforcement officers took photographs of Shammai's face and injured elbow.  GX20-23; see also GX27.  Shammai also provided law enforcement with a photograph of a red mark on the Minor Victim's back.  GX28.

Shammai testified that following the defendant's assault, he experienced pain in his head for a few days and had a cut on his elbow as a result of the defendant's conduct.  Tr. 305-06.

B.    Applicable Law

The defendant was charged with assault in the second degree, in violation of New York Penal Law § 120.05 (Charge One), which requires proof that the defendant intentionally caused physical injury to a child "less than seven years old"; assault in the third degree, in violation of New York Penal Law § 120.00 (Charge Two), which requires proof that the defendant intentionally or recklessly caused physical injury to another person; and child endangerment, in violation of New York Penal Law § 260.10 (Charge Three), which requires proof that the defendant acted "in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old[.]"

As to Charges One and Two, the relevant statute defines "physical injury" as "impairment of physical condition or substantial pain."  New York Penal Law § 10.10; People v. Chiddick, 8 N.Y.3d 445, 446, 866 N.E.2d 1039 (2007).

C.    The Preponderance of the Evidence Establishes that the Defendant Committed Charges Two and Three

As set forth below, the preponderance of the evidence establishes that the defendant's violent and dangerous conduct on March 29, 2025 constituted commission of Charges Two and Three.

With respect to Charge Two, the evidence establishes that the defendant acted with the intent to injure Shammai and in fact injured Shammai.  The defendant's intent is apparent from the video footage in which the defendant kicked and chased Shammai and threatened to "fuck [Shammai] up."  GX12.  In addition, the testimony from Shammai, Dizon, and Sara all made clear that the defendant was the physical aggressor and kicked

Shammai and hit Shammai.[2]  The photographs of Shammai's injuries and his testimony also make clear that the defendant caused a physical injury, including by causing Shammai substantial pain.  Substantial pain "is more than slight or trivial pain … [but] need not, however, be severe or intense."  Chiddick, 8 N.Y.3d at 447 (finding victim's description of feeling "moderate pain" after the defendant bit his finger was sufficient to constitute "substantial pain").

The defendant's conduct resulted in a cut to Shammai's elbow and pain in Shammai's head and while chewing for days following the assault.  GX22-23; Tr. 305-306 (Shammai testifying the cut to his elbow was caused when the defendant brought him to the floor and explaining that his head hurt for two to three days following the incident and that chewing bothered him as a result of the defendant hitting him in the face).[3]  These injuries and pain constitute physical injury.  See, e.g., Chiddick, 8 N.Y.3d at 446-47 (finding sufficient evidence of substantial pain where defendant bit victim's finger cracking the victim's finger nail and causing the finger to bleed); People v. Stapleton, 33 A.D.3d 464, 465, 823 N.Y.S.2d 32, 32-33 (1st Dep't 2006) (finding sufficient evidence of physical injury where victim was punched twice causing a swollen temple and pain for a day and a half despite taking a pain reliver); People v. James, 2 A.D.3d 291, 769 N.Y.S.2d 38, 38 (1st Dep't

---

[2]    Even if the evidence did not establish the defendant's intent to injure Shammai by a preponderance of the evidence, at a minimum, the defendant acted recklessly in injuring Shammai, satisfying the scienter requirement of New York Penal Law § 120.00.

[3]    Although Shammai described the pain as "minor," Tr. 306, the government respectfully submits that it was apparent from Shammai's testimony that he was attempting to minimize the defendant's conduct.  Given that Shammai experienced pain for multiple days after being hit in the face, Shammai's pain constituted physical injury within the meaning of the statute.

2003) (finding sufficient evidence of physical injury where the victim was punched twice in the face causing "pain, swelling, and headaches"); People v. Smith, 283 A.D.2d 208, 726 N.Y.S.2d 12, 13 (1st Dep't 2001) ("The element of physical injury was established by evidence that defendant punched the victim on the side of the head during the robbery, causing a bump and a bruise with resulting soreness, as well as pain when eating for approximately a week thereafter."); see also United States v. McCourty, 789 F. App'x 232, 235 (2d Cir. 2019) (summary order) ("A punch to the face—even one—is 'an experience that would normally be expected to bring with it more than a little pain.'"); Smith v. Duncan, No. 03-Civ-910 (DLC)(JCF) 2004 WL 859201, at *7 (S.D.N.Y. Apr. 21, 2004) ("Evidence that [the defendant] punched [the victim] hard enough to knock him to the floor, to cause a bump and bruising, and to result in a week of pain each time the victim tried to chew is sufficient to establish the element of physical injury under this definition."), report and recommendation adopted at 2004 WL 1857570, at *5.

