UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   - v. -

JONATHAN BRAUN,                         10-CR-433 (KAM)

      Defendant.

- - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - x


## DEFENDANT JONATHAN BRAUN'S POST-HEARING MEMORANDUM OF LAW

Kathryn Wozencroft
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Fl.
Brooklyn, NY 11201
Tel.: (718) 330-1200
*Counsel for Mr. Braun*

<u>BACKGROUND</u>

On May 28, 2019, following a plea of guilty to one count of conspiracy to import marijuana and one count of money laundering, Mr. Braun was sentenced by the Court to 10 years jail, with five years of supervision to follow, as well as a $100,000 fine. After receiving a commutation of his jail sentence in this matter, Mr. Braun commenced his five-year period of supervision on January 19, 2021. Four years later, on April 1, 2025, a violation of supervised release was filed, based on multiple state charges. *See* Violation of Supervised Release ("VOSR") Report (Containing Charges 1-7). Mr. Braun was arraigned on the VOSR on April 4, 2025, and remanded into federal custody. Mr. Braun waived a preliminary hearing and a full hearing on the merits began on April 10, 2025 and continued on April 11, 2025, May 15, 2025 and June 13, 2025. On May 1, 2025, mid-hearing, Probation filed a supplemental violation report adding three additional charges for conduct which predated the initial violation report. *See* Supp. VOSR (Charges 8-10). The government and Probation subsequently dismissed Charge Ten after Mr. Braun filed a Motion to Dismiss. ECF No. 238. The government proceeded to offer evidence as to Charges One through Nine over the course of the four-day hearing. Now, the government moves forward on Charges Two through Nine, conceding that they have not met their burden of proof as to Charge One. *See* Govt Mem. at 12-13. Mr. Braun maintains that he is not guilty of all remaining charges.

<u>APPLICABLE LAW</u>

A sentencing court may only revoke supervised release if the government has proven "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3853(e)(3). The preponderance standard "require[s] the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993); *see also Nissho--Iwai Co. Ltd v. M/T Stolt Lion*, 719 F.2d 34, 35 (2d. Cir. 1893) (requiring proof to be "more probably true than false" to meet the preponderance standard).

While this standard is not so strict as to require proof beyond a reasonable doubt, the Court must not simply accept the government's allegations; the preponderance of the evidence standard instead requires the government to present evidence "sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Concrete Pipe & Products of California, Inc.*, 508 U.S. at 622. The standard is not toothless; it requires the court to weigh competing evidence and make credibility determinations where necessary; it does not amount to the unquestioning acceptance of one party's account of the facts. *See Great Lakes Reinsurance (UK) SE v. Herzig*, 764 F.Supp.3d 164, 183 (S.D.N.Y. 2025) (weighing evidence and considering witness credibility in determining whether the defendant has proven the allegations in their counterclaim by a preponderance of the evidence).

ARGUMENT

## I.      Charges One, Two and Three ("The Shammai Counts")

The government has not established by a preponderance of the evidence that Mr. Braun violated supervised release by committing (1) assault in the second degree (assault on a child), in violation of New York Penal Law § 120.05 (Charge One); (2) assault in the third degree, in violation of New York Penal Law § 120.00 (Charge Two); and (3) child endangerment, in violation of New York Penal Law § 260.10(1) (Charge Three).

### A. Charge One

As to Charge One, the government appropriately concedes that it has not proven Charge One, requiring proof that Mr. Braun intentionally caused physical injury to a child "less than seven years old," N.Y.P.L. § 120.05(9). *See* Gov't Mem. at 5, 12-13. In order to establish this offense, the government was required to prove by a preponderance that Mr. Braun (1) caused physical injury to a person who was less than seven years old, (2) did so with the intent to cause physical injury to such child, and (3) was eighteen years old or more at the time of the offense. CJI2d[NY] P.L. § 120.05(9).[1]

Shammai testified that he never saw Jonathan Braun touch his son. Tr. 281:20-23 ("I do know that my son, like, at one point was on the, like, he tripped or he fell. I'm not sure if he was pushed or not, I didn't see that it a hundred percent.

