

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

271 Cadman Plaza East
Brooklyn, New York 11201

TH/RAB
F. #2025R00212

August 4, 2025

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re: United States v. Jonathan Braun
           Criminal Docket No. 10-433 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in reply to the defendant Jonathan Braun's post-hearing memorandum of law. ECF Docket Entry No. 248 ("Def. Mot."). For the reasons that follow and as set forth in the government's initial memorandum, the Court should revoke the defendant's supervised release.

    I.    Charge Two (March 29, 2025 Assault)

      The Court should reject the defendant's argument that because Shammai at times characterized his pain as "minor," the preponderance of the evidence does not support the finding that Shammai experienced "physical injury" within the meaning of the statute. Def. Mem. at 5. Shammai testified that he experienced pain in his head and while chewing for days following the assault, Tr. 305-306, and photographs of Shammai after the assault reflect that he sustained an open, red laceration to his elbow, see GX22-23. This evidence of injury and pain is sufficient for the Court to conclude, by a preponderance of the evidence, that Shammai suffered "physical injury" within the meaning of New York Penal Law § 10.00(9). Contrary to the defendant's arguments, the fact that Shammai at times described his pain as "minor," an entirely subjective assessment, does not foreclose this finding. First, the government respectfully submits that it was apparent from Shammai's testimony that he was attempting to minimize the defendant's conduct and his injury, whether as a result of fear of the defendant or in the hopes of receiving some benefit. See, e.g., GX31 (communications in which the defendant's mother directed Shammai not to call the police and indicated that he would be "paid more"). Second, in assessing "physical injury," courts have focused on the injury the defendant inflicted "viewed objectively," and found that an "objective account of the injury, unaccompanied by testimony about the degree of pain the victim experienced" is sometimes sufficient to find "physical injury" within the meaning of the statute. People v. Chiddick, 8 N.Y.3d 445, 447 (2007) (finding

evidence that defendant bit victim's finger sufficient to establish physical injury where victim indicated his pain level was in between "a little" and "a lot").

The Court should also reject the defendant's claim that the evidence was insufficient to demonstrate that the defendant was the cause of Shammai's injury. Shammai clearly testified that the pain he experienced in his head and while chewing was a result of the defendant striking him in the head:

> Q: [W]hat's your understanding of what caused the discomfort while you were chewing?
>
> SHAMMAI: That I got hit.
>
> Q: By whom?
>
> SHAMMAI. By Mr. Braun.

Tr. 306. Shammai also testified that the cut on his elbow was a result of scraping it when he was on the floor, which, based on his prior testimony and the testimony of the defendant's butler, Justin Dizon, was caused by the defendant's physical contact with Shammai. Shammai initially testified that he "slipped" and fell to the ground, but upon further questioning admitted that he fell after the defendant hit him, causing him to go off balance. Tr. 280. Dizon testified that the defendant tried to grab Shammai's whole body, causing Shammai to fall to the floor and that Dizon had to physically pull the defendant off of Shammai. Tr. 8, 32.

Finally, the evidence is clear that the defendant intended to injure or acted recklessly in injuring Shammai. See N.Y. Penal Law § 120.00. The video footage from the defendant's home on the day of the assault demonstrates the defendant's violent intent. As reflected on the video footage, the defendant was enraged and kicked and screamed at Shammai. See GX12. Dizon testified that during the altercation, the defendant was "yelling and his voice was raised and his face was red." Tr. 71; see also Tr. 8 (Dizon testifying that he had to physically pull the defendant off Shammai and "br[eak] them apart"); Tr. 280 (Shammai: "he was like over me yelling."). Moreover, the defendant struck Shammai in the face and grabbed him in a manner that brought Shammai to the ground. The defendant's intent is clear and "can be inferred from [his] conduct and [the] surrounding circumstances. Matter of Marcel F., 233 A.D.2d 442, 442-43, 650 N.Y.S.2d 274, 275 (2d Dep't 1996) ("There the intent to cause physical injury can be inferred from the appellant's actions of throwing two punches in the direction of the police officer's face."); see also In re Joseph J., 299 A.D.2d 235, 749 N.Y.S.2d 417, 417-18 (1st Dep't 2002) ("The evidence warranted the conclusion that when appellant struck several blows to the victim's face, thereby knocking the victim down, he did so with intent to cause physical injury."); In re Shaheed W., 298 A.D.2d 204, 748 N.Y.S.2d 144, 144 (1st Dep't 2002) ("The evidence warranted the conclusion that when appellant's companion slapped the victim hard on the face, he did so with intent to cause physical injury . . . ."); In re Eric C., 281 A.D.2d 543, 722 N.Y.S.2d 61, 62 (2d Dep't 2001) ("Here, the intent to cause physical injury can be inferred from the appellant's actions of punching an undercover officer in the chest."). If the defendant's actions were not enough, the defendant's own words make clear his intent to hurt

2

Shammai. The defendant screamed, among other things, "I'll fuck you up," "You want to get fucked up?" and "You think you can take me?" GX12.

