EMR:TH
F. #2025R00212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -                 Docket No. 10-CR-433 (KAM)

JONATHAN BRAUN,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S SENTENCING MEMORANDUM
AS TO DEFENDANT JONATHAN BRAUN


                         JOSEPH NOCELLA, JR.
                         UNITED STATES ATTORNEY
                         Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201


Tanya Hajjar
Rachel A. Bennek
Assistant U.S. Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in advance of the defendant Jonathan Braun's sentencing in connection with six violations of supervised release proved at a four-day revocation hearing held between April and June 2025. As set forth below, due to the gravity of the defendant's breach of the Court's trust and the serious need for deterrence in this case, the government asks that the Court impose the maximum available term of 60 months' imprisonment.

## BACKGROUND[1]

I. Underlying Criminal Offense and Sentencing

The defendant Jonathan Braun pleaded guilty on November 3, 2011 to one count of conspiracy to import more than 1,000 kilograms of marijuana and one count of money laundering to promote the carrying on of narcotics trafficking. The defendant's conviction arose out of a Drug Enforcement Administration investigation into large-scale marijuana trafficking from Canada into the United States. Presentence Investigation Report Dated February 28, 2018 ("PSR") ¶¶ 6-15. The defendant trafficked more than $6 million in marijuana per week, using boats and private planes to smuggle the drugs across the border, and was responsible for laundering approximately $14 million in drug proceeds. Id. ¶¶ 8, 15. At the time of the defendant's arrest, law enforcement agents retrieved $77,000 in bundled cash, drug ledgers, 16 cellular telephones, and 5 identical fraudulent New York State driver's

---

[1] The Court is familiar with the factual background, offense conduct, and violations of supervised release in this case, having presided over both the defendant's prior criminal case and the revocation hearing. The following factual summary is intended to give an overview sufficient to situate the government's arguments related to the defendant's sentencing.

licenses from his residence in Staten Island. Id. ¶ 15. The defendant used threats and violence to collect his debts and deter cooperation with the government; after a stash house in California was raided by law enforcement, the defendant hit the individual who controlled the stash house with a belt and threatened him and his family if he did not repay the value of the seized marijuana. Id.

In advance of sentencing, the defendant sought leniency from the Court and claimed, among other things, that since his arrest and incarceration, he had "turn[ed] his life around" and "recommitted his life to his family, career, and faith." Def. Sentencing Memo, ECF Docket Entry No. 136, at 4. The defendant's sentencing submission indicated that he worked as a "manager and risk analyst at a private lending company, Richmond Capital Group, LLC" and enjoyed "a successful and stable career in this field." Id. at 2.[2] The defendant also submitted letters from his parents, his father-in-law, his wife and various friends indicating that the defendant had changed "tremendously from this huge wake up call that he experienced in his life," that he "deserved a chance to be free to take care of his family," and that he had undergone a "wonderful transformation" and had "managed to establish himself in the business world as . . . a leader to others in his own business community." Id. at 7, 8, 10.

---

[2] In 2020, the defendant and his company, Richmond Capital Group, LLC, were sued by the Federal Trade Commission for deceiving small businesses by misrepresenting the terms of merchant cash advances the business provided and using unfair collection practices, including threats of physical violence, to force borrowers to pay. In 2023, in consideration of the "egregiousness of Mr. Braun's conduct, the seriousness of the harm he inflicted on consumers, his continuing denial of his role in the misconduct, and the sheer number of times Mr. Braun engaged in misconduct," a district court in the Southern District of New York permanently enjoined the defendant from making merchant cash advances or participating in debt collection activities. F.T.C. v. RCG Advances, LLC, 695 F. Supp. 3d 368, 396–97 (S.D.N.Y. 2023).

At the defendant's sentencing on May 28, 2019, the Court calculated the applicable Guidelines range as 262 to 327 months' imprisonment. Sentencing Transcript ("Tr.") at 16. The Court noted that the defendant "used very sophisticated means to smuggle drugs into the United States," and that when a stash house controlled by the defendant was raided in 2009 by the DEA, agents "seized over 600 pounds of marijuana and approximately $500,000 in cash." Id. at 18, 28. Because of the raid, the defendant "fled to Israel and then to Canada, where he remained a fugitive from justice for several months before returning to the United States." Id. at 28. While a fugitive from justice, the defendant "continued to direct the operations of his drug organization by using encrypted cell phones to communicate with his associates and customers" and "personally negotiated with high level members of organized crime groups" regarding marijuana trafficking. Id. The Court also noted that the defendant "employed threats and actual violence to collect drug debts and to deter fellow co-conspirators from cooperating with the government." Id. at 29. The Court also considered the defendant's personal history and circumstances, including the support of his family members and their belief that the defendant had "changed his life." Id. at 31.