With respect to Charge Three, the defendant's conduct on March 29 also constitutes child endangerment in violation of New York Penal Law § 260.10, which does not require actual harm, nor that the defendant's conduct be specifically directed at the child. People v. Johnson, 718 N.Y.S.2d 1, 95 N.Y.2d 368, 371-72 (2000). Not only did the defendant loudly and violently physically assault the father of the four children while the children were in his home, but he chased the children from his home, screaming insults at them, and causing three-year-old Minor Victim to fall to the ground, injuring his back. (See GX28, Tr. 281-88, 293-96, 420, 425). In some cases, courts have found vulgar language alone can constitute endangering the welfare of a child. People v. Simmons, 92 N.Y.2d 829, 830-31, 677 N.Y.2d 58 (1998) (finding sufficient evidence of child endangerment where a

day care worker made mocking and vulgar remarks to a 23-month-old child in her care over

a period of six weeks). Here, not only did the defendant scream repeatedly around the

children, referring to them in their presence as "dirty fucking kids," but he physically chased

them from his home and caused the Minor Victim to fall, injuring himself. The fear the

children experienced is apparent from the video footage showing them fleeing the

defendant's home, which is also consistent with the testimony provided by Shammai and

Sara. See GX14. Shammai testified that following the incident, the Minor Victim "was very

freaked out from the whole thing. He was crying, he was very pent up, like, very in shock,"

as were Shammai's other children. Tr. 303. Sara testified that all four of her children were

crying throughout the incident. Tr. 421. This Court may "draw upon [its] common human

experience and commonsense understanding of the nature of children to conclude that the

defendant's remarks [and behavior] were likely to cause the child[ren] harm." Matthews v.

Barr, 927 F.3d 606, 619 (2d Cir. 2019) (internal quotation marks and alterations omitted); see

also Guzman v. Holder, 340 F. App'x 679, 681 (2d Cir. 2009) (describing the "wide variety

of conduct [that] violates N.Y. Penal Law § 260.10"); People v Bray, 46 A.D.3d 1232, 848

N.Y.S.2d 738, 741 (2007) (finding evidence of child endangerment sufficient where there

was evidence of a verbal and possibly physical confrontation in front of children that

"terrified the children, who were crying and screaming hysterically"). Thus, the

preponderance of the evidence establishes that the defendant's violent and dangerous

conduct on March 29, 2025 constituted commission of Charges Two and Three.

   With respect to Charge One, the government acknowledges that the testimony

and evidence presented is not sufficient to meet the elements to find the assault on the Minor

Victim proved. Although Shammai previously reported and provided evidence to law

enforcement of the defendant assaulting the Minor Victim on March 29, see GX27, GX28, during the revocation hearing, both Shammai and Sara denied having witnessed the assault of the Minor Victim.  Contemporaneous communications, however, significantly undermine Shammai and Sara's testimony.  In Government Exhibit 29, a phone call recorded by Shammai on March 29, 2025, Shammai told Dizon that the defendant "hit [him] in the face" and "hit [my] son also," to which Dizon stated, "I know, bro."  GX29; Tr. 371-74 (SA Costello's testimony).  When Dizon stated that he (Dizon) had not seen the defendant hit Shammai's son, Shammai stated that it took place "[o]utside, when we were leaving the house" and that his son was "all red" and "hurting."  And, as reflected in Government Exhibit 30, Shammai told an employee of the defendant that it was not "safe" for her to go to work at the defendant's home because the defendant "attacked me today and he attacked my son."

The government is particularly troubled by communications between Shammai and the defendant's mother, as reflected in Government Exhibit 31, in which Shammai reported an attack on his child and the defendant's mother directed Shammai not to call the police and indicated that he would be "paid more."  GX31.  Although Shammai testified at the revocation hearing that he had not communicated with the defendant or anyone in the defendant's family after the incident on March 29, 2025, Shammai continued to communicate with the defendant's mother after this date.[4]  Although the government

---

[4]        On March 30, 2025, Shammai sent the following message to the defendant's mother: "I'm still waiting for your call[.] You told me yesterday that your [sic] going to call me and I'm waiting[.]"  On March 31, 2025, the defendant's mother attempted to place a call to Shammai.  On April 6—three hours after the government's first outreach to Shammai, Tr. 382-83—Shammai sent a message to the defendant's mother stating that it seemed she hadn't received his "message" and that he hadn't "received the payment for the last month for the

acknowledges that the evidence presented is not sufficient to find that the Minor Victim was assaulted, the government is deeply troubled by the directive by the defendant's mother not to call the police and that Shammai would be "paid more" for not involving law enforcement and submits that these interactions provide relevant context for evaluating Shammai and Sara's credibility.