---

[1] All New York State Model Jury Instructions can be found at: https://www.nycourts.gov/judges/cji/2-PenalLaw/cji3.shtml

3

There was like a lot going on."). When confronted with his statement to law enforcement that Mr. Braun assaulted his son, Shammai denied ever personally witnessing the assault he reported. Tr. 285:5-10 ("I said I'm not sure if it occurred. I said it may have occurred. I said I didn't say that it definitely because I didn't definitely see it. So I can't say that. I told him that my son did get knocked to the ground and I'm not -- I said it may have been or it may not have been so that's what I told them."). Further, he testified he was talking to his wife on the phone when he made the report. Tr. 294:23-295:7. Shammai's wife then testified that she did not see any contact between Mr. Braun and her child. Tr.419:6-17.

In sum, while Shammai made a police report that Mr. Braun injured his child, he then stated under oath that he did not witness what he reported. His wife, similarly, testified that she did not witness an assault. On this record, all parties agree that the government has not met their burden and the Court must find Mr. Braun not guilty as to Charge One.

### B. Charge Two

As to Charge Two, the government has not established that Mr. Braun acted with the intent to injure Shammai or that he did cause physical injury within the meaning of the statute. Assault in the Third Degree occurs when a person, with intent to cause physical injury to another person, causes such injury to that person or to a third person. N.Y.P.L. §§ 120.00(1); 120.00(2). In order to establish this offense, the government was required to prove by a preponderance of the evidence that Mr. Braun (1) caused physical injury to Shammai and (2) intended to cause

4

such physical injury, CJI2d[NY] P.L. § 120.00(1), or did so recklessly. CJI2d[NY] P.L. § 120.00(2). Physical injury is defined as "impairment of physical condition or substantial pain." N.Y.P.L. § 10.10.

The government failed to establish both elements of the statute by a preponderance of the evidence. As to element one, physical injury, Shammai repeatedly denied the "substantial pain" the government is required to establish. He first testified that he had "no" pain. Tr. 305:12-14 ("Q: Do you have any pain resulting from the altercation with the defendant? A: Me, No."). Upon continuous prodding by the government Shammai testified that he had "a little bit" of discomfort chewing and his head hurt, but that it was "minor, minor pain" and he "didn't have significant pain." Tr. 305:19 – 306:8. While the government argues that "experiencing pain for multiple days after being hit in the face…constituted physical injury within the meaning of the statute," it is Shammai's testimony, not the government's opinion, that the Court must consider. He testified under oath that he did <u>not</u> experience substantial pain.

Further, the government failed to establish that any injury Shammai had from the incident was "caused" by Mr. Braun as is required by statue. Shammai testified the injury caused to his arm was the result of him slipping to the floor – not an intentional push or shove from Mr. Braun which caused him to fall. Tr. 279:19-24 ("Q: Did at any point you -- were you brought to the ground during any of this interaction? A: Yeah, I slipped or something. Yeah, because he wanted me to leave. So I think I slipped and, like, I slipped and he was yelling at me and he

chased me through the kitchen to leave basically, yeah."); Tr. 305:6-8 ("Q: And the scrape depicted on your elbow in those photographs, how did you get that? A: When I was on the floor, my elbow scraped the floor."). The government also failed to establish the second element – that Mr. Braun intended to cause physical injury to Shammai or did so recklessly. While Mr. Braun acknowledges that GX 12 shows Mr. Braun screaming at Shammai to leave Mr. Braun's home, including a moment when Mr. Braun kicks his leg in the direction of Shammai, this is not evidence of intent to cause physical injury to Shammai. Rather, it establishes Mr. Braun's intent to kick Shammai out of his home. It is unclear from the video whether Mr. Braun's leg even makes contact with Shammai. Nor does this action evidence behavior so reckless as to create a "substantial and unjustifiable risk" that physical injury would occur. N.Y. P.L. § 15.05(3) (defining recklessness).

Further, the testimony regarding Mr. Braun's argument with Shammai prior to the video does not establish an intent to cause physical injury to Shammai. Jonathan Dizon, Mr. Braun's butler, testified repeatedly that Mr. Braun "tried to grab Shammai and they *fell* on the ground" Tr.8:9-11. *See also* Tr.31:12-16 ("So we're on, like a u-shaped couch, and Shammai -- I was on the other side and Shammai was on the other side, and we were -- at the edge of the couch, and when Mr. Braun tried to grab him, so basically, there's no more space for Shammai or Mr. Braun to hold onto, that's how they fell on the ground.")

Shammai himself described the interaction with Mr. Braun that day as a "minor physical altercation." Tr. 277:5-6. His memory of the actual assault was extremely limited and far from clear. Shammai testified,

Where did he hit you?