For these reasons and those set forth in the government's initial memorandum, the Court should find Charge Two proven by a preponderance of the evidence.

II. <u>Charge Three</u> (March 29, 2025 Child Endangerment)

With respect to Charge Three, the defendant argues that "yelling and using vulgar language on a single occasion, for a brief period of time" is insufficient "to establish injury to any child's mental or moral welfare." Def. Mem. at 7-8. As a preliminary matter, the statute does not require that the government prove such injury occurred. Rather, the government is required only to prove that such injury is likely. <u>People v. Castanza</u>, 53 Misc.3d 277, 279, 37 N.Y.S.3d 668, 669 (Dist Ct. Suffolk Cnty. 2016) (with respect to N.Y. Penal Law § 260.10(1), "[t]he key term is likely; there is no requirement that the physical, mental or moral welfare of the child be in fact injured" (collecting cases)).

In evaluating harm to a child under Section 260.10(1), the Court may "draw upon [its] common human experience and commonsense understanding of the nature of children to conclude that the defendant's remarks [and behavior] were likely to cause the child[ren] harm." <u>Matthews v. Barr</u>, 927 F.3d 606, 619 (2d Cir. 2019) (internal quotation marks and alterations omitted). The defendant did not merely yell and use vulgar language in front of children. He loudly and violently physically assaulted their father while the children were present in the home and then went to the area of the home where the children were located and physically chased them from the residence, screaming that they were "dirty fucking children." The video footage from the encounter, in which the children appear very upset, reflects the injury to the children's mental welfare. GX14. The impact of the defendant's actions on the children is also clear from the testimony elicited at the hearing. Tr. 303 (Shammai's testimony that the Minor Victim "was very freaked out from the whole thing. He was crying, he was very pent up, like, very in shock," as were Shammai's other children); 421 (Sara's testimony that all four of her children were crying throughout the incident). It is common sense to conclude that this encounter, which left the children, all of whom were under the age of four, terrified and crying, was not only likely to, but did cause injury to the children's physical, mental, and moral welfare. In sum, the Court should find Charge Three proven.

III. <u>Charge Four</u> (Menacing of Brianna Peace)

The defendant does not appear to dispute that advancing towards Ms. Peace while screaming obscenities and swinging an IV pole at her, as she testified he did, would constitute menacing in the second degree in violation of New York Penal Law § 120.14. Instead, the defendant's principal argument with respect to Charge Four appears to be that Ms. Peace's testimony is not credible because if the defendant had swung an IV pole at her and attempted to punch her, he should have been "immediately restrained." Def. Mem. at 10-11. He also argues that Ms. Peace had a motive to fabricate her testimony because she was "covering for the aggressive actions of a co-worker." <u>Id.</u> The Court should reject these arguments.

3

The government respectfully submits that Ms. Peace's testimony was clear and credible. Ms. Peace, an experienced emergency room nurse, testified that even though she felt "threatened" by the defendant's having swung an IV pole at her, she attempted to "deescalate the situation" and was able to persuade the defendant to provide another urine sample. Tr. 70-71. When defense counsel cross-examined Ms. Peace on her response to the menacing, Ms. Peace explained that the defendant "was a patient and it's a stressful situation to be in a hospital so I wanted to give him the benefit of the doubt so I deescalated the situation and allowed his care to continue." Tr. 80. The defendant also claims the fact that a portion of the available video from the hospital "does not show Mr. Braun attempt to strike Ms. Peace" and also depicts that the IV came out of the defendant's arm instead of being "ripped out" suggests that Ms. Peace's testimony is not credible. Def. Mem. at 11. This argument defies logic and common sense. Ms. Peace had already testified that the defendant's violent conduct towards her and other emergency room staff had occurred in a patient care area of the hospital where there were no video cameras. Tr. 75-76. And the precise way in which the defendant's IV came out of his arm as he was being escorted by security—an event that took place well after the defendant swung his IV pole at Ms. Peace and attempted to punch her—has no bearing on the charged conduct or Ms. Peace's credibility. The available evidence demonstrates that Ms. Peace repeatedly attempted to deescalate the defendant's violent and threatening conduct and, even after the defendant had menaced her, rendered aid to the defendant and treated him with care. Tr. 113. The Court should find Charge Four proven.