The Court ultimately sentenced the defendant to a significantly below-Guidelines sentence of 120 months' imprisonment; a five-year term of supervised release; a $100,000 fine, according to a payment plan specified by the Court; and a $200 mandatory special assessment. See Judgment, ECF Docket Entry No. 163. The Court ordered a payment schedule for the defendant's fine at the greater of (1) the minimum monthly rate of at least $2,500 per month; or (2) 15% gross monthly income after deductions required by law. Id. at 5.

On January 19, 2021, the defendant's sentence of imprisonment was commuted by President Donald J. Trump to time served, but the remainder of the defendant's sentence, including his term of supervised release and fine, were left intact.

The defendant's conditions of supervised release included, among other things, the requirement that the defendant "not commit another federal, state or local crime," that the defendant "work full time (at least 30 hours per week) at a lawful type of employment," and that the defendant provide the United States Probation Office with "truthful and complete disclosure of his financial records, including co-mingled income, expenses, assets and liabilities" and that the defendant provide "truthful monthly statements of his income and expenses" to "include all sources of income and all expenses." Id. at 3-5.

II. Violations of Supervised Release

Since his commencement of supervised release on January 19, 2021, and as set forth in further detail in the Court's September 5, 2025 Memorandum and Order ("Order"), the defendant committed six violations of supervised release, set forth below in chronological order:

A. Charge Nine (Failure to Pay a Fine)

As of the date the defendant began his term of supervised release, he failed to make payments towards his court-ordered fine in the amounts required by the payment schedule ordered by the Court. Order at 31-32. Instead, the defendant made sporadic and occasional monthly payments of as little as $25. See Defense Exhibit F. At the same time, as the Court found, between January 2021 and the present, the defendant had "access to funds that he used for various purposes instead of paying his court-ordered fine," including

employing a butler, gambling with over $25,000 in cash, living in a multi-million dollar property, and driving luxury vehicles. Order at 31-32.

B. Charge Seven (Petit Larceny)

Starting in at least May 2024 to July 2024, the defendant, who was driving a white Lamborghini Urus and a black Ferrari without license plates, repeatedly evaded paying the $4 toll on the Atlantic Beach Bridge in Nassau County, New York. The defendant evaded the toll by "following another car using the E-Z Pass system, tailgating them and following through the gates[,]" without paying a toll. Order at 28.

C. Charge Four (Menacing of Brianna Peace)

On January 24, 2025, while being treated at Mount Sinai South Hospital, the defendant screamed profanities at nursing staff. When Brianna Peace, an assistant nurse manager in the emergency department, approached the defendant, the defendant picked up the IV pole that was connected to his arm and began swinging it in her direction. Order at 16-17. Ms. Peace attempted to de-escalate the situation but explained that the defendant's wife, who was also screaming at hospital staff, would need to leave. Id. At that point, the defendant moved towards Ms. Peace and yelled profanities at her, including repeatedly saying that he was going to "fucking kill" her, until he was pushed back by hospital security. Id.

D. Charges Six and Eight (Forcible Touching and Sexual Abuse of Danelle)

On February 15, 2025, the defendant sat down on the bed of his live-in nanny, Danelle. He wrapped one arm around her upper body and one arm around her neck in a headlock position. Order at 22. While grabbing her in his arms, the defendant began

touching Danelle's breasts and told her that he had always wanted to have sex with her. Order at 23. Danelle told the defendant that she did not like what the defendant was doing and that she did not want to have intercourse with him, which caused the defendant to tighten his grip around her neck. Id. The defendant continued to touch Danelle without her consent and forced her hand under his clothes and onto his genitals. Id. To extricate herself from the defendant, Danelle told him that she had to use the restroom and, upon entering the bathroom, locked the door and woke her husband, with whom she had been on an ongoing FaceTime call. The defendant stayed outside the bathroom, asking Danelle to let him into the bathroom, pushing on the doorknob and saying that he would leave after Danelle made him orgasm. Id. at 22-24. Danelle was able to leave the bathroom only after police arrived.