II.    <u>Charge Four</u> (Menacing of Brianna Peace)

The evidence at the revocation hearing clearly established that on January 24, 2025, the defendant menaced Brianna Peace, an emergency room nurse at Mount Sinai South Nassau hospital in New York, by attempting to punch her and swinging a medical IV pole at her, in violation of New York Penal Law § 120.14.

New York Penal Law § 120.14 provides that a person is "guilty of menacing in the second degree when [he] intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or . . . firearm." Any object can qualify as a dangerous instrument within the meaning of the statute so long as "under the circumstances in which it is used, attempted to be used or threatened to be used, [it] is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13); see <u>People v. Carter</u>, 53 N.Y.2d 113, 116, 423 N.E.2d 30, 31-32 (1981) (("[T]he statute states plainly that any 'instrument, article or substance[,]' no matter how innocuous it may appear to be when used

_____

work that was done. . . . I was working this past month for you and haven't received the payment you said you were sending." On May 13, 2025, two days before his testimony in this matter, Shammai placed three apparently unanswered calls to the defendant's mother.

for its legitimate purpose, becomes a dangerous instrument when it is used in a manner which renders it readily capable of causing serious physical injury.").

The evidence at the revocation hearing established that Brianna Peace, a registered nurse, was working in the emergency room at Mount Sinai South Nassau in Oceanside, New York, at approximately 5 p.m. on January 24, 2025 when she approached the defendant, who was "screaming" profanities at the emergency department staff.  Tr. 70. The defendant had been told to supply a second urine sample after his first had spilled, and he screamed "Where is that fucking cunt?" in reference to the nurse who had been assisting him.  Id.  As Ms. Peace approached the defendant, the defendant lifted the IV pole through which he was receiving fluids and "started swinging it in [Ms. Peace's] direction."  Id.  Ms. Peace testified that she felt "threatened" and "stepped back" and "tried to deescalate the situation."  Tr. 71.  The defendant walked to the bathroom in order to provide a second urine sample at which point Ms. Peace told his wife—who was also screaming profanities at the staff—that if she could not behave appropriately in the emergency room, she would be escorted out.  Tr. 71-72.  When the defendant returned from the bathroom, the defendant's wife began screaming again at emergency room staff, and Ms. Peace informed the defendant's wife that she would have to leave the emergency room.

The defendant then "got up and started screaming that it's his wife and he tells her what to do and nobody else."  Tr. 73.  The defendant was "screaming, face red, spit coming out of his mouth when he was yelling."  Id.  Ms. Peace explained that the defendant was the patient and that she was willing to continue to treat him, but that his wife was no longer welcome as a visitor in the emergency room due to her behavior.  Tr. 74.  The defendant "lunged" at Ms. Peace, told her he would "fucking kill" her, and attempted to

punch her in the face.  Tr. 74-75.  The staff immediately attempted to intervene and the other

patients were "visibly upset."  After Ms. Peace attempted to move away, the defendant "for a

second time attempted to hit [her]."  Id.  Ms. Peace testified that she "felt like [she] was

going to be hit, so [she] felt scared."  Id.

          The evidence adduced at the hearing established that the defendant menaced

Ms. Peace.  The testimony established that the defendant advanced towards Ms. Peace, while

screaming obscenities, and swung an IV pole at her.  The defendant's actions clearly

constituted an intentional effort to place Ms. Peace in fear of injury, as further evidenced by

the fact that the defendant told Ms. Peace that he would "fucking kill" her and his attempts to

punch her in the face.  New York courts have found such actions to constitute menacing in

the second degree.  See, e.g., People v. Galindo, 85 Misc. 3d 138(A), 229 N.Y.S. 3d 811, at

*1 (1st Dep't 2025) (elements of Section 120.14(1) met where defendant "wrapped a belt

around his right hand, raised it in the air, and ran towards an off-duty probation officer" after

forcibly touching a female passenger on a subway train (internal quotation marks and

alterations omitted)); People v. Gorgone, 84 Misc. 3d 135(a), 225 N.Y.S. 3d 545, at *2

(finding allegations in the accusatory instrument sufficient to support a charge under Section

120.14(1) where the "defendant held a hammer in her right hand, cocked her arm back as if

she was going to strike the complainant, and made a 'hammering motion' towards the

complainant while stating 'I fucking hate you, I hope you die,'" and finding that, even

though a hammer is designed for household use it can constitute a "dangerous instrument"

based on the manner in which it was used); People v. Britt, 89 N.Y.S.3d 563 (N.Y. Crim. Ct.