> A My head, my face, I don't know. It doesn't hurt.
> Q He hit you, you said, in the head or face. What did he hit you with?
> A His hand.
> Q With his hand opened or closed?
> A I don't recall that.

Tr. 279:7-13.

Because the government has not established that Mr. Braun had the intent to cause physical injury or that he did cause physical injury, the government has not met its burden, and the Court should find Mr. Braun not guilty of Charge Two.

### C.     Charge Three

The government's evidence is insufficient to sustain Charge Three, because it does not establish the crime of child endangerment. Endangering the welfare of a child occurs when a person knowingly acts in a manner likely to be injurious to the physical, mental, or moral welfare of a child who is less than seventeen years old. N.Y.P.L. § 260.10. In order to establish this offense, the government was required to prove by a preponderance of the evidence that Mr. Braun (1) acted in a manner likely to be injurious to the physical, mental, or moral welfare of Shammai's children, (2) that he did so knowingly, and (3) that Shammai's children were less than seventeen years old. CJI2d[NY] P. L. § 260.10(1). That Mr. Braun was yelling and using vulgar language on a single occasion, for a brief period of time, in the

presence of minors, is not sufficient to establish injury to any child's mental or moral welfare as required under the statute.

Importantly, the children did not witness any violence. There was no testimony from Justin Dizon, Shammai, or his wife, that Mr. Braun had any physical altercations with anyone, including Shammai, in the presence of the children. Instead, the testimony and video evidence show Mr. Braun loudly shouting and cursing at Shammai and his family to leave his home. This is not enough to satisfy the statute. The government contends that some courts have found "vulgar" language alone can constitute endangering the welfare of a child, but the only case on which they rely is incomparable. In *People v. Simmons*, 92 N.Y.2d 829, 830-31, (1998), a day care worker directed *sexually* vulgar remarks to a toddler repeatedly over a period of *six weeks* while charged with that child's care. Here, a singular, brief event is described and Mr. Braun's comments do not rise to the level of the sexually explicit remarks described in *Simmons*.

Similarly, the government's reliance on *People v. Bray*, 848 N.Y.S.2d 738 (N.Y. Sup. Ct. App. Div. 2007), is misplaced. In *People v. Bray*, the defendant physically assaulted his estranged wife in her home and in the presence of their children. He refused to leave and blocked the path of a third adult who was present and trying to remove the children from the situation. In affirming the trial court's verdict, the court pointed to two factors which combined to raise an inference that the defendant was aware of the likelihood his actions would be injurious to the mental or emotional welfare of a child. First, the children were "crying and

screaming hysterically" likely because they were unable to escape witnessing this conduct. *Id.* at 740. Secondly, the "defendant admitted that he refused to leave the premises," and "could have ended the confrontation simply by leaving, [but instead he] refused to permit the children to be removed from the premises and physically blocked their exit." *Id*. Here, Mr. Braun, was clearly upset but there was no physical altercation in the presence of the children, nor did he attempt to block anyone from leaving – quite the opposite. *Cf. People v Johnson*, 95 NY2d 368 (2000) (finding sufficient evidence of endangering where child present for physical domestic violence incident that lasted over 10 hours). Because the government has not met its burden as to Charge Three, the Court should find Mr. Braun not guilty.

## II.     Charge Four

The government did not establish by a preponderance of the evidence that Mr. Braun menaced Brianna Peace. New York Penal Law § 120.14 provides that a person is "guilty of menacing in the second degree when [he] intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or . . . firearm." In order to establish this offense, the government was required to prove by a preponderance of the evidence that Mr. Braun (1) placed or attempted to place Ms. Peace in reasonable fear of physical injury, serious physical injury, or death by displaying…a dangerous instrument… and (2) did so intentionally. CJI2d[NY] P.L. § 120.14(1). The government contends that Mr. Braun menaced Ms. Peace by "attempting to punch her and swinging a medical IV pole at her." Govt Mem. at 13.

However, Ms. Peace's testimony does not support such a finding, both as a matter of law because it does not establish the elements of menacing, and because it is not credible.