IV. <u>Charge Five</u> (Menacing of Edward Miller)

The Court should reject the weak argument offered by the defendant as to Charge Five that "reaching out and grabbing a person by their arm so hard that it hurts," Tr. 232, refusing to let go, and screaming at the person such that the person fears being punched does not constitute menacing in the third degree under New York Penal Law § 120.15. These actions reasonably put Mr. Miller in fear of imminent physical injury, which is the very definition of menacing. Mr. Miller testified that the defendant "grabbed" his arm and "refused to let go," Tr. 222, and that the defendant seized his arm "with enough force so that it hurt." Tr. 225. It was at that point that Mr. Miller raised his left hand above his head, which he explained he did because he "was afraid [the defendant] was going to hit me in the head with his right hand." Tr. 223. New York courts have recognized the elements of menacing in the third degree to be met even where no physical contact took place but where an individual stood in front of a victim with "his fist cocked in front of the [victim's] face." <u>Matter of Denzel F.</u>, 44 A.D.3d 389, 390, 843 N.Y.S.2d 60 (1st Dep't 2007). The defendant, straining to distinguish <u>Denzel F.</u>, argues in his opposition that cocking a fist in front of a face "is a clear act of aggression and physical threat designed to instill fear." Def. Mem. 14. But screaming threats at Mr. Miller, grabbing Mr. Miller's arm hard enough to cause pain, refusing to let go, and causing Mr. Miller to raise his arm because he thought he was going to be hit, Tr. 232, is clearer still. The defendant's actions as to Mr. Miller in the synagogue constituted menacing in the third degree and the Court should find Charge Five proven.

V.   <u>Charges Six and Eight</u> (Forcible Touching and Sexual Abuse of Danelle)

The defendant does not dispute that the facts as set forth in Danelle's testimony meet the elements of the crimes of forcible touching and sexual abuse. Instead, the defendant takes the position that Danelle's testimony—which was extensively corroborated by contemporaneous text messages sent to Danelle's husband and to the defendant's mother—was not credible because she did not disclose the full extent to the defendant's abuse to the officers who first responded to the scene. Def. Mem. at 15-16. The defendant claims that the fact that Danelle did not report to the responding officers that the defendant put her hand on his genitals or that he choked her and touched her neck means that she testified falsely under oath, and that the Court should disregard her testimony because of this purported false testimony. Def. Mem. at 17. This is nonsense. The Court had the opportunity to observe Danelle testify on two separate days and to carefully assess her demeanor and credibility. The government respectfully submits that Danelle's credibility was amply demonstrated by, among other things, her demeanor on the stand, her lack of any motive to lie, and her corroboration by other evidence in the record, including contemporaneous text messages.

There are many obvious reasons Danelle might not have disclosed all of the details of her sexual assault when the responding officers arrived. Danelle was in the same room and on the same bed where she had just been assaulted, and she was still in her abuser's home where her abuser remained. <u>See</u> DX D; GX7; Tr. 170-71, 355, 363; <u>see also</u> Tr. 148, 162. Additionally, Danelle testified that when officers arrived on the day of the assault she was exhausted and frightened and she just wanted to go home and "feel safe again." Tr. 171, 364. Danelle described the initial questioning by the responding officers and testified that she was "shaken up" and "couldn't think thoroughly or process [her] words." Tr. 364. She described the situation as "an invasive moment," Tr. 364, which is not surprising given that she was being asked to report the details of her sexual assault to unfamiliar officers while sitting on the bed where the sexual assault had just occurred.

Danelle's testimony is corroborated by contemporaneous text messages and a report made to law enforcement two days after the assault. In text messages Danelle sent to her husband on February 15, 2025, while she was locked in the bathroom for her safety following the defendant's assault, Danelle wrote, "I don't know what to [do.] He held me around my neck. . . I don't want him to hurt me[.] I'm afraid." GX11 at 2; Tr. 363. Two days after the assault, Danelle went to a police precinct to provide further information about the assault and told law enforcement officers that the defendant took her hand and placed it on his genitals. Tr. 365. On February 28, Danelle sent a message to the defendant's wife, writing, "I wanted to give you the full story but I also wanted to wait until he was arrested. Your husband tried to rape me." GX39.