    E.  <u>Charge Five</u> (Menacing of Edward Miller)

On March 22, 2025, at a synagogue in Lawrence, New York, the defendant began screaming and threatening Edward Miller after Mr. Miller politely asked him to stop speaking during the religious services. Order at 20-21. The defendant left the synagogue, returned after ten minutes, got close to Mr. Miller's face and said "Do you know who I am?" and "Do you know what I could have done to you?" Id. The defendant grabbed Mr. Miller's right arm so tightly with his hand that it caused Mr. Miller pain. Mr. Miller raised his left hand above his head in anticipation of shielding himself from being hit by the defendant. Mr. Miller asked the defendant to let him go, but the defendant refused. Id.

    F.  <u>Additional Conduct</u>

Significantly, and in addition to the criminal conduct set forth above, the defendant has attempted to circumvent the requirements of his supervised release. In particular, the defendant has failed to seek and maintain full-time employment as required by

6

the Court's conditions of supervised release, and he has repeatedly failed to make truthful and complete financial disclosures to the United States Probation Office.

For example, the defendant's financial disclosure form, dated April 2, 2025, indicates that he worked full-time as a marketing associate for Marketplace Advisors Inc. The Probation Office was not given any additional proof of employment. The government has interviewed the defendant's employer, who indicated that he employed the defendant as a favor to a mutual friend; that the defendant had no set schedule of hours to work; that the employer did not verify the hours the defendant claimed to work; and that he was in contact with the defendant "once in a while." In addition, the financial disclosure form indicates that between 2021 and approximately 2023, the defendant worked as a "underwriter/analyst" for Ground Support Solutions ("GSS"). As reflected in the report of interview enclosed hereto as Exhibit A, the president of GSS indicated to law enforcement that the defendant "made some attempts for two to three months to travel to GSS work sites" but that soon thereafter, the defendant "stopped working for GSS all together but was still paid by GSS."[3]

The government has received additional information, as reflected in the report of interview enclosed hereto as Exhibit B, that after the defendant's commencement of supervised release, the defendant continued to work in the merchant cash advance industry, using different entity names in order to avoid scrutiny by banking institutions. Specifically, the defendant "frequently used multiple email addresses and often pretended to be someone else, including his cousin." Exhibit B at 1. The defendant "frequently threatened physical

---

[3] Exhibit A and Exhibit B are filed in redacted form on the public docket because they contain personal identifying information of individuals and refer to the conduct of individuals other than the defendant.

7

and economic harm to individuals that were unable to pay back the money that [the defendant's] companies lent them" and "often taunted both debtors and employees that he 'knew people' and could hurt them both physically and financially." Id.  This information is corroborated by, among other things, Danelle's testimony that she heard the defendant on the phone threatening people if they did not pay him money.  Order at 25.

Lastly, the defendant has not supplied the Probation Office with a truthful financial disclosure of his assets.  His initial financial disclosure form listed no income or assets at all.  After the Probation Office followed up to request that he complete the detailed list of his combined income and expenses contained on page 8 of the form, the defendant reported no assets whatsoever—either for either himself or his spouse—except $2,532.10 per month in wages.  Given the defendant's overall financial circumstances, including access to cash, multi-million dollar properties, and use of luxury vehicles, the defendant has not provided truthful or complete disclosure of his assets to the Probation Office as required.

## APPLICABLE GUIDELINES CALCULATION

Because the Court has found that the defendant committed a Grade A violation (conduct constituting a federal offense punishable by a term of imprisonment exceeding one year that is a crime of violence), the applicable term of imprisonment under the Guidelines in connection with Charge Eight is 24-30 months' imprisonment, given the criminal history category calculated at the time the defendant was originally sentenced.  See United States Sentencing Guidelines ("U.S.S.G.") § 7C1.5.[4]

---

[4] Citations above are to the amended provisions of the United States Sentencing Guidelines effective November 1, 2025.

8

The Guidelines identify several relevant grounds for departure from the Guidelines range above. First, a "[w]here the original sentence was the result of a downward departure . . . an upward departure may be warranted." U.S.S.G. § 7C1.5, app. note 4. Second, in "the case of a Grade C violation that is associated with a high risk of new felonious conduct (e.g., a defendant, under supervised release for conviction of criminal sexual abuse, violates the condition that the defendant not associate with children by loitering near a schoolyard), an upward departure may be warranted." U.S.S.G. § 7C1.5, app. note 3. Since the defendant's original conviction involved threats of violence and actual violence, the government respectfully submits that the defendant's commission of Charges Four and Five, both Grade C violations involving menacing and threats of significant violence, are particularly concerning and warrant an upward departure pursuant to the Guidelines.