2018) (finding that defendant's alleged conduct in holding a bicycle while approaching

victim's vehicle and stating that he would "hit you too, bitch," met the elements of second-

degree menacing); <u>see also</u> <u>Oshintayo v. Jones</u>, No. 19-CR-1249 (TWD), 2023 WL 3821325, at *12 (N.D.N.Y. Mar. 6, 2023) (evidence sufficient to support a conviction under Section 120.14(1) where the defendant "charged at [the victim] and opened and closed a two-feet-long pair of hedge clippers in [the victim's] direction"). That the defendant did not actually get close enough to Ms. Peace to hit her with his IV pole—though the IV pole was within one foot of Ms. Peace, Tr. 77—is of no consequence, since in "a pure menacing situation, there is no injury and thus no assault . . . . the intent is to frighten, not necessarily injure." <u>People v. Woods</u>, 54 Misc. 3d 453, 458, 43 N.Y.S.3d 695, 699 (N.Y. Crim. Ct. 2016); <u>see also</u> <u>People v. Bartkow</u>, 96 N.Y.2d 770, 772, 749 N.E.2d 158, 159 (Ct. App. 2001) ("[M]enacing does not require any form of 'physical contact,' actual, attempted or threatened."). The sole purpose for the defendant to have swung an IV pole at Ms. Peace was to frighten her and to make her believe that he would physically injure her, which, as Ms. Peace's testimony made clear, the defendant succeeded in doing. Thus, the government respectfully submits that the Court should find Charge Four proven.

III.    <u>Charge Five</u> (Menacing of Edward Miller)

The evidence at the revocation hearing established that on March 22, 2025, the defendant menaced Edward Miller in a synagogue in Lawrence, New York, in violation of New York Penal Law § 120.15.

New York Penal Law § 120.15 provides that a person is "guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of . . . imminent serious physical injury or physical injury."

On that date, Mr. Miller politely asked the defendant to stop talking during services. Tr. 220, 231. The defendant then "verbally attacked" Mr. Miller by "screaming,

threatening [him and] making a lot of noise." Tr. 220.  The defendant's screaming was "loud enough so that it stopped the whole services."  Tr. 224.  Mr. Miller was then called up to the Torah, Tr. 222-23, and returned to his seat.  After ten or fifteen minutes, the defendant returned to the synagogue.  Tr. 222.  The defendant was "even madder," Tr. 222, and got "in [Mr. Miller's] face," and, "making his face as scary as he could," said "Do you know who I am?"  Tr. 229.  The defendant grabbed Mr. Miller's right arm with the defendant's left hand so tightly that it caused pain.  Tr. 221, 225, 232.  Mr. Miller feared that the defendant was going to hit him in the head, so he raised his hand over his head to protect himself.  Tr. 223, 225, 235 (testimony by Mr. Miller that he raised his arm because he feared a battery).  Mr. Miller testified that he was "absolutely terrified" and that it was "terrifying being threatened by someone" who was "obviously out of control."  Tr. 225.

Mr. Miller testified that he could not recall exactly which threats were made the first or second time the defendant threatened him in the synagogue, but that he recalled the defendant telling him at various points, "Do you know who I am?  Do you know what I can do to you?" and a reference in Hebrew to the Angel of Death.  Tr. 233-34.

The evidence adduced at the hearing clearly established that the defendant menaced Mr. Miller.  By screaming at and threatening Mr. Miller and grabbing his arm tightly, the defendant intentionally placed Mr. Miller in fear of physical injury such that Mr. Miller's hand, as he described it, "shot up" to protect himself from an expected battery.  Tr. 235; see, e.g., In re Denzel F., 44 A.D.3d 389, 390, 843 N.Y.S. 2d 60, 62 (1st Dep't 2007) (finding conduct "sufficient to meet the requirements of Penal Law § 120.15" where the defendant was "in front of the complainant with his fist cocked in front of the complainant's face"); see also M.D. v. F.T., 236 A.D.3d 429, 430 230 N.Y.S. 3d 23, 25 (1st Dep't 2025) (sufficient

evidence that father menaced children in violation of section 120.15 where he hit the children on the hands or arms with a belt; cursed and screamed at the children, threatening to hit them with a belt; and physically intimidated his daughter by backing her up against a wall and screaming in her face).  Thus, the government respectfully submits that the Court should find Charge Five proven.