First, a punch or attempted punch, does not constitute menacing as a matter of law. In order to find a violation of § 120.14, a "deadly weapon, dangerous instrument or…firearm" must be used. While a wide range of objects may become "dangerous instrument[s]" for purposes of N.Y.P.L. § 120.14, a human body part can never be a "dangerous instrument." *See People v. Owusu*, 690 N.Y.S.2d 863, 865 (N.Y. App. Div. 1999) ("the plain meaning of instrument . . . is a device or object which is capable of causing harm as defined by the statute. One's hand, teeth, or other body parts are not, in common parlance, 'instruments'"); *People v. Vollmer*, 299 N.Y. 347, 350 (N.Y. App. Div. 1949) ("When the legislature talks of a 'dangerous weapon', it means something quite different from the bare fist of an ordinary man").

Secondly, Ms. Peace's testimony, both regarding the IV pole (as well as the attempted punches) is not credible and should be discounted. The Court should consider both the objective inconsistencies between Ms. Peace's testimony and video surveillance, as well as the logical inconsistencies of her testimony in comparison to the human experience. Ms. Peace testified that Mr. Braun was screaming profanities and swinging an IV pole in the direction of herself and other colleagues. Tr. 70: 14-71:3. Yet, surveillance shows Mr. Braun in a verbal dispute with Ms. Peace where he is free from restraint in a public area of the hospital. DX-B. Ms. Peace testified that Mr. Braun swung at her and swung an IV pole before the video

began (as none of those actions are depicting on video). To believe that Mr. Braun swung a large metal pole at hospital workers and then attempted to punch Ms. Peace not once, but twice, and was not immediately restrained, defies reality.

Further, surveillance video captures events which are in direct conflict with Ms. Peace's testimony – giving the Court further reason to doubt the veracity of her allegations. Ms. Peace testified that "after the second attempt to hit [her], the security guard turned [Mr. Braun] around and redirected him out of the ER…After the security guard went to walk him out, [Mr. Braun] ripped the IV out of his arm." Tr.75:8-13. Then, on cross-examination Ms. Peace was confronted with surveillance video she had never seen before. The surveillance video does not show Mr. Braun attempt to strike Ms. Peace, instead it shows approximately 10 seconds of what appears to be a verbal argument (there is gesturing and lips moving but no sound on the video). At one point a security guard lurches at Mr. Braun without warning, clearly pushing him so hard that Mr. Braun steps backward off-balance which causes the IV tube to becomes taut and be ripped from Mr. Braun's arm. DX-B, at :19-:25. It is clear from the video that Mr. Braun did not intentionally rip the IV from his arm. Nor would the most generous reading of the security guard's actions be described as "walking" Mr. Braun out. Ms. Peace exaggerated Mr. Braun's actions, which, while unbecoming, did not rise to the level of menacing as defined in the New York Penal Code. Because Ms. Peace's testimony is objectively controverted by the video surveillance, the Court should discount her testimony as a whole.

Further, Ms. Peace has motive to exaggerate Mr. Braun's actions in order to protect her colleague. It is clear from the video in evidence that the security guard, an employee of the hospital, used unnecessary force in pushing Mr. Braun while in the presence of Ms. Peace.[2]

For the above reasons the Court should find that the government has not met its burden as to Charge Four.

## III. Charge Five

The government did not establish that on March 22, 2025, Mr. Braun menaced Edward Miller in a synagogue in Lawrence, New York, in violation of New York Penal Law § 120.15. Menacing in the Third Degree occurs when a person, by physical menace, intentionally places or attempts to place another person in fear of death, imminent serious physical injury, or imminent physical injury. In order to establish this offense, the government was required to prove by a preponderance of the evidence that Mr. Braun (1) by physical menace, placed or attempted to place

---

[2] The Court denied admission of a further exhibit which depicts Mr. Braun being assaulted by the same security guard seconds after DX-B ends, and prior to the beginning of DX-C because Ms. Peace was not present. At the hearing, counsel argued that this assault was relevant to Ms. Peace's motive to lie. Specifically, that in exaggerating Mr. Braun's actions, she was covering for the aggressive actions of a co-worker. The Court denied admission of the part of the assault Ms. Peace was not present for, but Ms. Peace did acknowledge on cross examination that she has known the security officer for a number of years, Tr. 100:8-13, that the two of them spoke to the police together, Tr. 100:20-101:13, and that she is aware of what happened in the hallway from her colleague, Tr. 101:9-16. Her knowledge of the events, even if she did not witness them bears on her motive to exaggerate Mr. Braun's aggressiveness in order to mitigate her co-workers actions.