In sum, Danelle's testimony was clear and credible and extensively supported by corroborating evidence. The Court should find Charges Six and Eight proven.

VI.     Charge Seven (Petit Larceny)

The defendant claims that the evidence in the record is insufficient to conclude that he was the driver of the white Lamborghini Urus and black Ferrari that repeatedly evaded the $4 toll on the Atlantic Beach Bridge in Nassau County, New York in the summer of 2024, although he concedes that cars of the same make and model "were parked at [his] residence." Def. Mem. at 19. The defendant fails to acknowledge or address, however, the attributes of the vehicles that repeatedly evaded the toll and the implausibility of the notion that any other individual was the driver of the vehicles.

Neither vehicle involved in the fare evasion had license plates and the white Lamborghini Urus had "Perillo" dealer plates. Tr. 42 (Webb's testimony), 383-86 (SA Costello's testimony). As reflected on video footage from cameras at the Atlantic Beach toll terminal (Government Exhibits 36 and 37), the white Lamborghini Urus with "Perillo" dealer plates is clearly the same vehicle that was captured on bodyworn camera footage from Nassau County Police Department officers who responded to a domestic violence incident at the defendant's home that he shared with his wife:[1]



**Lamborghini Urus
May 27, 2024 Fare Evasion (Government Exhibit 37)**



**Image of Lamborghini Urus from Bodyworn Camera Footage at 2115 Pacific Boulevard on August 20, 2024 (Government Exhibit 32)**

Photographs taken by the assigned United States Probation Officer, admitted as Government Exhibit 35, also reflect the same vehicle at the defendant's residence:

---

[1] It appears that this specific model of luxury vehicle is favored by the defendant. According to materials submitted by the defendant in connection with civil litigation with Allstate Insurance Company, in June 2022, the defendant was "loaned" another Lamborghini Urus from a family member and subsequently claimed it had been stolen. Complaint and "Loaner Agreement," Allstate Insurance Company v. Braun et al., 24-CV-2123 (E.D.N.Y. 2024), ECF Docket Entry No. 1-3.



In addition to this evidence, Raymond Webb, the Executive Director of the Nassau County Bridge Authority, testified that he became aware that a toll booth staff member named Ryan had recorded instances of toll evasion of a white Lamborghini Urus and a black Ferrari with no recorded license plate. Tr. 44-45; GX2 (Toll Evader Observation Sheet). Ryan subsequently identified the defendant in a photograph identification procedure administered by the Nassau County Police Department in connection with a criminal investigation into the fare evasion. The defendant appears to suggest that the toll booth staff member named Ryan who recorded the toll evasion may not be the same toll booth staff member named Ryan who identified the defendant in a photo identification procedure, Def. Mem. at 20, but this argument strains credulity. Mr. Webb confirmed the name of the toll booth staff member who identified the defendant and indicated that it was the same name as on the Toll Evader Observation Sheet. See Tr. 64-65 (identifying the individual in the supporting deposition marked for identification as GX3).

       The Court should find Charge Eight proven.

VII.    Charge Nine (Failure to Pay a Fine)

       The defendant does not appear to dispute that he has failed to make payments towards his fine in the amounts required by the payment schedule ordered by the Court. Nothing more beyond this failure is required to find Charge Nine proven and to revoke his supervised release. See United States v. Quow, No. CR-89-00248 (CPS), 1993 WL 8666, at *5 (E.D.N.Y. Jan. 12, 1993), aff'd, 996 F.2d 302 (2d Cir. 1993).

The defendant also does not appear to dispute that his failure to make such payments was willful. The defendant does not argue that he is unable to make payments and does not appear to dispute that he has access to large amounts of wealth, including homes, luxury cars, and cash. See, e.g., GX7 (February 15, 2025 bodyworn camera footage depicting the defendant's palatial home and the defendant stating that he is the owner of the home at 4:39); GX25 (showing the defendant gambling with tens-of-thousands of dollars in 2021). Courts have found such "unnecessary and non-vital expenditures," see Quow, 1993 WL 8666, at *5, relevant to assessing whether to impose a sentence of imprisonment in connection with the violation of supervised release.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
Tanya Hajjar
Rachel Bennek
Assistant U.S. Attorneys
718-254-7000

cc:    Kathryn Wozencroft, Esq. (by email and ECF)
       U.S. Probation Officer Heather Clark (by email)