In sentencing the defendant, the Court must "conduct an individualized assessment to determine the appropriate length of the term of imprisonment." U.S.S.G. § 7C1.4(a); see also United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988) ("[T]he court is virtually unfettered with respect to the information it may consider."). The Court should consider, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the

defendant," and "the need to provide restitution to any victims of the offense." 18 U.S.C. §§ 3583(e), 3553(a); see Esteras v. United States, 145 S. Ct. 2031, 2036 (2025).[5]

ARGUMENT

The government respectfully submits that a sentence of 60 months' imprisonment is necessary to afford adequate deterrence, to account for the gravity of the defendant's breaches of the Court's trust, and to protect the public from further crimes by the defendant.

As demonstrated at the revocation hearing, the defendant's brazen and violent conduct caused fear and terror in his victims. The defendant's conduct reflects that he is a serious danger to the community and a lengthy term of imprisonment is necessary to protect the public from further crimes. The defendant forcibly groped and sexually abused Danelle, his live-in nanny in his own home while his children slept. The defendant tightened his hand around Danelle's neck when she said that she did not like what he was doing to her. Danelle was terrified of the defendant and threw up from fear and shock. As reflected in her contemporaneous text messages, she was frantic and fearful for her life. See GX11 at 5 ("I don't want to go back out what if he hurts me"), 9 ("He's going to kill me"), 10 ("He's going to kill me[.] He's getting mad[.] I know how he gets")). Danelle's ordeal only ended once police officers were called to the scene. The defendant also screamed profanities at nursing staff at the hospital in which he was being treated and violently threatened Brianna Peace

---

[5] Although restitution to victims appears to be available in a violation of supervised release proceeding, see, e.g., Judgment, United States v. Brown, 20-CR-34 (MKB) (E.D.N.Y. 2022), the government has not received affidavits of loss from any identified victims and is therefore not seeking restitution at this time.

10

with an IV pole and repeatedly told Ms. Peace that he was going to "fucking kill" her. He screamed threats of physical harm at Edward Miller, who was attempting to worship at his local synagogue, and grabbed his arm tightly enough to cause pain. The defendant asked Mr. Miller, "do you know who I am?" and "do you know what I can do to you?" Mr. Miller similarly testified that he was "absolutely terrified."

The defendant also flouted his conditions of supervised release by making false and inaccurate disclosures regarding his employment and finances and failing to pay his court-ordered fine and evading tolls despite having access to extraordinary wealth. These actions demonstrate the defendant's lack of respect for the Court and his continued efforts to avoid taking responsibility for his crimes.

The defendant's use of violence and threats, far from being aberrant, are entirely consistent with the defendant's criminal conduct in the commission of his underlying narcotics trafficking offense. As set forth in detail in the government's submission seeking detention, when the defendant discovered that one of his stash houses in California had been robbed, he contacted the "kid" who was watching the stash house and demanded that he compensate the defendant for the loss. Gov't Memo, ECF Docket Entry No. 14, at 27. Braun and a criminal associate immediately went to the stash house and Braun viciously beat the "kid" with his belt. Id. When the "kid" tried to get away from Braun, Braun's associate pushed him back down on the bed so that Braun could continue the beating. Id. In Braun's own words as reported to multiple witnesses, his assault left the "kid's" entire body "black and blue." Id. As a result of Braun's threats and violence, the debt was eventually repaid in full. In addition, Braun threatened violence against his criminal associates to prevent them from cooperating with law enforcement. Id. at 28.

11

At the sentencing on his offense of conviction, the defendant successfully sought leniency from this Court with claims that he was a changed man who had, in his wife's words, "learned his lesson" and begun stable employment at Richmond Capital Group, LLC. The Court acknowledged these arguments and sentenced the defendant to a term of imprisonment that was less than half of the bottom of the applicable Guidelines range of 262 to 327 months' imprisonment. But the defendant had continued to participate in the same violent, extortionate conduct after he was arrested for large-scale narcotics trafficking. As detailed in considerable length by the Honorable Jed S. Rakoff in issuing judgment in F.T.C. v. Braun, a lawsuit stemming from the defendant's activities in the merchant cash advance industry, the defendant personally participated in "blatantly illegal conduct" at Richmond Capital and did so "gleefully, with little remorse." No. 20-CV-4432 (JSR), 2024 WL 449288, at *4-5 (S.D.N.Y. Feb. 6, 2024). Among other violent threats and conduct, the defendant threatened to send a borrower to jail and said he would spit on his "fucking face on visiting day" in prison. Id. The defendant told the borrower to drive his Honda "off a cliff" and called him a "fucking lowlife," a "loser," a "degenerate" and "a piece of shit." Id.