     IV.   <u>Charges Six and Eight</u> (Forcible Touching and Sexual Abuse of Danelle)

On April 11, the government proved by a preponderance of the evidence that on February 15, 2025, the defendant committed forcible touching, in violation of New York Penal Law § 130.51(1), and sexual abuse, in violation of New York Penal Law § 130.65(1). The victim of these crimes was Danelle, a nanny hired to care for the defendant's children.

     A.   <u>Relevant Facts</u>

The testimony and exhibits presented at the evidentiary hearing established that in February 2025, Danelle worked for the defendant as a live-in nanny.  Tr. 141-42.  On February 14, 2025, the defendant's family had moved into a new home where Danelle had her own bedroom.  Tr. 142.  That first evening in the new home, the defendant asked Danelle to plug his phone in for him because he was unable to do so himself due to a religious observance.  Tr. 142.

At approximately 6:15 a.m. on February 15, 2025, Danelle heard a knock on her bedroom door.  Tr. 143.  Believing it was one of the children, she opened the door and found that it was instead the defendant who was shirtless.  Tr. 143, 145.  The defendant told Danelle that he had argued with his wife and his wife and his parents had left the house.  Tr. 143.  Danelle felt uncomfortable and tired and attempted to get the defendant to leave her bedroom by suggesting she go check on the children or that they both go back to bed.  Tr.

144.  Instead, the defendant sat down on Danelle's bed and pulled her down with him.  Id.

He then lay down on the bed, pulling Danelle down with him so that her back was to his bare

chest, and she was in a "headlock position" with his left hand around her neck and his right

hand around her upper body.  Tr. 144-45.  The defendant then began groping Danelle's bare

breast under her shirt and told her, using an expletive, that he had always wanted to have

intercourse with her.  Tr. 145-46.

Danelle told the defendant that she did not like what he was doing to her, and

the defendant held her tighter around her neck.  Tr. 146.  The defendant took Danelle's hand

and put it on his penis.  Tr. 146.  Danelle attempted to escape the situation by stating that

they were both married and that she was menstruating, efforts which were not successful. Tr.

147.  Throughout the sexual abuse, Danelle was "exhausted," "terrified," and "shocked."  Tr.

148; see also Tr. 154 ("I was just scared"), 161 ("I just wanted to be very far away, and I was

just, like, scared"); GX11 at 5 ("I don't want to go back out what if he hurts me"), 9 ("He's

going to kill me"), 10 ("He's going to kill me[.] He's getting mad[.] I know how he gets")).

Danelle was afraid of what else the defendant would do to her in part because

she had been present at the house when an encounter happened between the defendant and

his wife that resulted in his wife screaming and running out of the house, Tr. 153, and she

had heard the defendant on the phone threatening people if they didn't pay him money.  Tr.

157; see also GX11 at 5 ("He knows people he's dangerous I don't want him to hurt me")).

Danelle was eventually able to get away by telling the defendant she needed

to go to the bathroom.  Tr. 148.  She then took her phone, which had an ongoing FaceTime

call with her husband, who was asleep,[5] and went to the bathroom, locking herself in.  Tr. 147-48.  Danelle tried to wake her husband up without alerting the defendant, who was outside the bathroom, that she was on the phone and seeking help.  Tr. 148.  While locked in the bathroom, Danelle attempted to get help by communicating with or attempting to communicate with her husband, the police, the defendant's mother and the defendant's wife.  Tr. 149, 156-58, 160, 164-65; GX9-11.  She was so terrified that she began to throw up.  Tr. 150.  Meanwhile, the defendant was outside the bathroom door trying to get in and demanding that Danelle make him reach orgasm before he would leave.  Tr. 149, 158-59.  Eventually, the police arrived and found Danelle locked in the ensuite bathroom in her bedroom.  Tr. 161, 170-71; GX7.

Danelle's testimony is fully corroborated by frantic text messages between her and her husband beginning at 6:21 a.m. on February 15, 2025.  GX11.  In those messages, Danelle told her husband contemporaneously that the defendant came into her room, sat on her bed and groped her, and held her around the neck, tightening his grip when she tried to get him to leave.  GX11 at 1-2, 4.  She wrote to her husband that she was locked in the bathroom, that she was afraid and that she was concerned that the defendant would hurt her, writing, "I don't want him to kill me."  GX11 at 1-3.