Mr. Miller in fear of death, imminent serious physical injury, or imminent physical injury and (2) did so intentionally. CJI2d[NY] P.L. § 120.15.

To prove the element of physical menace, "[t]he defendant must commit <u>a physical act</u> which in and of itself places another in fear of imminent injury." *People v. Martini*, 950 N.Y.S.2d 547, 552 (Queens Crim. Ct. 2012) (holding that even when in close proximity to a gun and ammunition, a complainant's fear of imminent injury based on a defendant's "mere words" without any alleged accompanying physical act which "objectively would cause the complainant to fear imminent injury" is legally insufficient to prove menacing). Further, the physical act relied upon, must in and of itself, place another person in fear of imminent injury. *See People v. Stephens,* 418 N.Y.S.2d 868 (Suff. Dist. Ct, 1979) (defendant stating that he had a gun and was going to blow complainant's head off and then reaching into his pocket is insufficient to establish physical menace); *Martini*, 950 N.Y.S. 2d at 552 (failing to establish menacing where the defendant pushed the complainant and then threatened to shoot her in the head, because "the sole physical act attributed to the defendant of pushing the complainant prior to threatening her cannot be construed as an act of physical menace"). The facts as testified to by Mr. Miller cannot legally establish menacing because there was no physical act, in and of itself, which could have placed Mr. Miller in fear of imminent serious physical injury or physical injury.

Here, the sole testimony about a physical act is that Mr. Braun "grabbed [Miller's] right arm with his left hand" Tr. 25: 6-8. This act alone is not "in and of

itself" physically menacing. Mr. Miller testified that Mr. Braun screamed and repeatedly threatened him verbally by referring to the *Malakh ha-Mavet*, the Hebrew term for the "Angel of Death", and that this "threat" left him "terrified" Tr. 28: 24-25. He also testified that he raised him arm because he "feared for [his] physical safety" Tr. 29:17-18. However, when asked why he was terrified, Mr. Miller responded "it was just terrifying being threatened by someone [who is] obviously out of control." Tr. 29:8-10. Mr. Miller was terrified because of the verbal altercation, which, while understandable, is not sufficient for the crime of menacing. *See People v. Mills,* 203 N.Y.S.3d 821 (2023) (holding that a charge of third-degree menacing requires more than a "verbal threat," however alarming).

The Government relies on *In re Denzel F.*, 843 N.Y.S.3d 23, 25 (App. Div. 2025), to argue that grabbing someone's arm is a physical act sufficient to prove the elements of § 120.15. However, in *Denzel F.*, the defendant did not grab an arm, the defendant cocked his fist in front of the complainant's face – a clear act of aggression and physical threat designed to instill fear. The facts of Mr. Braun's case are much more akin to *Stephens* or *Martini*, where threats are made, but the physical act, in and of itself, is not physically menacing.

*People v. Carlson*, 705 N.Y.S.2d 830 (Crim. Ct. 1999), is instructive. In *Carlson,* the court ruled that spitting in a complainant's face, without more, was *not* physical conduct which would objectively instill a fear of imminent physical injury in the recipient. *Id*. at 835. "[S]imply put, some other act must [have] transpire[d] before the complainant could reasonably fear serious physical injury or physical

injury." *Id.* Without evidence of additional physical conduct taken by Mr. Braun, his conduct does not constitute "menacing" as defined in New York State. The Court should find Mr. Braun not guilty of Charge Five.

IV.    **Charge Six and Eight**

The government has failed to establish by a preponderance of the evidence that Mr. Braun committed forcible touching, in violation of New York Penal Law § 130.52(1)[3], and sexual abuse, in violation of New York Penal Law § 130.65(1).

To prove a violation of NY Penal Law Section 130.52(1), the government must prove that Mr. Braun (1) intentionally, and (2) for no legitimate purpose, (3) forcibly touched the sexual or other intimate parts of another person (4) for the purpose of degrading or abusing that person, or for the purpose of gratifying the actor's sexual desire and (5) without the victim's consent. N.Y.P.L. § 130.52(1).

To prove a violation of sexual abuse in the first degree, the government must prove that Mr. Braun (1) subjected another person to sexual contact (2) by forcible compulsion (3) without the victim's consent. N.Y.P.L. § 130.65(1). Forcible compulsion "means to compel by either: (a) use of physical force; or (b) a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped." N.Y.P.L. § 130.00(8).