A sentence of 60 months' imprisonment is necessary to address the serious need for deterrence, incapacitation and rehabilitation in this case. As the Second Circuit has explained:

> [E]ven though supervised release fulfills rehabilitative ends, distinct from those served by incarceration, it is still, like probation or parole, a grant of leniency based on a defendant's promise to follow certain conditions. A defendant's ability to follow those conditions reflects the trust placed in him by the sentencing court—essentially, the defendant promises he is able to return to society and function as a responsible, self-reliant person. Thus . . . any sanctions resulting from violations of supervised release conditions, even if based on new criminal

conduct, are first and foremost considered sanctions for the
defendant's breach of trust. . . . this approach is fully consistent
with supervised release's rehabilitative goals, as it does not
focus on punishing new conduct, but instead, on sanctioning the
individual for failure to abide by the conditions of his new, law-
abiding life.

United States v. Peguero, 34 F.4th 143, 61-162 (2d Cir. 2022) (internal alterations, quotations, and citations omitted); see Esteras, 145 S. Ct. at 2043 ("[I]f the defendant's original offense was particularly violent, that fact might inform the court's judgment as to whether revocation is necessary 'to protect the public from further crimes of the defendant.'").

The Court should reject outright the suggestions—made throughout the defendant's sentencing submission—that the defendant's conduct was aberrant, limited in time, or that the defendant has now accepted responsibility for his behavior or expressed remorse for his actions. As described above, the defendant has engaged in deceptive conduct and criminal activity for years. The defendant's claims that his crimes were committed during a "brief, intense period" during which he engaged in substance abuse, Def. Mem. at 1, is entirely belied by the duration and scope of his criminal activity. The defendant understates the gravity of his violations by "compressing the defendant's entire record of misconduct as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred over a lifetime of otherwise immaculate behavior. There is a fallacy in this argument. It distorts the record[.]" United States v. Regensberg, 635 F. Supp. 2d 306, 309 (S.D.N.Y. 2009), aff'd, 381 F. App'x 60 (2d Cir. 2010). There is substantial reason to doubt the defendant's contention that his "abhorrent behavior" was the result of a "manic episode" precipitated by drug abuse. Def. Mem. at 1-2. Body-worn camera footage from law enforcement officers who responded to the defendant's home in Lawrence shortly after the

13

defendant sexually abused Danelle reflects that the defendant was cogent and lucid in his interactions with the officers. As depicted in two clips of the defendant's interactions with officers on the morning of February 15, 2025, provided to the Court as Exhibits C1 and C2, the defendant lied about his crime and told the officers, among other things, that he never sat on the bed with Danelle and never put her arms around her. The defendant baselessly accused Danelle of seeking to "make money or something" by calling law enforcement for assistance. The defendant's behavior and attempts at manipulation are not consistent with the "medical and psychiatric breakdown" claimed in the defendant's sentencing submission. Def. Mem. at 2. Nor could it be plausibly asserted that the defendant's failure to pay the court-ordered fine and his fare evasion are wholly attributable to substance abuse. Even if the defendant's actions were aggravated by drug abuse—also prohibited by the conditions of the defendant's supervised release—substance abuse is not a mitigating factor at sentencing. See U.S.S.G. § 5H1.4.

    The defendant now appears to claim, as he did at his sentencing before the Court in May 28, 2019, that his "stability and insight" have been restored and that he has "expressed remorse and accountability," Def. Mem. at 2, but there is no support whatsoever for this assertion. At no time has the defendant accepted responsibility for his crimes or expressed remorse for his victims, and, at every stage of this proceeding, he has challenged the credibility of the victims in this case. The defendant's apparent inability to appreciate the seriousness of his conduct suggests that a significant sentence is particularly important for specific deterrence and protection of the public. See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of

14

substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order); accord United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)).

During the course of the defendant's narcotics trafficking operations, his participation in the merchant cash advance industry, and his conduct as detailed during the revocation hearing, the defendant used violence and threats against those the defendant perceived to be vulnerable: individuals who owed Braun money or who were employed by him. The defendant's abusive behavior, his attempts at deception and manipulation, and his disregard for his conditions of supervised release all weigh in favor of a term of incarceration of 60 months given the unique need for deterrence presented in this case.

## CONCLUSION

For the reasons above, the government respectfully submits that a sentence of 60 months is sufficient but no greater than necessary to achieve the goals of sentencing.

Dated:     Brooklyn, New York
          October 31, 2025

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/
      Tanya Hajjar
      Rachel Bennek
      Assistant U.S. Attorneys
      718-254-7000