B.    Applicable Law

To prove a violation of NY Penal Law Section 130.51(1) (forcible touching), the government must prove that the defendant (1) intentionally, and (2) for no legitimate

---

[5]    Danelle testified that she and her husband would often sleep on the phone together because they did not live in the same place, and it made them feel more comfortable to have each other on the phone at night.  Tr. 147.

purpose, (3) forcibly touched the sexual or other intimate parts of another person (4) for the purpose of degrading or abusing that person, or for the purpose of gratifying the actor's sexual desire and (5) without the victim's consent.  N.Y. 130.51(1); see also People v. Hatton, 26 N.Y.3d 364, 369 (2015).  "[A]ny bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as a forcible touch within the meaning of Penal Law § 130.52."  Hatton, 26 N.Y.3d at 369 (quoting People v. Guaman, 22 N.Y.3d 678, 684 (2014)).

        To prove a violation of NY Penal Law Section 130.65(1) (sexual abuse in the first degree), the government must prove that the defendant (1) subjected another person to sexual contact (2) by forcible compulsion (3) without the victim's consent.  N.Y. Penal Law § 130.65(1).  Sexual Contact "means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party.  It includes the touching of an actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing. . . ."  N.Y. Penal Law § 130.00(3).  Forcible compulsion "means to compel by either: (a) use of physical force; or (b) a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped."  N.Y. Penal Law § 130.00(8).  "The proper focus of the inquiry on forcible compulsion is on the state of mind produced in the victim by the defendant's conduct."  Dismel v. LaValle, No. 11-cv-85 (KAM), 2013 WL 4775561, at *8 (E.D.N.Y. Sept. 6, 2013) (internal quotation marks and citations omitted).

C.    The Preponderance of the Evidence Establishes that the Defendant
      Committed Charges Six and Eight

The government submits that the evidence demonstrates that the defendant

committed forcible touching, in violation of New York Penal Law § 130.51(1) (Charge Six),

and sexual abuse, in violation of New York Penal Law § 130.65(1) (Charge Eight).

As to Charge Six, the defendant held Danelle in a headlock position and

groped her breast without Danelle's consent. See People v. Mustafa, 20 N.Y.S.3d 293, 2015

WL 4556996, at *2 (Crim. Ct. N.Y. 2015) (finding that grabbing a victim's brassiere and

exposing her breast constitutes a sufficient allegation of forcible touching of a sexual or other

intimate part of another person); People v. Smiley, 958 N.Y.S.2d 63, *5 (Crim. Ct. N.Y.

Queens Cnty. 2010) (finding the act of grabbing the victim's breasts and squeezing her

buttocks provided reasonable cause to believe the defendant forcibly touched the victims'

sexual or intimate parts with intent to degrade or abuse her and to gratify his sexual desire).

Danelle's testimony makes clear that the acts were without her consent, which she

communicated to the defendant, resulting in him tightening his grip around her throat. Tr.

146. The defendant acted intentionally and for the purpose of gratifying his own sexual

desire, which was evident based on his conduct as well as his statements to Danelle that he

had always wanted to engage in intercourse with her. Tr. 145. Based on Danelle's testimony

and the corroborating text messages and body worn camera video footage from February 15,

2025, the government has proven by a preponderance of the evidence that the defendant is

guilty of Charge Six.

As to Charge Eight, the evidence demonstrates that those elements too have

clearly been met. The defendant engaged in sexual contact with Danelle by placing her hand

on his exposed genitals.  Tr. 146.  Danelle's testimony makes clear that such conduct was without her consent and was achieved by forcible compulsion, both through the use of physical force and threat of physical injury.  Id.  Danelle was with the defendant in his palatial home with no other adults present to help.  Tr. 154, GX7.  She testified that she feared for her life, and she had previously heard the defendant make threats to others over the phone and had heard a violent interaction between the defendant and his wife.  Tr. 153, 154, 157, 159.  In addition, Danelle testified that the defendant's arm was wrapped around her throat and when she indicated to the defendant that she did not want to engage in sexual acts with him, the defendant tightened his hold around her neck.  Tr. 146.  The fact that the defendant gripped Danelle around the neck and tightened that grip while physically placing her hand on his genitals proves by a preponderance that the defendant used physical force to compel Danelle to engage in the sexual contact.  In addition, the defendant's conduct in that moment and the threats Danelle had previously observed placed Danelle in fear of immediate death or physical injury.  Danelle testified that she was afraid the defendant would kill her, a fear that is reflected in her contemporaneous text messages to her husband, in which messages she repeatedly stated she feared for her life.  GX11.  Based on the foregoing, the government has proved by a preponderance of the evidence Charge Eight of the VOSR Supplement: that the defendant subjected Danelle to sexual contact by forcible compulsion and without her consent, in violation of NY Penal Law Section 130.65(1) (sexual abuse in the first degree).  See, e.g., People v. Osman, 228 A.D.3d 1007, 1011 (3d Dep't 2024) (sufficient evidence of forcible compulsion by physical force established by "victim's testimony that defendant attempted to pry her legs apart and engage in vaginal intercourse, as well as the victim's testimony recounting defendant forcing his penis into her mouth");