The government argues that they have met their burden of proof as to both charges because Danelle testified that Mr. Braun placed her in a "headlock position

---

[3] The government cites § 130.51(1), presumably as a typographic error.

and groped her breast without consent," Govt Mem. at 22, and that he "engaged in sexual contact with Danelle by placing her hand on his exposed genitals…without her consent…and…by forcible compulsion, both through the use of physical force and threat of physical injury," *Id.* at 22-23. However, Danelle's testimony is incredible and must be viewed in context with her prior statements to law enforcement, which are inconsistent as to important, unmistakable elements of her version of events.

Danelle acknowledged on cross-examination that the day the allegations occurred, police arrived at Mr. Braun's home and spoke with her. Tr. 355:1-3. Two officers came to her bedroom and she felt completely safe in their presence. Tr. 355:4-18. The police asked her to tell them everything that had happened, and Danelle knew it was important to be truthful and accurate. Tr. 356:2-12. In fact, the female officer even spoke privately with Danelle and re-emphasized the importance of telling the police what had transpired. Tr. 356:16-24. During the course of that conversation Danelle did not tell the police that Mr. Braun placed her hand on his genitals. Tr.356:25-357:2, *see also* DX-D (body cam video of Danelle speaking to female officer, telling the officer she was touched over her shirt on her breasts and nowhere else). Danelle also acknowledged that when police asked her where she was touched, she never indicated that she was choked or touched on the neck. Tr.360:21-25, 361:3-6.

The Supreme Court has long held that where a party speaks to a fact in respect to which she cannot be presumed liable to mistake and that fact turns out

otherwise, the courts should apply the doctrine of *falsus in uno, falsus in omnibus*—
which permits a factfinder to disregard the entire testimony of a witness who has
willfully testified falsely with respect to any material fact. *The Santissima
Trinidad,* 20 U.S. 283, 339 (1822) (Story, J.); s*ee also Washington Mut. Bank v. Holt*,
979 N.Y.S.2d 612, 614 (N.Y. App. Div. 2014) ("where a witness has given testimony
that is demonstrably false, we may, in accordance with the maxim *falsus in uno
falsus in omnibus*, choose to discredit or disbelieve other testimony given by that
witness"); *Bank of America v. Lavelle*, 107 N.Y.S.3d 618, 618 (Sup. Ct. Queens Cty.,
2018) (applying *falsus in uno, falsus in omnibus* where a witness gave internally-
contradictory testimony). While a court need not always discount a witness's
testimony completely, it is appropriate to disregard a witness's testimony in its
entirety when the internally-contradictory testimony is unsupported by other
evidence. *Cf. DiPalma v. State*, 936 N.Y.S.2d 464 (4th Dept. 2011) (choosing to
accept in part inconsistent witness testimony where it was corroborated by other
witnesses). Here, Danelle was given ample opportunity immediately after this event
occurred, in the safety of the presence of police, to describe everything that had
occurred between herself and Mr. Braun, and she did not say that Mr. Braun
choked her or put her hand on his genitals. These are glaring internal
inconsistencies within her narrative. Accordingly, the Court should not accept her
testimony as credible.

The government may argue that Danelle was afraid of Mr. Braun, which is
why she was not truthful with the police initially. However, these arguments cannot

be sustained under scrutiny. Danelle's testimony that she was fearful of Mr. Braun cannot explain why she would accuse him of part, but not all, of the details of an alleged sexual assault. Presumably, any fear of retribution from him would be just as likely to prevent her from telling police that Mr. Braun touched her breasts, as it would that Mr. Braun choked her or had her touch his genitals.

Even if the Court were to credit Danelle's testimony in part, the Court should not credit her testimony with regards to the additional allegations of choking or touching of Mr. Braun's genitals that were made after the opportunity for contemplation and not made contemporaneously to the police. If the Court were to credit Danelle's initial allegations, but not her subsequent ones, then the government could not prevail as to Charge Eight.[4]

## V.   Charge Seven

The government has failed to establish by a preponderance of the evidence that Mr. Braun committed Petit Larceny, in violation of New York Penal Law § 155.25. Petit Larceny occurs when a person steals property, that is, wrongfully takes, obtains, or withholds property from an owner of the property with the intent to deprive another of property or to appropriate such property to himself/herself or to a third person. In order to establish this offense, the government was required to prove by a preponderance of the evidence that Mr. Braun (1) wrongfully took, obtained, or withheld property from its owner, and (2) did so with the intent to

---

[4] Notably, Nassau County Criminal Court has never brought felony charges of Sexual Abuse against Mr. Braun and has only charged him with Forcible Touching, in accordance with the allegations Danelle made initially to police.

deprive another of the property or to appropriate the property to himself/herself or to a third person. CJI2d[NY] P.L. § 155.25.