23

People v. Bonilla, 229 A.D.3d 850, 853 (3d Dep't 2024) (sufficient evidence of forcible compulsion by threat established where "the victim was young, alone and vulnerable, having been approached by an unknown adult man on a darkened street" and the victim's testimony established that "she had been actively trying to evade [the defendant] and did not feel safe"); People v. Hackett, 167 A.D. 3d 1090, 1092-93 (3d Dep't 2018) (sufficient evidence of forcible compulsion where defendant took victim's wrist, twisted it behind her back, pushed her into a bathroom and locked the door after which the victim resisted, kicked and repeatedly asked defendant to stop the sexual contact) People v. Hartle, 159 A.D.3d 1149, 1151-52 (3d Dep't 2018) (sufficient evidence of forcible compulsion where minor victim was awoken by the adult defendant and "resisted defendant's behavior by attempting to push him away and then dropping to the couch like dead weight to resist being pulled into the bedroom"); People v. King, 79 A.D.3d 1277, 1279-80 (3d Dep't 2010) (sufficient evidence of forcible compulsion by physical force established where defendant and victim were wrestling and defendant pushed the victim to the ground and touched his genitals after the defendant had previously made repeated efforts to forcibly remove the victim's' shorts while they were swimming in a nearby pond); see also Hartle, 159 A.D.3d at 1152 ("[F]orcible compulsion is not synonymous with violence.").

V.     Charge Seven (Petit Larceny)

The VOSR Report charged the defendant with petit larceny in violation of New York Penal Law § 155.25 in connection with his failure to pay tolls at the Atlantic Beach Bridge between approximately May and July 2024. N.Y.P.L. § 155.25 ("A person is guilty of petit larceny when he steals property.")

The evidence at the revocation hearing established that the defendant, who was driving a white Lamborghini Urus and a black Ferrari, repeatedly evaded the $4 toll on the Atlantic Beach Bridge in Nassau County, New York in the summer of 2024. Raymond Webb, the Executive Director of the Nassau County Bridge Authority, which oversees the operations of the Atlantic Beach Bridge testified that he became aware of repeated instances of toll evasion by a white Lamborghini and black Ferrari in 2024. Tr. 41-42. The vehicles—which notably did not have license plates—evaded the $4 toll on the Atlantic Beach Bridge by "following another car using the EZPass system, tailgating them and following them through the gates, through the toll blocks." Tr. 42 (Webb's testimony). As reflected in Government Exhibits 36 and 37, video footage from cameras at the Atlantic Beach toll terminal captured a white four-door Lamborghini Urus with a black dealer plate with the name "Perillo" evade the toll on May 16, 2024 and May 27, 2024 by travelling immediately behind another vehicle. GX36-37; Tr. 383-86 (SA Costello's testimony). Toll plaza staff monitored instances of fare evasion and documented them on a Toll Evader Observation Sheet, which was admitted at the hearing as Government Exhibit 2. Tr. 44-45 (Webb's testimony); GX2. The Toll Evader Observation Sheet contained recorded instances of toll evasion between approximately May 31, 2024 and June 28, 2024. GX2. As reflected in Government Exhibit 2, during that time frame, there were numerous instances of toll evasion of a white Lamborghini Urus and a black Ferrari with no recorded license plates, often recorded by a staff member named Ryan.

Detective Burns, a Detective in the Fourth Precinct, subsequently conducted a photo array identification procedure with the toll staff member named Ryan in connection with a criminal investigation into the fare evasion. Tr. 243, 261 (Det. Burns's testimony).

As reflected in the photo array, which was admitted as Government Exhibit 5, Ryan identified the defendant. GX5; Tr. 266 (Det. Burns's testimony). In addition, Mr. Webb testified that he was made aware that the driver of the white Lamborghini and a black Ferrari had been observed by toll plaza staff in a different vehicle, with a license plate KYT2716. Tr. 46-47, 53. Webb ran the license plate of that vehicle in a New York City Motor Vehicle database and it was registered to the defendant's wife, Miriam Hurwitz. Tr. 53-54 (Webb's testimony).