As with all crimes, the government must establish identity – that is, not only that a crime was committed, but that Mr. Braun is the one who committed the crime. Here, the government cannot sustain their burden as to identity. The government has introduced ample proof that a white Lamborghini Urus and a black Ferrari, evaded a $4 toll on the Atlantic Beach Bridge in Nassau County in the summer of 2024. They have also introduced evidence that cars of that make and model were parked at Mr. Braun's residence. However, the government must also establish that it was Mr. Braun who was driving each specific vehicle on the specific dates of toll evasion. No such evidence exists in the record.

In an effort to establish identity, the government introduced a "toll evader observation sheet" that indicates the name "Ryan" written down on a log that appears to document when toll booth workers observe a car which evades the toll. GX-2. There are several instances of a black Ferrari and white Lamborghini being logged by "Ryan." *Id*. Then, the government called Detective Burns to testify that he "administered a photo array to the witness of a crime," Tr.243:3-7; all he knew about the case was that "it was a larceny," Tr. 243: 22-24; "the witness was a toll booth worker at the Atlantic Beach toll booth. And he witnessed an individual." Tr.243:25-244:4. The government then introduced Government Exhibit 5 which is the photo array paperwork attached to the identification procedure Detective Burns

conducted with "Ryan," that indicates that "Ryan" identified Mr. Braun. This is not enough.

First, no further identifying information was introduced about "Ryan," including last name, date of birth, or a physical description. There is nothing in the record tying the "Ryan" who is listed in the toll log sheet to the "Ryan" who conducted the identification procedure. Detective Burns was not the detective on the case and did not testify that the "Ryan" he met was the same person who logged (and observed) the Lamborghini and Ferrari evading the toll. Further, the photo array identification paperwork does not contain any statements from Ryan indicating the purpose for which he was supposedly identifying Mr. Braun, much less that he was identifying Mr. Braun as the perpetrator of a crime. The paperwork simply says "Do you recognize anyone in the photo array? Yes" and "From where to you recognize that person? I recognize him from the toll booths." GX-5. There is no statement in the record, hearsay or otherwise, connecting the toll booth evasion by the Ferrari and Lamborghini to Mr. Braun as the driver of those specific cars at those specific times of evasion. Therefore, the government has not met its burden as to Charge Seven.

## VI.    Charge Nine

The government has failed to meet their burden as to Charge Nine, failure to pay a fine. Based on the record established at the hearing, Mr. Braun has made 66 payments totaling $23,000 towards the $100,000 fine assessed to him at the time of sentencing. *See* DX-F. He routinely made payments, averaging about $360 per

month from the time of his release from custody through the end of the 2024 calendar year. *Id*. In the year 2025, he increased his payments, paying approximately $7500 over the first four calendar months of the year. *Id*. At no time between his release in January 2021 up until May 1, 2025, did Probation file a violation for failure to pay his fine – presumably, because he was paying his fine and continued to do so in increasing amounts up until the date of his re-incarceration on this pending VOSR.

The government suggests that Mr. Braun has incredible family wealth and as a result his family should pay his fine but cites no authority supporting this position. Further, the government relies on facts not in the hearing record which the Court cannot consider. Specifically, 1) Judge Rakoff's finding in a civil lawsuit that Mr. Braun's previous assertions that he could not pay a fine were incredible, and 2) that Mr. Braun made statements to probation that he does not feel he should have to pay a fine even though his family is able, are alleged facts never offered into evidence through testimony or exhibit over the course of the four day hearing which occurred.

Based on Mr. Braun's history of consistent payments, the Court should dismiss Charge Nine.

<u>CONCLUSION</u>

For the above reasons, we respectfully submit that Mr. Braun should be found not guilty of violating the conditions of his supervised release and should be restored to supervision.

Respectfully submitted,

/s/
Kathryn Wozencroft
Counsel for Mr. Braun
Federal Defenders of New York, Inc.

Cc:    Tanya Hajjar (AUSA)
       Rachel Bennek (AUSA)