At the time—in the summer of 2024—the defendant resided with his wife at 2115 Pacific Boulevard, Atlantic Beach, New York, which was located approximately six blocks away from the Atlantic Beach toll terminal. Tr. 390 (SA Costello's testimony). Bodyworn camera footage from three officers with the Nassau County Police Department who responded to a domestic violence incident at 2115 Pacific Boulevard on August 20, 2024 was admitted at the hearing as Government Exhibits 32, 33 and 34. Tr. 387-89 (SA Costello's testimony). Government Exhibits 32, 33 and 34 depict a white four-door Lamborghini Urus with no license plate but a black dealer plate with the name "Perillo"— consistent with the images of the vehicle evading the fares in Government Exhibits 36 and 37—and a black Ferrari at the defendant's residence. Id.; GX32-34. Photographs taken by the assigned United States Probation Officer, admitted at the hearing as Government Exhibit 35, also depict the defendant's residence with the same white Lamborghini Urus with the black dealer plate on the rear of the vehicle with the name "Perillo." GX35; Tr. 385 (SA Costello's testimony).

Thus, the evidence established at the revocation hearing demonstrated that the defendant committed petit larceny between approximately May and July 2024 by repeatedly evading the $4 toll on the Atlantic Beach Bridge in Nassau County, New York.

VI.    <u>Charge Nine</u> (Failure to Pay a Fine)

As reflected in the VOSR Supplement, since commencing his term of supervised release on January 19, 2021, the defendant has paid a total of $22,800 towards the court-imposed fine of $100,000.  The judgment that the Court entered in the defendant's case specifies that the fine was "due immediately" and as of the time the defendant began his term of supervised release, the defendant was required to make payments "at the minimum monthly rate of at least $2500 per month or 15% of his gross monthly income after deductions required by law, whichever is greater."  Judgment, Docket Entry No. 163.  As of the date of the commencement of his term of supervised release, the defendant has failed to make payments in the amounts required by the payment schedule ordered by the Court but instead has made payments of sometimes as little as $25 and sometimes $360.  When the assigned Probation Officer inquired about the defendant's failure to make payments, the defendant responded that "although his family can pay the fine in full, he does not feel that he should have to pay the fine and would rather pay the minimum amount, as he may not make payments when his term of supervised release ends."  VOSR Supplement at 4.

Although the defendant has claimed under penalty of perjury to have no assets except for a checking account with a balance of $3,000 – 4,000 in his financial disclosure statement made to the Probation Department, he has access to extraordinary wealth.  The defendant resides at 225 Causeway in Lawrence, New York, an enormous multi-million dollar property; he drives luxury sports cars (the starting retail price of a Lamborghini Urus is well over $200,000); and he has access to significant amounts of cash, as reflected in records provided by Foxwoods Casino.  GX25 at 11-12.  In late November 2021, at approximately the same time he made a $360 payment towards his court-ordered fine, the

28

defendant gambled at the Foxwoods Casino in Puerto Rico with approximately $29,200 in cash.  Id.

The defendant appears to intentionally keep his assets in the name of family members in order to avoid being required to pay court-ordered obligations.  The Honorable Jed S. Rakoff, in issuing judgment in February 2024 in F.T.C. v. Braun, a lawsuit stemming from the defendant's activities in the merchant cash advance industry, cited testimony that the defendant "plac[ed] money with others rather than keep[] it in his own name" and did not find the defendant's assertions that he was unable to pay a fine to be credible.  See F.T.C. v. Jonathan Braun, 20-CV-4432 (JSR), Docket Entry No. 217.  Ultimately, Judge Rakoff imposed a $20.3 million judgment, which included $3,421,067 in restitution to the small business victims of the defendant's scheme and $16,956,000 in civil penalties.  Attorneys for the Federal Trade Commission have informed the government that the defendant has not paid a cent towards these judgments, which remain outstanding.

The government respectfully submits that the Court should find Charge Nine proven by a preponderance of the evidence.

CONCLUSION

For the reasons above, the government respectfully requests that the Court

revoke the defendant's supervised release and set a date for sentencing.

Dated:    Brooklyn, New York
          July 7, 2025

                                    Respectfully submitted,

                                    JOSEPH NOCELLA, JR.
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                          By:    ___/s/_____
                                    Tanya Hajjar
                                    Rachel Bennek
                                    Assistant U.S. Attorneys
                                    718-254-7000